## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| VENOCO, LLC, | Case No. 17-10828 (JTD) |
| Liquidating Debtor. | |
| EUGENE DAVIS, in his capacity as Liquidating Trustee of the Venoco Liquidating Trust, | Adv. Pro. No 18-50908 (JTD) |
| Appellant, | |
| v. | Civil Action No. 1:22-cv-01174-CFC |
| STATE OF CALIFORNIA and CALIFORNIA STATE LANDS COMMISSION, | |
| Appellees. | |

## APPELLANT'S BRIEF

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

Robert J. Dehney (No. 3578)
Andrew R. Remming (No. 5120)
Matthew O. Talmo (No. 6333)
1201 North Market Street,
16th Floor
P.O. Box 1347
Wilmington, Delaware 19899
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
rdehney@morrisnichols.com
aremming@morrisnichols.com
mtalmo@morrisnichols.com

**BRACEWELL LLP**

Warren W. Harris (admitted *pro hac vice*)
Nancy McEvily Davis (admitted *pro hac vice*)
Stephani A. Michel (admitted *pro hac vice*)
711 Louisiana, Suite 2300
Houston, Texas 77002
Telephone: (713)-221-1520
Facsimile: (800) 404-3970
Warren.Harris@bracewell.com
Nancy.Davis@bracewell.com
Stephani.Michel@bracewell.com

*Counsel for the Liquidating Trustee, Appellant*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Civil Procedure 7.1(a) and Federal Rule of Bankruptcy Procedure 8012, Eugene Davis, solely in his capacity as Liquidating Trustee (the "Trustee") of the Venoco Liquidating Trust (the "Trust"), makes the following disclosure:

The Trust has no parent corporation, and no publicly held corporation owns 10% or more of any Trust stock.

The debtors not named in the caption were: TexCal Energy (LP) LLC; Whittier Pipeline Corporation; TexCal Energy (GP) LLC; Ellwood Pipeline, Inc.; TexCal Energy South Texas, L.P.  Whittier Pipeline Corporation has no parent corporation, and no publicly held company holds 10% or more of its stock.  Ellwood Pipeline, Inc. has no parent corporation, and no publicly held company holds 10% or more of its stock.

# **TABLE OF CONTENTS**

*Page*

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES.........................................................................v

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT ........................................................4

ISSUES PRESENTED...........................................................................5

STANDARD OF REVIEW ....................................................................5

STATEMENT OF THE CASE................................................................6

    A.    Venoco, with the Commission's approval, acquired offshore leases in the South Ellwood Field, and produced oil and gas there until a pipeline ruptured. .............................................6

    B.    Venoco first filed for bankruptcy in March 2016; one year later, the Commission began negotiating with Venoco a transition agreement covering the South Ellwood Field assets....................................................................................8

    C.    As a result of their negotiations, Venoco and the Commission executed a Reimbursement Agreement in April 2017. ......................10

    D.    After Venoco quitclaimed the leases and again filed for bankruptcy, the Commission hired a contractor that would assume operations at the EOF and Platform Holly in September 2017. ................................................................................11

    E.    The Commission entered into the Gap Agreement with Venoco, and agreed to pay Venoco for the Commission's use of the EOF. .......................................................................................13

    F.    Venoco notified the Commission of its intent to terminate the Gap Agreement, but the Commission refused to vacate the EOF..................................................................................................15

*Page*

G.    The Trustee sued Defendants for inverse condemnation, and the bankruptcy court ultimately held that the Commission's free use of the EOF constituted a valid exercise of the State's police powers ...................................................................................16

SUMMARY OF THE ARGUMENT ....................................................17

ARGUMENT .........................................................................................20

I.    The Bankruptcy Court Erred in Concluding That an Emergency Existed to Justify Application of the Police-Powers Exception..................20

A.    The police-powers exception applies only in limited circumstances not applicable here......................................................20

B.    The bankruptcy court ignored that an emergency justifying the police-powers exception must be imminent................................22

1.    An "emergency" requires an "imminent" threat to the public's health or safety.............................................................23

2.    There was no imminent threat to the public's health or safety posed by Venoco's alleged "threats" to leave the EOF unmanned. .......................................................................25

3.    There was no "imminent" threat to the public's health and safety during the pendency of the plugging and abandoning process. ...............................................................31

4.    After September 15, 2017, Defendants could have exercised their eminent domain authority to pay for their continued use and occupancy of the EOF. .....................35

C.    The bankruptcy court erred in ignoring that an emergency justifying the police-powers exception must be unforeseeable.......................................................................................38

*Page*

D.      The bankruptcy court erred in ignoring Defendants' choice
not to enforce their contractual and statutory rights to require
ExxonMobil to perform the plugging, abandoning, and
decommissioning work. .....................................................................44

CONCLUSION ......................................................................................................49

CERTIFICATE OF COMPLIANCE ......................................................................51

## <u>TABLE OF AUTHORITIES</u>

*Page(s)*

*Cases*

*Bauer v. Ventura Cnty.*,
  289 P.2d 1 (Cal. 1955) ......................................................................37

*Cal. State Lands Comm'n v. Davis*,
  142 S. Ct. 231 (2021) .......................................................................16

*Cedar Point Nursery v. Hassid*,
  141 S. Ct. 2063 (2021) .................................................................20, 24

*Chi., Burlington & Quincy Ry. Co. v. Illinois*,
  200 U.S. 561 (1906) ....................................................................46, 49

*City of Anaheim v. Michel*,
  66 Cal. Rptr. 543 (Cal. Ct. App. 1968) .............................................36

*City of Oakland v. Oakland Raiders*,
  646 P.2d 835 (Cal. 1982) ..................................................................36

*Commonwealth v. Barnes & Tucker Co.*,
  371 A.2d 461 (Pa. 1977) ...................................................................23

*Customer Co. v. City of Sacramento*,
  895 P.2d 900 (Cal. 1995) ..................................................................22

*In re Exide Techs.*,
  607 F.3d 957 (3d Cir. 2010) ................................................................5

*Holtz v. Superior Ct.*,
  475 P.2d 441 (Cal. 1970) ..................................................................20

*House v. L.A. Cnty. Flood Control Dist.*,
  153 P.2d 950 (Cal. 1944) .........................................21, 22, 23, 33, 34

*Irwin v. City of Minot*,
  860 N.W.2d 849 (N.D. 2015) ............................................................30

*Page(s)*

*Leppo v. City of Petaluma,*
   97 Cal. Rptr. 840 (Cal. Ct. App. 1971)...............................................48

*Los Osos Valley Assocs. v. City of San Luis Obispo,*
   36 Cal. Rptr. 2d 758 (Cal. Ct. App. 1994)......................... 23, 24, 33, 39, 44, 49

*In re MD Helicopters, Inc.,*
   641 B.R. 96 (D. Del. 2022)........................................................5

*Nassr v. Commonwealth,*
   477 N.E.2d 987 (Mass. 1985).................................................24, 34

*Odello Bros. v. Cnty. of Monterey,*
   73 Cal. Rptr. 2d 903 (Cal. Ct. App. 1998).............................21, 36, 39, 41, 44

*Pa. Coal Co. v. Mahon,*
   260 U.S. 393 (1922)...........................................................20, 35

*Redevelopment Agency of Burbank v. Gilmore,*
   700 P.2d 794 (Cal. 1985).........................................................37

*Ridge Line, Inc. v. United States,*
   346 F.3d 1346 (Fed. Cir. 2003) ...................................................5

*Riley v. Kennedy,*
   553 U.S. 406 (2008)..............................................................4

*Rose v. City of Coalinga,*
   236 Cal. Rptr. 124 (Cal. Ct. App. 1987)........................................29, 45

*San Christina Inv. Co. v. City & Cnty. of San Francisco,*
   141 P. 384 (Cal. 1914).........................................................24

*Smith v. Cnty. of Los Angeles,*
   262 Cal. Rptr. 754 (Cal. Ct. App. 1989)....................................30, 31, 45

*Textainer Equip. Mgmt. Ltd. v. United States,*
   115 Fed. Cl. 708 (Fed. Cl. 2014) ................................................29

*Thousand Trails, Inc. v. Cal. Reclamation Dist. No. 17,*
   21 Cal. Rptr. 3d 196 (Cal. Ct. App. 2004)....................................22, 34, 39

*Page(s)*

*In re Trans World Airlines, Inc.*,
  145 F.3d 124 (3d Cir. 1998) ................................................................5

*TrinCo Inv. Co. v. United States*,
  722 F.3d 1375 (Fed. Cir. 2013) .........................................................23

*United States v. Caltex*,
  344 U.S. 149 (1952)..........................................................21, 23, 34

*In re Upstream Addicks & Barker (Tex.) Flood Control Reservoirs*,
  146 Fed. Cl. 219 (Fed. Cl. 2019) ....................................24, 39, 43, 44

*In re Venoco, LLC*,
  998 F.3d 94 (3d Cir. 2021) ...........................................................4, 16

*In re Venoco, LLC*,
  No. 19-463-CFC, 2019 WL 2117638 (D. Del. May 15, 2019) ...........4

*Yox v. City of Whittier*,
  227 Cal. Rptr. 311 (Cal. Ct. App. 1986)............................................37

**Statutes**

28 U.S.C. § 157(b) ....................................................................................4

28 U.S.C. § 158(a)(1)................................................................................4

28 U.S.C. § 1334(b) ..................................................................................4

Cal. Civ. Proc. Code § 1255.410(a)........................................................37

Cal. Pub. Res. Code § 3237(c)(2) ...........................................................46

**Rules**

Fed. R. Bankr. P. 8012...............................................................................i

Fed. R. Civ. P. 7.1(a).................................................................................i

*Page(s)*

**Constitutional Provisions**

U.S. Const. amend. V ..................................................................................... 20

Cal. Const. art. 1, § 19(a) .............................................................................. 20

**Other Authority**

*Emergency,* Oxford English Dictionary,
   https://www.oed.com/view/Entry/61130?redirectedFrom=
   emergency#eid) ............................................................................................ 39

## <u>INTRODUCTION</u>

This case involves an important constitutional issue: the scope of the police-powers emergency exception to the just compensation requirement.  The bankruptcy court erroneously found that the exception applies here, such that it excused (and continues to excuse) the State of California and the California State Lands Commission[1] from paying for their now more-than-five-year use and occupancy of a privately owned oil and gas processing facility in California.  This was so even though Defendants' use and occupancy of the facility began by negotiated contracts with the property's then-owner, Venoco, under which Defendants agreed to pay Venoco for their use of the facility.  In fact, Defendants did pay Venoco for their use of the facility for more than a year.

But that changed in October 2018.  Then, for the first time, Defendants declared that an "emergency" required their presence on the facility.  Defendants also claimed that this alleged "emergency" had always entitled them to use the property for free, despite their history of paying for its use.  Defendants continue to use and occupy the facility and refuse to make any payment to compensate the Trust for that use.

---

[1] The State of California ("State") and the California State Lands Commission ("Commission") are referred to together herein as "Defendants."

The bankruptcy court found this unpaid taking to be legally permissible based upon the existence of an "emergency" in April 2017 when the Commission believed Venoco would abandon the facility.  At that time, however, there was no emergency; indeed, there was no "taking" at all because the Defendants' presence at the facility was permitted by the terms of the agreements with Venoco.  The bankruptcy court further found that even after the alleged "emergency" had been resolved by the hiring of Defendants' own contractor to staff the facility in September 2017, the unpaid taking could continue until Defendants completed a multi-year, offshore plugging and abandoning of offshore wells—even though the bankruptcy court found that plugging and abandoning of the wells was "not necessary" to protect health and human safety.

These erroneous holdings significantly expand the police-powers exception, which applies only where there is an "imminent" threat of harm and "unforeseen" circumstances calling for immediate action.  No such imminent threat or unforeseen circumstances existed here, and certainly no ongoing imminent threat or unforeseen circumstance justifies the continuation of Defendants' unpaid occupation of the property to this day.  The lack of an emergency is clearly demonstrated by the fact that when the alleged emergencies arose, Defendants decided not to seize the facility. Instead, they weighed their options, entered into contracts to pay for their use of the property, and then retroactively declared an emergency when they no longer wished

to pay for that use.  These are not the actions of a government facing an imminent threat of harm to the public.  These are the actions of a government seeking to correct what they admitted at trial was a budgeting error and to avoid the constitutionally required payment of just compensation.

Additionally, the bankruptcy court failed to consider that Defendants had, but chose not to enforce, statutory and contractual rights to address the alleged "emergencies" by ordering ExxonMobil, the immediately preceding operator, to take over the leases, plug and abandon the wells, and decommission the facilities. By ignoring the evidence presented at trial that enforcement of these rights was a viable alternative to the unpaid taking, the bankruptcy court erroneously found that Defendants "had no choice" but to take over operations at the facility themselves. Properly considered in light of the evidence that the bankruptcy court ignored, it is clear that Defendants made an arbitrary choice to rely upon their police powers instead of their contractual and statutory rights, saddling the property owner with the financial burden of supporting the plugging and abandoning effort instead of ExxonMobil.  This violates the California constitution's and the Fifth Amendment's guarantee of "just compensation" when property is taken for a public use.

Under well-established precedent, the circumstances surrounding Defendants' unpaid taking are legally insufficient to excuse Defendants of their constitutional duty to pay for the taking of private property.  This Court should

reverse the bankruptcy court's judgment, find that no emergency exists to excuse Defendants' unpaid taking, and remand the case to the bankruptcy court for findings on the amount of just compensation owed.

## JURISDICTIONAL STATEMENT

The bankruptcy court's Final Judgment in the adversary proceeding, entered on August 23, 2022, "end[ed] the litigation on the merits and le[ft] nothing for the court to do but execute the judgment." *Riley v. Kennedy*, 553 U.S. 406, 419 (2008) (internal quotations omitted); A1503. This Court thus has appellate jurisdiction over the Trustee's appeal of the Final Judgment. 28 U.S.C. § 158(a)(1). The Trustee timely filed the notice of appeal on September 6, 2022. A1504-07.

The bankruptcy court also had core jurisdiction over the adversary proceeding pursuant to 28 U.S.C. §§ 157(b), 1334(b), and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated February 29, 2012.[2]

---

[2] Although Defendants objected to the bankruptcy court's jurisdiction over the adversary proceeding, the bankruptcy court found that core jurisdiction existed, and this Court denied Defendants' Motion for Leave to Allow Interlocutory Appeal of the bankruptcy court's jurisdictional ruling. *See In re Venoco, LLC*, No. 19-463-CFC, 2019 WL 2117638, at *1, 4 (D. Del. May 15, 2019); *see also In re Venoco, LLC*, 998 F.3d 94, 100 (3d Cir. 2021) ("The District Court granted leave for the California Parties to appeal only the Bankruptcy Court's ruling on their sovereign immunity defense and did not allow interlocutory appeal of other issues.").

## ISSUES PRESENTED

1.   Did the bankruptcy court err in concluding that the police-powers exception to the just compensation requirement for inverse condemnation applied?

2.   Did the bankruptcy court err in ignoring ExxonMobil's obligations to plug and abandon the wells?

## STANDARD OF REVIEW

This Court reviews "the bankruptcy court's legal determinations *de novo*, its factual findings for clear error and its exercise of discretion for abuse thereof." *In re MD Helicopters, Inc.*, 641 B.R. 96, 102 (D. Del. 2022) (quoting *In re Trans World Airlines, Inc.*, 145 F.3d 124, 131 (3d Cir. 1998)).  For mixed questions of law and fact, this Court "engage[s] in a mixed standard of review, affording a clearly erroneous standard to integral facts, but exercising plenary review of the lower court's interpretation and application of those facts to legal precepts."  *See In re Exide Techs.*, 607 F.3d 957, 962 (3d Cir. 2010) (cleaned up).  Because the question of whether a taking has occurred is "a question of law based on factual underpinnings," *see Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1352 (Fed. Cir. 2003), this Court's mixed standard of review applies to the issue of whether the police-powers exception is applicable here.

## STATEMENT OF THE CASE

***A.      Venoco, with the Commission's approval, acquired offshore leases in the South Ellwood Field, and produced oil and gas there until a pipeline ruptured.***

This dispute involves an on-shore oil and gas processing facility known as the Ellwood Onshore Facility (the "EOF"), which is situated on a triangular-shaped, 4.46-acre site in Goleta, California.   A0164, A0167.   The EOF is connected by pipeline to Platform Holly—an offshore platform located off the California coast in state waters that was historically used to conduct operations at thirty offshore wells in an area known as the South Ellwood Field.   A0166, A0168.   The gas produced from those wells contains hydrogen sulfide.   A1455.   Use of the EOF, including around-the-clock monitoring by the facility's trained staff, is necessary to control that gas.   A1455, A1481.   And the Commission has "always known" this.   *See* A0916, A0941, A0982.

Beginning in 1964, the Commission, on behalf of the State, executed oil and gas leases covering the South Ellwood Field.   A0166; *see also* A1298-1315.   Those leases entitled the lessee to unilaterally quitclaim the leases back to Defendants (*i.e.*, the State and the Commission).   A1303-04.   They also required the lessee to pledge a bond in favor of the State in support of the obligations in the leases.   A1306 (requiring bond "to guarantee the faithful performance by the Lessee of the terms,

covenants, and conditions of this lease ….").  They further required State approval to transfer the leases.  A1302-03.

For a time, Mobil Oil Company (ExxonMobil's predecessor in interest) was the lessee under these leases.  A0167, A0864.  But in 1997, Mobil—with the State's approval—transferred the leases to Venoco.  A0167, A0864-65.  As part of the transaction, Venoco also acquired fee simple ownership of the EOF.[3]  A0167; *see also* A0866 (Commission's acknowledgement that it had no "ownership interest in the EOF").

Pursuant to the lease transfer, Venoco (like its predecessor lessees) was contractually required to maintain financial assurance for its obligations under the leases.  A1306.  The Commission thus required Venoco to post a bond that would protect the State if Venoco abandoned the leased premises, including by covering any costs of plugging, abandoning, and decommissioning the wells and Platform Holly.  A0864-66; *see also* A0167.

After the transfer, Venoco used Platform Holly to operate its 100% working interest in the leases in the South Ellwood Field.  A0168.  Oil and gas from Platform Holly were transported through pipelines to the EOF, where the oil and gas were processed and carried to market by a pipeline owned by Plains All American Pipeline

---

[3] This makes ExxonMobil Venoco's predecessor in interest to the leases, the EOF, and some of the wells.  A0167.

Company. A0168. In May 2015, however, the pipeline ruptured. A0168. Without that pipeline, Venoco could not commercially sell oil and gas produced from the South Ellwood Field. A0168. To date, there has been no commercial production from Platform Holly to the EOF since the pipeline ruptured. A0168.

**B.      *Venoco first filed for bankruptcy in March 2016; one year later, the Commission began negotiating with Venoco a transition agreement covering the South Ellwood Field assets.***

Following the pipeline rupture, Venoco and some of its affiliates filed for bankruptcy for the first time in March 2016. A0168. The Commission was aware of this filing, and during and after the first bankruptcy, renegotiated and increased the amount of Venoco's bond. A0869-70.

At this time, the Commission was also aware that the pipeline remained offline, leaving Venoco no way to transport oil and gas to market. A0980-81. Indeed, by the beginning of 2017, Venoco and the Commission were "in fairly regular contact" regarding Venoco's ongoing "attempt to save the company." A0206-07 (noting that in-person meetings, phone calls, and emails were "ongoing" in "three or four months" before April 2017 "as it became apparent that [Venoco] didn't have a way out").

As a result of this "regular contact," in March 2017 the Commission and Venoco began negotiating a transition services agreement under which Venoco would transition operation of the South Ellwood Field assets to the Commission.

A1325-28.  Counsel for Venoco emailed counsel for the Commission and outlined two scenarios "based on our discussions with [the Commission and its] team …." A1325.  He also provided "a timeline for each of the scenarios," noting that the "dates are not hardened (although they're probably quite close to reality)."  A1325.

Under the first scenario, Venoco would execute a transition services agreement with the Commission and quitclaim the leases.  A1325.  In exchange, Venoco would agree to continue to staff personnel at the EOF at its own expense to maintain then-current operations through April 25, 2017.  A1325.  Under the second scenario, ExxonMobil would pay Venoco not to quitclaim the leases, thereby preserving ExxonMobil's option to step in as the operator of the leases.  A1326.  Venoco and ExxonMobil would enter into a transition services agreement under which Venoco personnel would remain on the South Ellwood assets until termination of that agreement.[4]  *See* A1326.

Venoco ultimately proceeded with the first scenario.  On April 12, 2017, Michael Wracher (Venoco's Chief Operating Officer) emailed Jennifer Lucchesi, (the Commission's Executive Officer, A0857-58) informing her that, "as [Venoco]

---

[4] Venoco made this offer knowing that the Commission had a statutory right to pursue ExxonMobil and other prior operators seriatim to assume the responsibility for plugging and abandoning the wells or decommissioning of the production facilities.  *See infra* Part I.D.  The Commission could have required ExxonMobil to continue to pay Venoco to operate the EOF and Platform Holly or otherwise take over operations itself.  *Id.*

ha[d] discussed" with the Commission, Venoco would "soon be unable to continue meeting its obligations under the South Ellwood Field Leases." A1329. This came as no surprise to the Commission, which was by then well aware of Venoco's deteriorating financial condition. A0980.

Mr. Wracher continued that Venoco might be quitclaiming its interests in the South Ellwood Field leases "in the near future." A1329. Even so, Mr. Wracher made clear that Venoco would continue operations at the EOF through April 30, 2017, at Venoco's expense, in order to maintain a safe transition:

> As we have also discussed, Venoco intends to work with the [Commission] to facilitate a safe and responsible transition for the South Ellwood Leases and to ensure that the assets remain prepared for the plug and abandonment process. With that commitment in mind, while Venoco remains the owner and operator of the [EOF], … the Company intends to allow for continued operational support from EOF recognizing that it is operationally necessary for the plugging and abandoning of the South Ellwood Field.

A1329. The email further relayed Venoco's willingness to maintain operations "for a short transition period beyond April 30, 2017, provided that an acceptable reimbursement agreement" with the Commission could be finalized. A1329.

### C. As a result of their negotiations, Venoco and the Commission executed a Reimbursement Agreement in April 2017.

Venoco and the Commission executed an Agreement for Reimbursement of Temporary Services (the "Reimbursement Agreement") on April 14, 2017, two days after Ms. Lucchesi received Mr. Wracher's email. A1338. The purpose of the

Reimbursement Agreement was to effectuate an orderly transition of the EOF and Platform Holly from Venoco to the Commission.  A0210, A0282-83, A1338-39.

Under the Reimbursement Agreement, Venoco agreed to maintain operations at the EOF and Platform Holly at Venoco's expense through April 30, 2017.  *See* A1338-39, A1344.  After that time, Venoco would continue to work at the EOF and Platform Holly, but the Commission would reimburse the actual costs of that work. A1344.  Additionally, the Commission agreed to pay an initial deposit of $1,120,000 to be applied to Venoco's actual costs.  A1346.

### D.    *After Venoco quitclaimed the leases and again filed for bankruptcy, the Commission hired a contractor that would assume operations at the EOF and Platform Holly in September 2017.*

Venoco ultimately quitclaimed the leases on April 17, 2017, and surrendered all its rights, title, and interests in the leases to the Commission.  A0169, A1332. Nonetheless, Venoco employees continued to work at the EOF and Platform Holly to maintain a safe transition of operations.  A0283.

On the same day as the quitclaim, Venoco and the other Debtors filed for bankruptcy for the second time.  A0169.  Soon after, the Commission notified Venoco that it intended to call upon Venoco's bond.[5]  A0880-81, A1358-59.  The Commission copied ExxonMobil on its correspondence with the bonding company

---

[5] The State was later paid the full amount of Venoco's bond.  A0870-71.

because the Commission believed ExxonMobil had a duty to plug, abandon, and decommission the wells if Venoco was unable to do so. A0881-82. Indeed, the Commission knew that if Venoco could not meet its obligations under the leases, then the Commission or ExxonMobil would be responsible for the wells and deciding how to handle the hydrogen sulfide produced from the wells. A0982.

This reality was highlighted when a division of the State ordered Venoco to plug and abandon the wells on May 15, 2017. A0905. Shortly after that order, the division sent a letter to ExxonMobil stating that ExxonMobil—as the immediately preceding operator—would be responsible for any remaining unpaid cost to plug and abandon the wells that Venoco could not pay. A1398. Consequently, to limit its own liability for the decommissioning costs, the Commission entered into a settlement agreement with ExxonMobil, reaffirming that ExxonMobil would not be released "from any obligations to [the Commission] under the Leases" and that the Commission could seek fulfillment of *all* the obligations in the leases from ExxonMobil (including plugging and abandoning). A0904-05, A1397.

Around that same time, the Commission published a solicitation to hire an engineering consultant that could take over operations from Venoco in September 2017. A0882-85. The Commission ultimately selected Beacon West as its contractor and entered into a five-year agreement. A0885-86. The Beacon West Agreement specified that Beacon West was hired "to continue the safe daily

-12-

operations of Platform Holly (Holly) and the Ellwood Onshore Facility (EOF) at the Current Baseline Conditions" and to facilitate the plugging and abandoning operations. A1361. Beacon West was well suited for this role because it was founded by former Venoco executives, *i.e.*, the same people already involved in oversight of the South Ellwood assets. A0336-37, A0408, A0415, A1101.

### E.   *The Commission entered into the Gap Agreement with Venoco, and agreed to pay Venoco for the Commission's use of the EOF.*

The transition of operations at the EOF from Venoco to Beacon West (the Commission's contractor) was scheduled to occur on September 15, 2017, when the Reimbursement Agreement was set to expire. *See* A0885. To facilitate a smooth transition, the Commission and Venoco entered into the Gap Agreement on September 14, 2017. A0283-84, A1384-87. The Gap Agreement ensured that the Commission and Beacon West would have access to the EOF. A1384, A1386-87. The Gap Agreement was intended to be part of a process to establish a longer-term solution for the Commission's use of the EOF. A0282-84, A1384-87. It provided:

> While Venoco and the Commission have not yet agreed upon a payment amount for the Commission's continued non-exclusive use of [the] EOF, the parties recognize that an uninterrupted transition of operations should be accomplished to ensure that the Quitclaimed Facilities (as defined in the Reimbursement Agreement) remain secured and maintained for use during the anticipated Plug and Abandonment Program and the subsequent decommissioning project and lawful abandonment.

> Accordingly, pursuant to this letter, Venoco agrees to allow the Commission and its designated contractor to continue non-exclusive

use of the EOF, [and] EOF-related machinery or equipment … so long as the Commission agrees to the following conditions:

(a)     The Commission continues to negotiate in good faith with Venoco regarding a reasonable payment amount for the Commission's continued non-exclusive use of [the] EOF and the EOF-related equipment and machinery.

(b)     Any periodic payment that the Commission agrees to pay Venoco shall be payable retroactive to the Transition Date (the "Catch-Up Payment")….

A1384-85.

As planned, when the Reimbursement Agreement expired on September 15, 2017, operations at the EOF were transitioned from Venoco to Beacon West, and the Gap Agreement went into effect.  A0885.  The EOF was never left unmanned at any point during this transition period.  A0343, A0885; *see also* A0210.

The parties amended the Gap Agreement four times.  A0171.  The first and second amendments simply extended the term, but the third amendment provided that the Commission would pay Venoco a nonrefundable sum of $250,000 for the Commission's use of the EOF from December 15, 2017, to February 28, 2018, and that amount would be contributed toward any final settlement that Venoco and the Commission might reach.  A0891-92, A1388-91.  The fourth amendment provided that the Commission would pay Venoco, beginning March 2018, a nonrefundable monthly sum of $100,000 for the Commission's continued non-exclusive use of the

EOF, and that amount would be contributed toward any catch-up payment owed by the Commission to Venoco.  A0892, A1392-93.

Although the Commission failed to make payments under the Gap Agreement for several months, it ultimately paid $100,000 per month for its use of the EOF through October 15, 2018.  *See* A0315, A0893-94, A0897.

**F.    *Venoco notified the Commission of its intent to terminate the Gap Agreement, but the Commission refused to vacate the EOF.***

On August 22, 2018, Venoco notified the Commission that it intended to terminate the Gap Agreement, in part, because the Commission was behind on its payment obligations.  A0170-71, A0288, A1450-51.  The Commission cured its late payments prior to the termination date, but no final settlement regarding the Commission's long-term use of the EOF was reached between the parties.  A0171.

When the Gap Agreement terminated on October 15, 2018, the Commission continued its use and occupancy of the EOF.  A0171, A0285.  The Commission paid no additional amounts for its use and occupancy of the EOF.  A0287.  Instead, for the first time, the Commission asserted that it *always* had the right to use the EOF under its police power in response to an emergency.  A0285.  When asked at trial what accounted for this change in position, the Commission and the State identified only the stalling of negotiations toward a settlement with Venoco.  A0897-98.

-15-

**G.    The Trustee sued Defendants for inverse condemnation, and the bankruptcy court ultimately held that the Commission's free use of the EOF constituted a valid exercise of the State's police powers.**

When the Commission continued to occupy the EOF without payment following termination of the Gap Agreement, the Trustee filed an adversary proceeding against Defendants for inverse condemnation and asserted unconstitutional-taking claims under the U.S. and California Constitutions.[6]  *In re Venoco LLC*, 998 F.3d 94, 100 (3d Cir. 2021).  Defendants responded by claiming that they had sovereign immunity, which exempted them from the bankruptcy court's jurisdiction.  *Id.* at 100.  The bankruptcy court, the district court, and the Third Circuit rejected that argument, *id.* at 100, 110, and the U.S. Supreme Court denied Defendants' petition for writ of certiorari on this issue, *Cal. State Lands Comm'n v. Davis*, 142 S. Ct. 231 (2021).

After failing to avoid suit on jurisdictional and sovereign immunity grounds, Defendants defended the case on the merits by claiming that their continuing unpaid use and occupancy of the EOF was a valid exercise of their police power under the emergency exception to the just compensation requirement.  *See* A0133, A0150, A1471.  Defendants moved for summary judgment on the emergency exception,

---

[6] The Trustee also asserted a claim for violation of § 105 of the Bankruptcy Code.  *See Venoco*, 998 F.3d at 100.  The bankruptcy court granted summary judgment to Defendants on that claim, A0016, A0239-40, and that ruling has not been appealed.

arguing that the Commission's use of the EOF was necessitated by a threat to the public's health and safety beginning in 2017 and lasting through plugging and abandoning of the wells at Platform Holly.  *See* A0239-40.  The Trustee cross-moved for summary judgment, asserting that there was no "emergency" justifying Defendants' purported exercise of police power.  *See* A0239-40.  The bankruptcy court denied both motions.  A0239-40.

The case proceeded to a five-day bench trial.  *See* A1452.  The bankruptcy court ultimately held that "the Commission's occupation of the Trustee's property is a proper exercise of its police power and is not [an unconstitutional] taking" under federal or California law.  A1452-53.  This appeal followed.  A1504.

## **SUMMARY OF THE ARGUMENT**

The bankruptcy court disregarded well-established law in holding that there was an "emergency" justifying the exercise of Defendants' police powers and relieving them of the constitutional obligation to pay just compensation for their taking of the Trust's private property.  Since the inception of the police-powers exception, courts have limited its application to cases involving imminent threats in extreme circumstances, like wartime concerns or unexpected natural disasters.  The bankruptcy court's application of the exception here, where no such circumstances exist, constitutes an unprecedented and improper expansion of the otherwise narrowly circumscribed doctrine.

The bankruptcy court's conclusion that two alleged "emergencies" justified application of the exception here flouted the applicable legal test.  The bankruptcy court ignored that there must be an "imminent" threat to the public's health or safety to trigger and sustain the police-powers exception.  Neither of the "emergencies" identified by the bankruptcy court—*i.e.*, Venoco's alleged "threat[s]" to leave the EOF unmanned in April 2017 or the Commission's need to complete the plugging and abandoning process—posed or continue to pose an imminent threat to the public. The Commission's decision to contract with and pay Venoco for use of the EOF for more than a year *after* the first alleged "emergency" arose, as well as the bankruptcy court's concession that the multi-year plugging and abandoning process is not necessary to protect the public from any "immediate" harm, make that clear.

But even if this Court finds that as of April 2017 an "imminent" threat to the public existed, that threat was eliminated by September 15, 2017.  As of September 15, 2017, the Commission had entered into two contracts, the Beacon West Agreement and the Gap Agreement, ensuring staffing for and access to the EOF. From that date forward, there was no threat—imminent or otherwise—that anyone would abandon the EOF.  The bankruptcy court nevertheless found that the circumstances existing in March and April 2017 were sufficient to justify Defendants' indefinite physical invasion of real property for the entirety of the

subsequent five years[7]—long after the alleged "threat" was entirely eliminated. The bankruptcy court's ruling created a new standard for the application of the police-powers emergency exception: once emergency circumstances exist, the government is entitled to take without pay indefinitely thereafter, regardless of whether the emergency has ended or abated. This is not and has never been the constitutional rule.

Finally, in its discussion of whether alternatives existed to Defendants' exercise of police power, the Court ignored evidence that Defendants had contractual and statutory rights to require ExxonMobil to fulfill *all* the obligations under the leases. In other words, rather than exercising their police powers and taking over the EOF themselves, Defendants could have ordered ExxonMobil to perform the plugging, abandoning, and decommissioning work, as contemplated by California's regulatory regime. Had Defendants done so, ExxonMobil would have been required

---

[7] Defendants admit that their continuing use and occupancy of the EOF is temporary, not permanent. *See* A0910 (confirming that the Commission intends to vacate the property after the plugging and abandoning of the wells, and that the Commission does not contend that it owns the property by virtue of its police power). Defendants' representatives testified at trial that they anticipated their need for use of the EOF would end by December 31, 2022. A0977. As of the date of the submission of this brief, however, Defendants anticipate that plugging and abandoning activities will take until the end of the year, after which there will be a one- to three-month disengagement period. Thus, Defendants are still unable to provide a date certain by which their occupation and use of the Trust's property will end.

to either negotiate with Venoco or the Trust for use of the EOF or find another way to handle the annular gasses from the wells.  But Defendants declined to enforce their rights, opting instead for the expedient solution: to exercise their purported powers of state to shift the financial burden of paying for use of the EOF from ExxonMobil to the beneficiaries of the Trust (the unsecured creditors of Venoco). Because the bankruptcy court failed to consider this viable alternative to the exercise of Defendants' police powers, the judgment should be reversed.

## ARGUMENT

I.   **The Bankruptcy Court Erred in Concluding That an Emergency Existed to Justify Application of the Police-Powers Exception.**

   A.   *The police-powers exception applies only in limited circumstances not applicable here.*

The United States and California Constitutions prohibit the taking of private property for public use without "just compensation."  U.S. Const. amend. V; Cal. Const. art. 1, § 19(a).  Put simply, when the government takes private property, "[t]he government must pay for what it takes."  *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021).  Given the importance of this constitutional mandate, courts have "narrowly circumscribed" the circumstances permitting governments to bypass the "just compensation" requirement.  *E.g.*, *Holtz v. Superior Ct.*, 475 P.2d 441, 446 (Cal. 1970).  Doing otherwise "would completely"—and impermissibly—"vitiate the constitutional requirement of just compensation."  *Id.*; *see also Pa. Coal Co. v.*

*Mahon*, 260 U.S. 393, 415 (1922) (expanding exceptions to the just compensation requirement "more and more until at last private property disappears" contradicts the Constitution).

One of the few recognized exceptions to the just compensation requirement, which the bankruptcy court erroneously applied to excuse Defendants' payment of just compensation here, is the police-powers exception.  Under both federal and California law, this rare exception applies only when there is an emergency that constitutes an imminent threat to the public's health and safety.  *See, e.g.*, *United States v. Caltex*, 344 U.S. 149, 154 (1952) (acknowledging the rule that "in times of imminent peril—such as when fire threatened a whole community—the sovereign could, with immunity, destroy the property of a few that the property of many and the lives of many more could be saved"); *House v. L.A. Cnty. Flood Control Dist.*, 153 P.2d 950, 953 (Cal. 1944) (stating that the police-powers exception applies only "under the pressure of public necessity and to avert impending peril").

In practice, courts applying federal and California law have seldom found that situations constitute qualifying "emergencies."  Indeed, courts have primarily applied the police-powers exception in limited circumstances involving discrete episodes of imminent harm that arise from "distinctive" and "uncommon" facts.  *See Odello Bros. v. Cnty. of Monterey*, 73 Cal. Rptr. 2d 903, 910 (Cal. Ct. App. 1998).  Such facts have involved wartime concerns, *see Caltex*, 344 U.S. at 150, 156

("impending seizure" of oil companies' terminal facilities "by the enemy" following the Pearl Harbor attack), police activity to combat crime, *see Customer Co. v. City of Sacramento*, 895 P.2d 900, 901, 909-11 (Cal. 1995) ("armed and dangerous" felony suspect hiding in store and refusing to surrender), and unexpected natural disasters, *see Thousand Trails, Inc. v. Cal. Reclamation Dist. No. 17*, 21 Cal. Rptr. 3d 196, 205-06 (Cal. Ct. App. 2004) ("extraordinary event" of "massive flooding" in an area where the government did not anticipate flooding); *House*, 153 P.2d at 953 (conflagration, and "diseased animals," "rotten fruit, or infected trees" that jeopardize "life or health").

The police-powers exception has been so limited because the requirements for an "emergency" are stringent.  Under federal and California law, an emergency exists only if the alleged emergency poses an "imminent" threat to the public.  That requirement was not met here; instead, the bankruptcy court interpreted the emergency exception broadly to allow continued government occupation of private property long after any alleged threat was gone.  This legal error warrants reversal.

### B.    *The bankruptcy court ignored that an emergency justifying the police-powers exception must be imminent.*

Both federal and California law make clear that an emergency must be imminent to trigger the police-powers exception.  The bankruptcy court erroneously ignored this requirement in holding that two emergencies existed here.  First, the bankruptcy court erred in holding that Venoco created an "emergency" in March and

April 2017 by allegedly "threaten[ing]" to leave the EOF unmanned. *See* A1458-59, A1483-86, A1492. And second, the bankruptcy court erred in holding that anything short of the "permanent solution" of plugging and abandoning the wells constituted a continuing emergency. A1486. Neither of these alleged "emergencies" posed an "imminent" threat to the public's health or safety, and this Court should reverse the bankruptcy court's rulings.

1. <u>An "emergency" requires an "imminent" threat to the public's health or safety.</u>

For purposes of the police-powers exception, an emergency exists only if there is "an *imminent* and substantial threat to public health or safety." *E.g.*, *Los Osos Valley Assocs. v. City of San Luis Obispo*, 36 Cal. Rptr. 2d 758, 764 (Cal. Ct. App. 1994) (emphasis added); *Caltex*, 344 U.S. at 154 (requiring "imminent peril"); *see also TrinCo Inv. Co. v. United States*, 722 F.3d 1375, 1378 (Fed. Cir. 2013) (noting that "[t]he Supreme Court has consistently" required "an imminent danger and an actual emergency giving rise to actual necessity"). Consistent with the directive that courts narrowly circumscribe the scenarios permitting non-compensable takings, courts have considered threats "imminent" only when they require immediate, unanticipated action.[8] *See, e.g.*, *House*, 153 P.2d at 953

---

[8] Even the bankruptcy court's inapposite case law, which relates to private entities' decisions not to remedy public nuisances, requires an imminent threat to justify a non-compensable taking. *See* A1486-88; *Commonwealth v. Barnes &*

(requiring a situation "calling for immediate action," and rejecting claimed "emergency" because the government had "time to exercise a deliberate choice of action"); *In re Upstream Addicks & Barker (Tex.) Flood-Control Reservoirs*, 146 Fed. Cl. 219, 263-64 (Fed. Cl. 2019) (rejecting claim that flooding constituted an "emergency" because the government "had made a calculated decision to allow for [the] flooding" of private lands for "years" before the natural disaster struck).

The requirement for immediate, unanticipated action makes sense because an "emergency"—by definition—is an unforeseen combination of circumstances or the resulting state that calls for *immediate* action. *Los Osos*, 36 Cal. Rptr. 2d at 764 ("The term 'emergency' has long been accepted in California as an unforeseen situation calling for immediate action." (alterations omitted)); *San Christina Inv. Co. v. City & Cnty. of San Francisco*, 141 P. 384, 388 (Cal. 1914) (this definition "is the meaning of the word that obtains in the mind of the lawyer as well as in the mind of

---

*Tucker Co.*, 371 A.2d 461, 467 (Pa. 1977) (finding it appropriate to invoke the police power to dispel an "immediate dangerous condition"); *Nassr v. Commonwealth*, 477 N.E.2d 987, 990 (Mass. 1985) (noting that a "classic exercise[] of the State's police power" is to address "a public health emergency"). So do any "pre-existing background restrictions on property rights" that could justify a non-compensable taking. *See* A1475-76; *Cedar Point Nursery*, 141 S. Ct. at 2079 (discussing the necessity doctrine, which requires an "imminent" disaster or taking action "to avert serious harm"); *In re Upstream Addicks & Barker (Tex.) Flood Control Reservoirs*, 146 Fed. Cl. 219, 264 (Fed. Cl. 2019) (noting that the necessity doctrine requires (1) actual emergency, (2) imminent danger, and (3) actual necessity).

the layman"). If a situation does not warrant "immediate action," it necessarily lacks the urgency intrinsic to an "emergency."

> 2.   There was no imminent threat to the public's health or safety posed by Venoco's alleged "threats" to leave the EOF unmanned.

The bankruptcy court found that an emergency first arose when Venoco made "threats" to abandon the EOF in a series of emails in March and April 2017. A1483-86, A1492. In these emails, Venoco informed the Commission that it planned to quitclaim its leases due to financial difficulties, but it intended to maintain normal operations at the EOF through the end of April. A1329, A1458-59, A1483-84. The emails also stated that Venoco "intend[ed] to work with the [Commission] to facilitate a safe and responsible transition" and that Venoco "would be willing to maintain current operations for a short transition period beyond" the end of April if "an acceptable reimbursement agreement" could be finalized. A1329, A1459.

Defendants were aware of Venoco's financial distress prior to its receipt of these emails. During the three to four months leading up to Venoco's quitclaim of the leases, Mr. Wracher conveyed to the Commission by in-person meetings, phone calls, and emails, that Venoco would soon be unable to meet its obligations under the leases. A0206-07. He did so to ensure that there was an orderly transition of operations from Venoco to the Commission. A0207. Defendants admitted that they were "not surprised" at Venoco's report about its financial condition. A0980.

In response to the March and April 2017 emails—which the bankruptcy court found triggered an "emergency"—the Commission did *not* seize the EOF or claim that there was an "emergency" that permitted the Commission to occupy the EOF for free.  Instead, the Commission negotiated and executed the Reimbursement Agreement with Venoco in April 2017 that obligated Venoco to maintain operations at the EOF and Platform Holly at its own expense through April 30, 2017, and at the *Commission's* expense beyond that date.  A1338-39, A1344, A1461-62.  The parties operated under that agreement until September 2017.

At that time, the Commission hired Beacon West to take over the "safe daily operations" at Platform Holly and the EOF.   *See* A1360-61, A1466.   The Commission and Venoco also executed the Gap Agreement.  A1384-87, A1467. According to the terms of the Gap Agreement, "the parties recognize[d] that an uninterrupted transition of operations should be accomplished to ensure that the Quitclaimed Facilities … remain[ed] secured and maintained for use," and Venoco agreed to permit the Commission and "its designated contractor" (Beacon West) to continue using the EOF so long as "[t]he Commission continues to negotiate in good faith with Venoco *regarding a reasonable payment amount*" for the Commission's use of the EOF.  A1384-85 (emphasis added); *see also* A1467.  At no time did the

parties contemplate that the Commission or Beacon West would (or could) use the EOF without compensating the EOF's owner.[9]

Thus, by September 15, 2017, the Commission had entered into the Beacon West Agreement and the Gap Agreement, which ensured that the Commission had (1) continuous staffing at the EOF provided by its own selected contractor; and (2) access to and use of the property.  After the execution of these agreements, any threat constituting the first alleged "emergency"—the possibility that the EOF would be left unmanned—ceased to exist.

The Commission paid Venoco (albeit not in full or on time)[10] for its use of the EOF from September 2017 to October 2018.  A0171, A0315, A0893-94.  But when the Commission and Venoco could not reach a final settlement regarding the EOF,

---

[9] Venoco was the owner of the EOF as of September 2017.  In May 2018, the chapter 11 Plan of Confirmation was approved by the bankruptcy court, acknowledging that Venoco and the Commission were parties to the Gap Agreement under which the Commission would pay a non-refundable sum of $100,000 per month for continued non-exclusive use of the EOF.  Order Approving and Confirming Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation, *In re Venoco*, No. 17-10828-JTD, D.I. 922-1, at 46-47 (May 23, 2018).  The EOF was transferred to the Liquidating Trust according to the chapter 11 plan on October 1, 2018, subject to the Gap Agreement.

[10] The Gap Agreement required Venoco and the Commission to negotiate and agree upon "a reasonable payment amount" for the Commission's non-exclusive use of the EOF and its equipment, and the $100,000 per month payments would be credited toward that to-be-agreed-upon amount.  A1385, A1392-93.  No such agreement was ever reached.

the Commission decided—after nearly thirteen months of paying Venoco for use of the EOF *and* after entering into the settlement agreement with ExxonMobil—that it no longer wished to pay. *See* A0285-87, A1470. The Commission claimed retroactively that an "emergency" *always* existed, such that it could use (*i.e.*, take) the Trustee's property without paying just compensation. *See* A0285, A1470. The Gap Agreement terminated on October 15, 2018, and the Commission continued to use and occupy the EOF, but refused to make any further payments to Venoco or the Trust. A0171. There were no changes in safety concerns or operations that prompted this about-face. In fact, from the Commission's perspective, the *only* circumstance that changed after the Gap Agreement's expiration was "the stalling of negotiations toward a settlement with Venoco."[11] A0898.

As a result, the bankruptcy court's conclusion as to the existence of the first alleged "emergency" violates the constitutional requirements and constitutes reversible error for two reasons. First, the Commission's financial concerns stemming from the inability to reach a settlement do not fall within the rare type of imminent, unforeseeable threat to the public's health and safety that warrants application of the police-powers exception. *See supra* Part I.A (discussing the

---

[11] Of course, by that time, the Commission also had secured ExxonMobil's agreement to participate in the plugging and abandoning process by execution of the settlement agreement. A1397-99 (effective June 29, 2018).

limited circumstances where the police-powers exception applies). Absent an emergency, when the government cannot come to a consensual arrangement with a private landowner, it must take *and pay* under its eminent domain authority, not its police powers. *See infra* Part I.B.4.

Second, the Commission's decision to negotiate, contract with, and pay[12] Venoco for use of the EOF *for over a year* in response to the alleged "emergency," rather than to take immediate, unilateral action, defeats the Commission's argument that an "imminent" threat justified a non-compensable taking. *See, e.g.*, *Rose v. City of Coalinga*, 236 Cal. Rptr. 124, 129 (Cal. Ct. App. 1987) (finding a fact issue on whether an emergency existed because the city waited 57 days before remedying the allegedly hazardous situation); *cf. Textainer Equip. Mgmt. Ltd. v. United States*, 115 Fed. Cl. 708, 718 (Fed. Cl. 2014) (noting, outside the context of the police-powers exception, that "when the United States continues to physically occupy and use property after a lease expires, a taking occurs"). Though few courts have confronted this precise issue, courts *have* considered a governmental entity's past and future

---

[12] Ms. Lucchesi was asked at trial why, given the Commission's position that the circumstances were emergent, it made cash payments to Venoco under the Gap Agreement. A0969. She responded "we were trying to be a good neighbor, essentially, and wanted to work with Venoco. … [W]e wanted, in good faith, to negotiate some solution outside of litigation, and the Gap Agreement provided the framework and the time to do that." A0969. This testimony further confirms the absence of an emergency. Had a real emergency existed, the Commission's hand would have been forced to act immediately.

behavior in determining whether a true emergency exists.   Two examples are instructive.

In *Irwin v. City of Minot*, 860 N.W.2d 849, 851-53 (N.D. 2015), the Supreme Court of North Dakota held that a fact issue existed on application of the police-powers exception because the government had paid some property owners, but not others, for a taking in response to the same alleged "emergency."   There, the city had "acted to combat [a] flood by constructing emergency earthen dikes" using clay from multiple property owners' land.  *Id.* at 851.  The city contracted with and paid some property owners, but not others, for the removal of that clay.  *Id.*  When the uncompensated property owners sued the city, the city claimed that it had acted within its emergency police powers.  *Id.*  Although the Court agreed that the need to construct the dikes constituted an emergency, it held that a fact issue existed on the police-powers issue because "prior to the flood, the City [had] contracted with property owners for clay to be used in constructing the dikes."  *Id.* at 853.

Similarly, in *Smith v. County of Los Angeles*, 262 Cal. Rptr. 754, 765-66 (Cal. Ct. App. 1989), the court looked to a government's subsequent (rather than prior) actions in determining whether its taking was justified by an emergency.   There, property owners had asserted claims for inverse condemnation based on the county's removal of slide debris from roadways.  *Id.* at 757.  The county claimed that its removal of the debris was a valid "exercise of police power performed under

emergency conditions" because the debris was a "traffic hazard," and closing the road would have required the county's residents "to utilize substantially longer alternate routes." *Id.* at 765. The court rejected that argument, in part, because the county *did* ultimately close the road to traffic, which undermined the alleged "emergency" actions taken to avoid such closure. *Id.* at 765-66.

These cases demonstrate that when there is an alternative to a non-compensable taking, and a governmental body has in fact employed that alternative to assuage the alleged "emergency," the police-powers exception based on the existence of that "emergency" does not apply. Concluding otherwise would permit governments—like the Commission did here—to evade their constitutional and contractual obligations simply because they no longer like the price of just compensation or the bargain they struck. Because the Commission entered into an agreement with and paid Venoco for use of the EOF *after* the alleged "emergency" arose, there was no "imminent" threat in April 2017, and the bankruptcy court erred in permitting the Commission to invoke the police-powers exception.

### 3. There was no "imminent" threat to the public's health and safety during the pendency of the plugging and abandoning process.

The second "emergency" identified by the bankruptcy court was the fact that the wells had not been permanently plugged and abandoned. Even if an emergency existed in April 2017 (which it did not), the bankruptcy court found that the only "immediate need" was to "keep[] the EOF up and running" to "protect the public

from exposure to toxic H$_2$S gas." A1486.  The execution of the Reimbursement Agreement ensured that this need would be satisfied by Venoco from April until the transition to Defendants' selected contractor.  But even if the Commission *still* perceived some "threat" during that time, it was completely eliminated by September 15, 2017, when both the Beacon West Agreement and the Gap Agreement were in place.  Through the execution of those two agreements, the Commission had secured its own contractor to staff the EOF and had a consensual arrangement with Venoco ensuring that the Commission and its contractor had access to the EOF property. There was no risk that anyone would "walk off the job" or leave the EOF unmanned after September 15, 2017.  The bankruptcy court nevertheless held that an emergency would exist indefinitely until the "permanent solution" of plugging and abandoning the wells was complete.[13]  A1486.  But the bankruptcy court's own findings contradict this conclusion.

First, the bankruptcy court found that "the P&A process *is not necessary* to manage the H$_2$S gas in the short term." *See* A1486 n.108 (emphasis added).  Second, the bankruptcy court considered the complete cessation of plugging and abandoning

---

[13] The bankruptcy court further concluded that because "Venoco indicated it had no intention of [plugging and abandoning the wells], the Commission had no choice but to do so itself." A1486.  This factual finding is clearly erroneous, as explained in Part I.D, *infra*, because Defendants could have, at any time, ordered ExxonMobil to perform the plugging and abandoning work.

work for 527 days as a result of COVID-19 (described by the witnesses at trial as the "COVID shutdown"),[14] A1060, and explained that while Beacon West needed to continue its work to monitor the pressure at the EOF during those 527 days, "permanently plugging and abandoning the wells was, at that time, *not essential*." A1490 (emphasis added).  As a matter of law, these factual findings preclude the existence of an "emergency" based upon the fact that the wells were not permanently plugged and abandoned because the plugging and abandoning work, according to the bankruptcy court's own findings, was not necessary.

If there was no "immediate need" to protect the public by performing the plugging and abandoning, then the alleged threat did not require "immediate action" and cannot, as a matter of law, constitute an "emergency."  *See House*, 153 P.2d at 953.  In holding otherwise, the bankruptcy court ignored that the term "[e]mergency is not synonymous with expediency, convenience, or best interests, and it imports more than merely a general public need."  *Los Osos*, 36 Cal. Rptr. 2d at 764 (cleaned

---

[14] The COVID-19 pandemic halted the plugging and abandoning process for over a year, confirming that the process was unnecessary to address any "imminent" threat to the public.  The Chief Operating Officer of Beacon West (and former Operations Manager at Venoco) testified that "from the start of COVID" in March 2020 until October 2021, there was no plugging and abandoning work done on the wells.  A0408, A0428-30.  He also confirmed that "[t]he wells were in the same state before the COVID shutdown and through the COVID shutdown," and he "assum[ed]" that "[i]f there had been a threat of uncontrolled emissions at any of those wells, COVID would not have prevented any efforts to address such a threat." A0430.

up).  Thus, even though plugging and abandoning the wells may be the "permanent solution" to prevent any release of hydrogen sulfide gas, *see* A1486, and may address a long-term public need, *see* A1479, it cannot constitute an emergency because it is not necessary to alleviate any *imminent* danger, and the government has other powers to address such needs—*i.e.*, eminent domain authority, as well as the authority to order a predecessor operator to take responsibility for the quitclaimed oil and gas leases.

Additionally, long-lasting, ongoing events are not "emergencies" that justify non-compensable takings.  "Emergencies" generally involve acute moments of imminent harm, like large destructive fires, *see House*, 153 P.2d at 953, "raging flood waters during torrential rains," *see Thousand Trails*, 21 Cal. Rptr. 3d at 198, or a wartime enemy's "impending seizure" of assets, *see Caltex*, 344 U.S. at 156. They do not, however, involve multi-year processes to resolve admittedly non-imminent threats, especially if those processes can be paused at will without injuring the public.[15]

---

[15] This renders the bankruptcy court's reliance on *Nassr* improper.  *See* A1486-87.  In that case, the government consistently engaged in clean-up operations for over a year to remove significant amounts of hazardous material.  477 N.E.2d at 990-91.  Given the "volatile" nature of the materials and the "extensive" clean-up needs, the court observed that "the time involved for removal" was reasonable.  *See id.* at 989, 991.  The court likely would not have come to that conclusion had the government (like the Commission here) taken a 527-day pause in operations.

Any other rule would allow governments to indefinitely take private property without compensation for any public improvement, regardless of whether any threat of harm to the public existed or mandated immediate action.  This is precisely what the Supreme Court has warned against: "[A] strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."  *See Pa. Coal*, 260 U.S. at 416.  When, as here, the alleged "emergency" will last for years and the length of the alleged "emergency" is determined by the government's decisions on when to actually address the issue, there can be no "imminent" threat that excuses the constitutional requirement of just compensation.

    4.    <u>After September 15, 2017, Defendants could have exercised their eminent domain authority to pay for their continued use and occupancy of the EOF.</u>

Properly construed within its constitutional bounds, the police-powers exception could be applied *at most* to the time period from April 2017 until September 15, 2017.  That is why the Trust sought no inverse-condemnation damages for the time prior to September 15, 2017.  *See* A0002.  But after that date, neither the bankruptcy court's findings nor the record in the case support the existence of any imminent threat constituting an emergency.

The lack of an emergency justifying the exercise of police powers does not mean, however, that Defendants would be left without a remedy if they could not

reach an agreement with Venoco or the Trust for use of the EOF to support plugging and abandoning of the wells.  In such a situation, Defendants could have exercised their eminent domain authority to take *and pay for* access to the EOF.  *See, e.g.*, *Odello Bros.*, 73 Cal. Rptr. 2d at 911 (rejecting the existence of an emergency where the county had prior knowledge of the threat of flooding and could have chosen to condemn part of the property to implement its existing flood plan, which would have required the payment of just compensation to the property owners).

"The power of eminent domain is an inherent attribute of sovereignty."  *City of Anaheim v. Michel*, 66 Cal. Rptr. 543, 545 (Cal. Ct. App. 1968).  "The only limitations placed on the exercise of the right of eminent domain are those imposed by article 1, section 1[9], of the California Constitution and the Fourteenth Amendment of the United States Constitution, which require that the taking of private property by a governmental agency be for a 'public use' and that 'just compensation' be paid for such taking."  *Id*.  "When properly exercised, [eminent domain] power affords an orderly compromise between the public good and the protection and indemnification of private citizens whose property is taken to advance that good."  *City of Oakland v. Oakland Raiders*, 646 P.2d 835, 838 (Cal. 1982).

The Gap Agreement itself acknowledged that the Commission's continued need for the EOF was "for use during the anticipated Plug and Abandonment Program and the subsequent decommissioning and lawful abandonment."  A1384.

-36-

This is unquestionably a "public use." *See Yox v. City of Whittier*, 227 Cal. Rptr. 311, 314 (Cal. Ct. App. 1986) ("'Public use' within the meaning of California Constitution article I, section 19, has been 'defined as a use which concerns the whole community or promotes the general interest in its relation to any legitimate object of government.'") (quoting *Bauer v. Ventura Cnty.*, 289 P.2d 1 (Cal. 1955)).

Had Defendants exercised their eminent domain authority and filed a condemnation proceeding in a California court, they could have quickly obtained an order granting them possession of the EOF. *See* Cal. Civ. Proc. Code § 1255.410(a) ("At the time of filing the [eminent domain] complaint or at any time after filing the complaint and prior to entry of judgment, the plaintiff may move the court for an order for possession under this article, demonstrating that the plaintiff is entitled to take the property by eminent domain ....").  In fact, California has adopted "early possession" or "quick-take" procedures, which entitle the condemning agency to "take over condemned property prior to trial and judgment by depositing" the "probable compensation" and obtaining an "order for possession" from the court. *See Redevelopment Agency of Burbank v. Gilmore*, 700 P.2d 794, 798 (Cal. 1985).

Here, on August 22, 2018, when Venoco informed the Commission of its intent to terminate the Gap Agreement because of the Commission's failure to pay, Defendants could have exercised their eminent domain authority and paid for the right to continue to use the EOF.  *See* A0170-71.  But to avoid the constitutional just

compensation requirement, Defendants instead declared for the first time in October 2018 that their presence at the EOF was an exercise of their police powers based upon an "emergency" that supposedly existed for more than a year before.  A0285. Because no such emergency existed, the bankruptcy court's judgment should be reversed, and the Commission must pay just compensation for its use of the EOF from at least September 15, 2017 to present.[16]

### C.     *The bankruptcy court erred in ignoring that an emergency justifying the police-powers exception must be unforeseeable.*

In addition to posing an "imminent" threat of harm, an emergency justifying the exercise of police powers must also be unforeseen or unanticipated.  The bankruptcy court incorrectly found that no such "broad rule" exists and further found, based upon a misunderstanding of the Trust's arguments at summary judgment and trial, that the situation that led to Venoco's "abandonment" of the EOF

---

[16] Affirming the bankruptcy court's determination that an emergency exists when offshore wells have not been plugged and abandoned would have sweeping implications for the oil and gas industry because plugging and abandoning—*i.e.*, the second alleged "emergency" here—is required virtually every time an offshore lease ends.  *See, e.g.*, A0929 (testimony by Ms. Lucchesi that, when an offshore leaseholder's term ends, "[g]enerally, their obligations are to plug and abandon safely their wells, … as well as decommission the infrastructure and facilities associated with that lease, and essentially restore the leased premise to their natural condition …"); A1059-60 (testimony by former Commission employee that "[a]ll wells in California and really anywhere need to be plugged and abandoned to stop any hydrocarbons from flowing to the surface after you walk away").

was not reasonably foreseeable.  A1492-97.  These two erroneous findings require reversal.

First, the definition of an emergency for purposes of the police-powers exception "has long been accepted in California as an *unforeseen* situation calling for immediate action."  *See Los Osos*, 36 Cal. Rptr. 2d at 764 (emphasis added) (internal quotations and citations omitted).  California courts have explained that an emergency does not exist where the government has prior knowledge of the allegedly emergent circumstances.  *Odello Bros.*, 73 Cal. Rptr. 2d at 911 ("[W]e do not think that the public interests are served by simply ignoring County's prior knowledge of the … threat."); *Thousand Trails, Inc.*, 21 Cal. Rptr. 3d at 205-06 (finding a valid exercise of police power under the emergency exception where the plaintiff failed to cite to any evidence of the government's prior knowledge or notice of the potential levee failures).

Federal courts similarly define an emergency as an unexpected event.  *See Upstream Addicks*, 146 Fed. Cl. at 264 (rejecting government's emergency and necessity defenses, and explaining that "the term 'emergency,' according to both common usage and definition, refers to 'a state of things *unexpectedly arising*'") (quoting *Emergency,* Oxford English Dictionary, https://www.oed.com/view/Entry/61130?redirectedFrom=emergency#eid) (emphasis in original).  Thus, in deciding whether an emergency exists for purposes of the police-powers exception, both

California and federal courts consider whether the government foresaw, anticipated, or had prior knowledge of the purported emergency.

The Trust argued at summary judgment and at trial that the Commission not only foresaw, but planned for the possibility that Venoco, or any other lessee, would quitclaim the leases and leave the Commission responsible for the plugging and abandoning of the wells if the lessee could not. *See, e.g.*, A0252-56. That is why the Commission required Venoco, like all lessees, to pledge financial assurance (here, a bond) in support of the lease obligations, including plugging, abandoning, and decommissioning the wells and Platform Holly. A0865-66. Among other things, the purpose of the bond was to ensure that the State was protected in the event that the leased premises were abandoned and the State was responsible for restoring the leased premises. A0865. The Commission knew this. A0982 (Ms. Lucchesi's testimony that the Commission "knew that, if Venoco couldn't meet its obligations under the leases, then the Commission or ExxonMobil would be responsible for th[e] wells" and the attendant hydrogen sulfide gas).

The Commission also knew that use of the EOF would be a necessary part of the decommissioning process. Indeed, at trial, Ms. Lucchesi testified that the "the EOF is necessary for the safe plugging and abandonment … of the wells on Platform Holly" and that "anyone ordered to plug and abandon" those wells "would need to use the EOF." A0907; *see also* A0867-68 (Ms. Lucchesi's acknowledgement that

-40-

the Commission knew Platform Holly relied on the EOF).   The fact that the Commission made a budgeting error in anticipating the *cost* of using the EOF does not mean that the necessary *use* of the EOF itself was unforeseen.   A0940 (acknowledging budgeting error); *cf. Odello Brothers*, 73 Cal. Rptr. 2d at 911 (noting that a governmental entity's "liability cannot be based solely upon the situation which existed" on the date of the alleged "emergency" because its "prior knowledge" of the alleged threat matters).

Here, the bankruptcy court identified the Commission's need to complete the "permanent solution" of plugging and abandoning the wells as the second "emergency" justifying the Commission's continued (and still ongoing) presence at the EOF.  *See, e.g.*, A1486.  But for years, if not decades, the Commission had prior knowledge that (1) it might be responsible for plugging and abandoning the wells if Venoco or any other lessee could not; (2) the EOF was necessary for the safe plugging and abandoning of Platform Holly; and (3) the Commission had no ownership interest, leasehold interest, right of reversion or any other right to use the EOF if it was ultimately required to restore the leased premises and plug and abandon the wells.

Consequently, when Venoco did quitclaim the leases and inform the Commission it could no longer meet its obligations under the leases, the resulting circumstances were not "emergent"—they were anticipated, *even created* by

-41-

Defendants by the terms of the leases themselves. *See* A1303-04 (permitting a lessee to quitclaim its rights under the leases, "subject to the continued obligation of the Lessee and his surety … to place all wells on the lands … to be quitclaimed or relinquished, in condition for suspension or abandonment in accordance with the terms of this lease …."); A1306 ("Lessee shall, at the time of execution of this lease, furnish and thereafter maintain a good and sufficient bond in favor of the State … to guarantee the faithful performance by the Lessee of the terms, covenants, and conditions of this lease …."). The law does not entitle Defendants to correct their budgeting error by disregarding the constitutional protections afforded to private property owners.

Second, the bankruptcy court misunderstood the Trust's argument regarding Defendants' anticipation of the alleged "emergency." The Trust did not argue that the Commission should have foreseen the details of every event leading to the quitclaim of the leases that resulted in the wells reverting to the Commission. A1496. The Trust did not and does not suggest that the Commission should have predicted the occurrence of the pipeline rupture or the precise cause of the financial distress that resulted in Venoco's inability to fulfill its obligations under the leases. A1496-97. But Defendants, as lessors of the South Ellwood Field, *did* anticipate and plan for the lessee's (and specifically Venoco's) inability to perform the lease obligations, including plugging and abandoning. Defendants foresaw and planned

for that eventuality by requiring a bond in support of the lease obligations, requiring ExxonMobil to remain liable after transfer of the leases to Venoco, and by increasing the amount of the bond when Venoco's financial distress caused it to file for bankruptcy protection for the first time.

The bankruptcy court thus missed the mark in its foreseeability analysis. The bankruptcy court concluded that there was "no evidence presented that the Commission was aware that Venoco was unable to meet its obligations to P&A the Wells until just before Venoco's second bankruptcy filing when it notified the Commission it would not comply with its obligation." A1497. But for a circumstance to be foreseeable such that it does not qualify as an emergency, the law does not require the government to predict the precise moment the anticipated circumstances will occur. For example, in *Upstream Addicks*, where the court found that a compensable taking occurred as a result of the government's planned flooding of private properties during severe storms, the court noted the fact "[t]hat this case involved a severe tropical storm, and a record-breaking one at that, is not enough to infer an actual emergency." 146 Fed. Cl. at 264. The court did not purport to require the government to predict the severity of the storm or the moment it would hit, but the court nevertheless found that the government anticipated the storm because it made a "calculated decision to allow for flooding of these lands years before Harvey,

when it designed, modified, and maintained the dams in such a way that would flood private properties during severe storms." *Id*.

Similarly, in *Odello Brothers*, the court considered the county's prior knowledge of the threat of flooding—not on any particular date, not to any particular degree, but the possibility that flooding would occur in the future. 73 Cal. Rptr. 2d at 911. The court found that the "determination regarding County's liability cannot be based solely upon the situation which existed on [the date of the flood]." *Id*. Instead, the court considered the inadequacies "acknowledged by the County as early as 1989, and an inadequacy which had caused flooding during January 1995, just two months prior to County's March 1995 'emergency' action." *Id*.

The bankruptcy court's artificially narrow view that all of the precise circumstances must be foreseen led to the erroneous conclusion that no emergency existed here because the Commission did not know "until just before Venoco's second bankruptcy filing" that Venoco would be unable to comply with its plugging and abandoning obligations. A1497. Properly applied, however, an analysis of the foreseeability requirement compels the opposite result.

> **D.    The bankruptcy court erred in ignoring Defendants' choice not to enforce their contractual and statutory rights to require ExxonMobil to perform the plugging, abandoning, and decommissioning work.**

The existence of an emergency is also informed by whether there are alternatives to the government's exercise of police power. *See Los Osos*, 36 Cal.

Rptr. 2d at 764.  The bankruptcy court erred by failing to consider one of the alternatives available to Defendants' unpaid taking of the EOF: Defendants' independent contractual and statutory rights to require ExxonMobil, as the immediately preceding operator of the leases, to perform the plugging and abandoning of the wells and the decommissioning of the attendant facilities if Venoco was unable to do so.

The Trust presented evidence establishing this alternative at trial, and the Commission failed to offer any evidence as to why that alternative was not viable. Yet the bankruptcy court's discussion of alternatives omits ExxonMobil entirely. *See* A1497-1502 (discussing the "two other options" presented by the Trustee: "building a 9.6-mile onshore pipeline … and the renting or leasing of a floating production storage and offloading platform").  This is yet another ground for reversal of the bankruptcy court's judgment.

Courts consider the existence of alternatives in deciding whether an emergency justifying police powers exists.  *See, e.g.*, *Rose*, 236 Cal. Rptr. at 129 (describing facts suggesting that there were alternative methods to remedy the alleged safety threats that did not involve demolition); *Smith*, 262 Cal. Rptr. at 766 ("Removing slide debris in order to keep a road open to traffic, when alternate routes are available, is not among the narrowly circumscribed types of emergency that can justify taking private property without compensation.").   Courts consider

alternatives because the means employed to take private property for public use cannot be "arbitrary and unreasonable, beyond the necessities of the case …." *Chi., Burlington & Quincy Ry. Co. v. Illinois*, 200 U.S. 561, 592-94 (1906).

Here, Defendants had a statutory right to require ExxonMobil, as Venoco's predecessor-in-interest, to perform the plugging, abandoning, and decommissioning of the wells and Platform Holly under Section 3237(c)(2) of the California Public Resources Code, which states:

> If the supervisor determines that the current operator does not have the financial resources to fully cover the cost of plugging and abandoning the well or decommissioning of deserted production facilities, the immediately preceding operator shall be responsible for the cost of plugging and abandoning the well or the decommissioning of deserted production facilities.…

> The supervisor may continue to look seriatim to previous operators until an operator is found that the supervisor determines has the financial resources.…

Defendants also had a contractual right to require ExxonMobil to perform the plugging, abandoning, and decommissioning of the wells and Platform Holly. Specifically, the Commission approved the transfer of the leases from Mobil to Venoco on the condition that Mobil would remain liable for all of the obligations under the leases in the event that Venoco could not fulfill the lease obligations. A0904-05; *see also* A1397.

Inexplicably, Defendants' actions around the time of the quitclaim demonstrate their intention to preserve, but not enforce, these rights. For example,

-46-

the Commission copied ExxonMobil on the correspondence to the bonding company calling upon Venoco's bond because the Commission believed ExxonMobil had responsibility to fulfill the plugging, abandoning, and decommissioning obligations if Venoco could not.  A0881-82.  Additionally, a State division ordered Venoco to plug and abandon the wells on May 15, 2017, when Venoco was already in bankruptcy, and on May 19, 2017, that same division sent a letter to ExxonMobil placing it on notice of its responsibility as the immediately preceding operator.  *See* A1398.  The division never revised its order or issued a similar order to ExxonMobil. A0906.

Defendants' inexplicable posture persisted in the months following the quitclaim.   Then, the Commission entered into a settlement agreement with ExxonMobil.  A0904.  In that agreement, the Commission "reserve[d] its rights to seek fulfillment of *all* obligations in the Leases" from ExxonMobil because it remained the Commission's position that ExxonMobil was liable if Venoco could not fulfill the obligations under the leases.  A1397 (emphasis added); *see also* A0904-05.  Defendants confirmed at trial that, as of the execution of the settlement agreement, it was the Commission's position that ExxonMobil had the responsibility to plug and abandon the wells if Venoco was unable to do so, and that the plugging and abandoning of the wells required use of the EOF.  A0906-07.  Defendants further conceded at trial that anyone ordered to plug and abandon the wells—including

ExxonMobil—would need to use the EOF.  A0907.  But Defendants did not order ExxonMobil to perform the plugging and abandoning work, did not otherwise enforce their contractual and statutory rights, and did not offer any explanation for their failure to do so.

Had Defendants enforced either their statutory or contractual rights, ExxonMobil would have needed to use the EOF and would have been required to negotiate with the Trust for that use.  *See* A0906-07.  Instead, the Commission took the extraordinary step of taking the property itself and engaging its own contractor to support the plugging and abandoning work that ExxonMobil agreed to perform in the settlement agreement.  In other words, the Commission decided to exercise the powers of the state to take private property to relieve ExxonMobil (a non-state entity) of the burden of leasing the property (and depriving the Trust's beneficiaries the fair market value of that lease).

Defendants never offered any evidence or explanation at trial as to why they could not have pursued ExxonMobil as an alternative to taking the EOF.  As the party asserting the police-powers exception, Defendants bore the burden of proving its application.  *Leppo v. City of Petaluma*, 97 Cal. Rptr. 840, 844 (Cal. Ct. App. 1971).  The Trust proved that requiring ExxonMobil to complete the plugging, abandoning, and decommissioning work was a viable alternative to the taking, and Defendants offered no evidence rebutting it.

Defendants' choice not to enforce their contractual and statutory rights confirms the lack of existence of any emergency.  The bankruptcy court found that "[a]s Venoco indicated it had no intention of [plugging and abandoning the wells], the Commission *had no choice* but to do so itself."  A1486 (emphasis added).  The bankruptcy court arrived at this erroneous conclusion by ignoring the fact that Defendants *always* could have enforced their contractual or statutory rights against ExxonMobil.

Defendants' taking of the EOF was not a last resort, but a "choice among many," including the option to enforce the rights they had preserved by contract decades before.  *See, e.g.*, *Los Osos*, 36 Cal. Rptr. 2d at 764.  Defendants' choice to favor ExxonMobil over the Trust is exactly the kind of arbitrary and unreasonable exercise of power that the constitution does not permit.  *See Chi., Burlington & Quincy Ry. Co.*, 200 U.S. at 592-94.

## CONCLUSION

For these reasons, Appellant requests that the Court reverse the bankruptcy court's Final Judgment, hold that the police-powers exception is inapplicable, and remand the case to the bankruptcy court for findings on the amount of just compensation owed or, in the alternative, for any further proceedings this Court deems necessary.

Dated: November 18, 2022

| | |
|---|---|
| **MORRIS, NICHOLS, ARSHT & TUNNELL LLP** | **BRACEWELL LLP** |

/s/ Matthew O. Talmo

Robert J. Dehney (No. 3578)
Andrew R. Remming (No. 5120)
Matthew O. Talmo (No. 6333)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899
Telephone: (302) 658-9200
Facsimile:  (302) 658-3989
rdehney@morrisnichols.com
aremming@morrisnichols.com
mtalmo@morrisnichols.com

Warren W. Harris (admitted *pro hac vice*)
Nancy McEvily Davis (admitted *pro hac vice*)
Stephani A. Michel (admitted *pro hac vice*)
711 Louisiana, Suite 2300
Houston, Texas 77002
Telephone: (713) 221-1520
Facsimile: (800) 404-3970
Warren.Harris@bracewell.com
Nancy.Davis@bracewell.com
Stephani.Michel@bracewell.com

*Counsel for the Liquidating Trustee, Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    The foregoing Appellant's Brief complies with the type-volume limitations in Fed. R. Bankr. P. 8015(a)(7)(B) and 8015(h) because it contains 11,793 words, excluding the parts excepted from the word count by Fed. R. Bankr. P. 8015(g).

2.    This document complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5) and the type-style requirements of Fed R. Bankr. P. 8015(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point.

November 18, 2022                         */s/Matthew O. Talmo*
                                          Matthew O. Talmo