```
 1                   IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF DELAWARE

 3

 4     In Re:                      )  Chapter 11
                                   )
 5     VENOCO, LLC,                )  Case No. 17-10828(JTD)
                                   )
 6           Liquidating Debtor.   )
       - - - - - - - - - - - - - - - - -
 7     EUGENE DAVIS, in his capacity as)
       Liquidating Trustee of the    )  Adv. Pro No. 18-50908(JTD)
 8     Venoco Liquidating Trust,     )
                                     )
 9                       Appellant,  )
                                     )
10                  v.               )
                                     )
11     STATE OF CALIFORNIA and     )  C.A. No. 22-1174-CFC
       CALIFORNIA STATE LANDS      )
12     COMMISSION,                 )
                                   )
13                    Appellees.   )

14
                                        J. Caleb Boggs Courthouse
15                                      844 North King Street
                                        Wilmington, Delaware
16
                                        Wednesday, April 26, 2023
17                                      8:36 a.m.
                                        Oral Argument
18

19     BEFORE:  THE HONORABLE COLM CONNOLLY, U.S.D.C.J.

20     APPEARANCES:

21                 MORRIS NICHOLS ARSHT & TUNNELL LLP
                   BY:  ANDREW R. REMMING, ESQUIRE
22                 BY:  MATTHEW TALMO, ESQUIRE

23                         -and-

24

25
```

1   APPEARANCES CONTINUED:

2                BRACEWELL LLP
                 BY:  WARREN W. HARRIS, ESQUIRE
3                BY:  NANCY McEVILY DAVIS, ESQUIRE
                 BY:  STEPHANI A. MICHEL, ESQUIRE
4                BY:  MARK DENDINGER, ESQUIRE
                 BY:  BRITTANY PEMBERTON, ESQUIRE
5
                        For the Venoco Trust
6

7                TROUTMAN PEPPER HAMILTON SANDERS LLP
                 BY:  DAVID M. FOURNIER, ESQUIRE
8
                            -and-
9
                 LOEB & LOEB LLP
10               BY:  STEVEN S. ROSENTHAL, ESQUIRE
                 BY:  MARC S. COHEN, ESQUIRE
11               BY:  ALICIA CLOUGH, ESQUIRE
                 BY:  JOHN D. TALIAFERRO, ESQUIRE
12
                        For the California State Lands Commission
13
                 U.S. ATTORNEY'S OFFICE
14               BY:  EDWARD K. BLACK, ESQUIRE

15                          -and-

16               CALIFORNIA ATTORNEY GENERAL'S OFFICE
                 MITCHELL E. RISHE, ESQUIRE
17
08:15:37                    For the State of California
08:15:37 18
08:15:37                 ***   PROCEEDINGS   ***
08:22:02 19

08:22:39 20            DEPUTY CLERK:  All rise.  Now, in the United

08:36:41 21   States District Court for the District of Delaware, the

08:36:45 22   Honorable Colm F. Connolly presiding.

08:36:47 23            THE COURT:  All right.  Good morning.  Please be

08:36:49 24   seated.

08:36:55 25            Who do we have?  Oh, good morning.

08:36:59  1          MR. REMMING:  Good morning, Your Honor.  For the

08:37:00  2    record, Andrew Remming from Morris Nichols for the Venoco

08:37:05  3    Trust.  I'm joined at counsel's table today by my colleagues

08:37:07  4    from the Bracewell firm, Warren Harris, Nancy Davis and

08:37:11  5    Stephani Michel.  Mr. Harris will handle the presentation

08:37:14  6    today for the trust.

08:37:14  7          THE COURT:  Okay.  Great.

08:37:17  8          MR. REMMING:  Thank you.

08:37:18  9          MR. FOURNIER:  Good morning, Your Honor.  David

08:37:25 10    Fournier from Troutman Pepper on behalf of California State

08:37:31 11    Lands Commission.  I'm joined here by my colleagues from the

08:37:33 12    Loeb & Loeb firm, Steven Rosenthal, Alicia Clough and Marc

08:37:38 13    Cohen.  Mr. Rosenthal will handle the presentation for the

08:37:42 14    Lands Commission.

08:37:43 15          THE COURT:  Okay.  Great.  Thank you.

08:37:45 16          All right.

08:37:47 17          MR. BLACK:  Your Honor, Deputy Attorney General

08:37:54 18    Edward K. Black appearing as local counsel for the State of

08:37:58 19    California.  With me is Deputy Attorney General Mitchell

08:38:00 20    Rishe from the State of California as lead counsel.  We cede

08:38:03 21    our time for presentation to the State Lands Commission.

08:38:08 22          THE COURT:  All right.  Thank you very much.

08:38:12 23    Good morning.

08:38:12 24          MR. HARRIS:  May it please the Court, my name is

08:38:15 25    Warren Harris.  I'll present two points today.

08:38:18 1      First, there's no emergency because there was no

08:38:20 2  imminent threat to the public's health and safety, and any

08:38:24 3  alleged emergency was foreseeable.

08:38:26 4      And, second, because ExxonMobil is liable for

08:38:28 5  the cost of plugging and abandoning the wells, there was a

08:38:31 6  reasonable alternative to Defendant's taking of the EOF.

08:38:34 7      The Bankruptcy Court ignored that an emergency

08:38:38 8  justifying the police powers exception must be imminent and

08:38:41 9  unforeseeable.  Courts have limited the circumstances

08:38:44 10 permitting Government to bypass the just compensation

08:38:47 11 requirement for the takings of private property.  These

08:38:50 12 limitations are limited to circumstances that involve

08:38:52 13 emergencies in the traditional sense such as natural

08:38:55 14 disasters, like fires and floods, wars, and political

08:39:00 15 activity -- or police activity to combat crime.

08:39:03 16      These narrow circumstances involving emergencies

08:39:05 17 have two things in common.  First, they involve imminent

08:39:09 18 peril; and, second, they involve unforeseeable

08:39:12 19 circumstances.

08:39:12 20      The Bankruptcy Court held that an emergency

08:39:15 21 justified a non-compensable taking.  First, the Bankruptcy

08:39:18 22 Court found that an emergency existed when Venoco allegedly

08:39:22 23 threatened to leave the EOF unmanned.

08:39:25 24      And, second, the Bankruptcy Court found that an

08:39:28 25 emergency would exist indefinitely until the wells were

08:39:31  1   permanently plugged and abandoned, but the Bankruptcy

08:39:34  2   Court's holding was erroneous because the alleged emergency

08:39:36  3   was neither imminent nor unforeseeable.

08:39:39  4             THE COURT:  Is it a totally factual

08:39:41  5   determination or a legal determination that you take issue

08:39:43  6   with?

08:39:43  7             MR. HARRIS:  It's primarily a legal

08:39:45  8   determination.  We've only challenged one finding as being

08:39:47  9   clearly erroneous.  The rest were legal determinations.

08:39:50 10             THE COURT:  Okay.  And then what is the one fact

08:39:52 11   that you have said is fact or the one fact finding that in

08:39:58 12   your mind constitutes a clear error?

08:40:01 13             MR. HARRIS:  The Bankruptcy Court's finding that

08:40:04 14   there was no choice but for the Commission to step in and

08:40:08 15   take over, and that goes to the alternative holding of the

08:40:12 16   Bankruptcy Court as well as affects the unforeseeability

08:40:17 17   element of the Bankruptcy Court.

08:40:18 18             THE COURT:  All right.  So, just so I'm clear,

08:40:21 19   it's the holding that -- well, I'd like you to, again, maybe

08:40:26 20   just restate it or -- just so I know in my mind what is the

08:40:31 21   factual finding that you say was clearly erroneous.  If you

08:40:36 22   had to write it down and give it to me, you would.

08:40:39 23             MR. HARRIS:  That the Commission had no choice

08:40:41 24   but to step in and take over.  And that's on Page 1497.

08:40:46 25             THE COURT:  Hold on.  Had no choice but to...

08:40:49  1               MR. HARRIS:  Step in and take over the plugging

08:40:52  2      and abandoning --

08:40:53  3               THE COURT:  Now, just so we're clear, the

08:40:55  4      Commission is not stepping in and taking over.  They're

08:40:58  5      getting third parties effectively to do that; right?

08:41:01  6               MR. HARRIS:  Correct.  Beacon West was the

08:41:03  7      contractor they hired.

08:41:04  8               THE COURT:  Right.  Okay.  So, they had no

08:41:06  9      choice but to get a third party --

08:41:09 10               MR. HARRIS:  Right.

08:41:09 11               THE COURT:  -- to step in.

08:41:11 12               All right.  And just, also, can you step back

08:41:13 13      and help me out?  I just kind of want to get a little -- it

08:41:15 14      may not be relevant, but am I right that -- is it Wracher --

08:41:20 15      how do you pronounce it -- the person, the COO or the former

08:41:23 16      COO whose emails go --

08:41:26 17               MR. HARRIS:  Yes.  I can't remember his name,

08:41:27 18      but let me -- Wracher.

08:41:32 19               THE COURT:  Wracher?

08:41:32 20               MR. HARRIS:  Yes.

08:41:33 21               THE COURT:  But it's W-R-A-C-H-E-R or something

08:41:35 22      like that?

08:41:36 23               MR. HARRIS:  Yeah.

08:41:36 24               THE COURT:  Okay.  So, Wracher is the COO of

08:41:40 25      Venoco; is that right?

08:41:41  1                    MR. HARRIS:  Yes.

08:41:42  2                    THE COURT:  Okay.  And he's the one whose emails

08:41:46  3      are relied upon by the State and the Commission to say,

08:41:51  4      We've got an imminent threat; right?

08:41:53  5                    MR. HARRIS:  Primarily, yes.

08:41:54  6                    THE COURT:  He's also, as I understand it, part

08:41:55  7      of Beacon West.

08:41:57  8                    MR. HARRIS:  Beacon West --

08:41:58  9                    THE COURT:  Is that right?

08:41:59 10                    MR. HARRIS:  I believe that's right.  Beacon

08:42:01 11      West, as I understand, was formed by former Venoco

08:42:03 12      employees.

08:42:04 13                    THE COURT:  Including Wracher.

08:42:06 14                    MR. HARRIS:  I believe that's right.

08:42:17 15                    THE COURT:  I am not saying I can articulate it,

08:42:24 16      but there's something about that that strikes me as odd or

08:42:28 17      worthy of further inquiry.  Can you help me maybe explore

08:42:32 18      that?

08:42:32 19                    MR. HARRIS:  As I understand, whenever they

08:42:35 20      needed someone to come in and take over the facility, they

08:42:38 21      were looking for people that had experience on that

08:42:42 22      facility.  Venoco was no longer able to employ the workers

08:42:46 23      that were there, and they -- that's why they formed a

08:42:49 24      separate company called Beacon West.  And it was that

08:42:51 25      company that was hired by the Commission.  That's my

08:42:54 1   understanding.

08:42:57 2                THE COURT:  Okay.  Now, am I oversimplifying

08:43:05 3   things too much to say, so Wracher is basically saying, Hey,

08:43:10 4   we're going to shut down come April, what is it, 25th?  I

08:43:14 5   forget what date it was.

08:43:15 6                MR. HARRIS:  There are different dates in the

08:43:16 7   record.  One's April 25th, I think, and one is April 30th.

08:43:20 8                THE COURT:  And it's like -- so, we're out of

08:43:22 9   here April 25th.

08:43:24 10               Now, as a practical matter, if Wracher had

08:43:28 11  walked off the job April 25th, and all of his colleagues,

08:43:33 12  and left that plant vacant and $H_2S$ leaked and killed people,

08:43:41 13  isn't he going to be prosecuted criminally for some kind of

08:43:46 14  crime?

08:43:46 15               MR. HARRIS:  I'm not that familiar with

08:43:48 16  California law on that, but I would suspect there's a very

08:43:51 17  good chance that that would happen.  It seems to me that

08:43:53 18  would be a violation of most state laws.

08:43:55 19               THE COURT:  All right.  Anyway, sorry.  I

08:44:02 20  interrupted your flow.  Go ahead.

08:44:04 21               MR. HARRIS:  California and federal law require

08:44:08 22  an emergency to be imminent to trigger the application of

08:44:12 23  police powers exception, and the case law is very explicit

08:44:14 24  about this.  California law requires an imminent and

08:44:18 25  substantial threat to public health or safety, and federal

08:44:21  1    law, likewise, requires imminent peril.  And to constitute

08:44:24  2    an imminent peril, a situation must call for immediate

08:44:28  3    action.

08:44:29  4                There could be no imminent threat to the

08:44:32  5    public's health or safety once the State's contractor

08:44:35  6    assumed operations of the EOF in September 2017.

08:44:38  7                THE COURT:  Can you read that again?

08:44:40  8                MR. HARRIS:  There can be no imminent threat to

08:44:42  9    the public's health or safety once the State's contractor

08:44:46 10    assumed operations of the EOF in September 2017.

08:44:50 11                What the Bankruptcy Court found was the

08:44:52 12    emergency arose when Venoco allegedly threatened, as we

08:44:55 13    talked about a minute ago, to leave the EOF unmanned.  And

08:44:59 14    that finding was based on an alleged immediate need to keep

08:45:02 15    the EOF up and running to protect the public from hydrogen

08:45:06 16    sulfide.

08:45:06 17                But the Commission didn't assert its police

08:45:08 18    powers then.  If that had been a situation where the police

08:45:11 19    powers were triggered, it would have taken the EOF.  What

08:45:15 20    the Commission did instead was to go find funding, which

08:45:18 21    shows that the Commission knew that at that time it couldn't

08:45:21 22    use its police power to take the EOF without compensation.

08:45:26 23                THE COURT:  So, let me just step back, though.

08:45:28 24    So, are you saying that if in April of 2017, the Commission

08:45:36 25    gets this email hypothetically, right, and it says, We're

08:45:39  1    going -- we, Venoco --

08:45:41  2                    MR. HARRIS:  Right.

08:45:41  3                    THE COURT:  -- are leaving unmanned the EOF come

08:45:44  4    April 25th, are you saying that if the Commission and the

08:45:48  5    State had not gone and sought funding and, instead, had

08:45:57  6    brought in its own engineers, some third party, and on

08:46:03  7    April 25th walked into the plant, took it over, that

08:46:10  8    actually would have been a lawful taking?

08:46:12  9                    Is that what you're saying?

08:46:13 10                    MR. HARRIS:  What I'm saying is that the

08:46:16 11    Commission at that time knew that if -- they knew this was

08:46:19 12    all coming.  They knew --

08:46:20 13                    THE COURT:  Well, they didn't -- let's say -- I

08:46:22 14    think the email is, you know, probably dated April 17th or

08:46:25 15    something.  That's my recollection.

08:46:26 16                    Does anybody know?  I'm looking at the

08:46:30 17    associates or the younger partners.

08:46:30 18                    MS. DAVIS:  It's dated April 12th.

08:46:31 19                    THE COURT:  April 12th.  Thank you.

08:46:33 20                    All right.  So, you know, they get this -- the

08:46:35 21    Commission gets an email April 12th.  And if you had an

08:46:43 22    email April 12th that said, We're leaving unmanned the plant

08:46:47 23    on April 25th --

08:46:50 24                    MR. HARRIS:  Mm-hmm.

08:46:51 25                    THE COURT:  -- would you dispute that that's

08:46:54  1    imminent?

08:46:56  2              MR. HARRIS:  I think that would be imminent.

08:46:56  3              THE COURT:  Okay.  So, let's stop then.

08:46:58  4              So, then we've got an imminent threat on

08:47:02  5    April 12th that the plant is going to go unmanned on

08:47:04  6    April 25th.  And you would agree, right, that the unmanned

08:47:07  7    plant is a danger?  You have to agree with that; right?

08:47:10  8              MR. HARRIS:  Yes, Your Honor.

08:47:11  9              THE COURT:  Okay.  So, now the State -- and I'm

08:47:13 10    going to put the State and the Commission together.  Let's

08:47:15 11    just call it the State.

08:47:17 12              MR. HARRIS:  Yes.

08:47:17 13              THE COURT:  Okay.  They've got 13 days to do

08:47:20 14    something, right.  And if they went out and they hired a

08:47:24 15    third party, all right, let's just call it a third party, to

08:47:28 16    come in on April 25th to take over the plant, would that be

08:47:33 17    a lawful taking?

08:47:35 18              MR. HARRIS:  If nothing else had prevented -- if

08:47:39 19    nothing else had interceded to take the imminence away.  And

08:47:43 20    here, for example, on April 14th, the Commission of Venoco

08:47:47 21    entered into the Reimbursement Agreement.  So --

08:47:49 22              THE COURT:  I got that.

08:47:49 23              MR. HARRIS:  -- there was already an agreement

08:47:51 24    in place.

08:47:52 25              THE COURT:  Right.  But it's almost like you're

08:47:54  1    punishing the State because they decided to come up with

08:47:57  2    something of a compromise, if you will.  Because it sounds

08:48:03  3    like what you're saying is, Look, if they wanted to, they

08:48:07  4    could have gone out between April 12th and April 25th, and

08:48:13  5    hired a third party and or manned it with some State

08:48:18  6    employees.  Let's just -- maybe we don't have any other

08:48:20  7    third party.  And they could have come in on April 25th and

08:48:23  8    taken it over, no problem, without compensation.

08:48:25  9              That's what you're saying?

08:48:27 10              MR. HARRIS:  No, Your Honor.  Remember here that

08:48:30 11    Venoco never locked -- no one ever locked the State out of

08:48:35 12    the EOF.  The EOF had always been available.  It was simply

08:48:36 13    a matter of whether it was being manned.  So, that's really

08:48:39 14    what the focus is that --

08:48:40 15              THE COURT:  Yeah, but, I mean, if you're the

08:48:42 16    State and the company says, We're out of here April 25th,

08:48:48 17    we're out, we're done.  I mean, at that point, let's say,

08:48:53 18    and -- doesn't the State -- I mean, it's responsible for

08:48:57 19    going out and accounting for what would happen if, in fact,

08:49:01 20    on April 25th there's nobody at that plant.

08:49:03 21              MR. HARRIS:  And what the State went to do was

08:49:05 22    to hire people to come in.  And the Reimbursement Agreement

08:49:08 23    was put in place, which took the urgency off of that.

08:49:11 24              And then by September, they had a contract with

08:49:14 25    Beacon West.  And that was the emergency that was found by

08:49:17  1    the Bankruptcy Court.  That was the imminent threat.  The

08:49:20  2    imminence had ceased once they had a contractor in place

08:49:24  3    that was going to be manning the facility, because it wasn't

08:49:27  4    dealing with access to the facility --

08:49:29  5                 THE COURT:  So, is it your position that there

08:49:31  6    was an imminent threat between April and September?

08:49:34  7                 MR. ROSENTHAL:  We don't --

08:49:34  8                 THE COURT:  Because they signed the contract

08:49:35  9    with Beacon West in September; right?

08:49:37 10                 MR. HARRIS:  Correct.

08:49:37 11                 THE COURT:  Okay.  So, is it your position that

08:49:39 12    those four to five months, there was an imminent threat?

08:49:43 13                 MR. HARRIS:  No, Your Honor.  I guess two points

08:49:45 14    on that.

08:49:46 15                 First, the Reimbursement Agreement was signed on

08:49:49 16    April 14th, so I believe that would be sufficient to stop

08:49:52 17    the imminent threat.

08:49:53 18                 Then, we have the Beacon West agreement, which

08:49:56 19    was put in place in September.  We disagree with the

08:50:00 20    Bankruptcy Court's finding.  We're not challenging that

08:50:02 21    finding.  Even assuming --

08:50:04 22                 THE COURT:  Wait, wait.  Hold on.  So, you've

08:50:06 23    got to be clear on that then.

08:50:07 24                 MR. HARRIS:  Yes.

08:50:09 25                 THE COURT:  So, what finding are you -- if

08:50:09  1   you're disagreeing, then you are saying it's erroneous?

08:50:12  2            MR. HARRIS:  We have not challenged it as

08:50:13  3   clearly erroneous.

08:50:15  4            THE COURT:  Okay.  I see.

08:50:16  5            MR. HARRIS:  But even assuming the Bankruptcy

08:50:17  6   Court is right on there being an imminent threat, it would

08:50:19  7   have been cut off by the Reimbursement Agreement or at the

08:50:23  8   very latest, it would have been cut off in September 2017,

08:50:27  9   whenever Beacon West was hired.

08:50:28 10            So, at that point there is no more imminent

08:50:30 11   threat.  The imminent threat found by the Bankruptcy Court

08:50:32 12   is we think Venoco may leave the facility unmanned.  The

08:50:36 13   Reimbursement Agreement really took care of that a few days

08:50:38 14   later.

08:50:39 15            Then in September, the State hires Beacon West.

08:50:44 16   They have a contract for -- in place.  Any threat of the EOF

08:50:47 17   being unmanned is gone at that point.  And so, even assuming

08:50:51 18   that the Bankruptcy Court was right and there was an

08:50:54 19   imminent threat, those two factors -- and certainly by

08:50:57 20   September 17th, when they had their contractor in, there was

08:51:00 21   no longer an imminent threat, and the emergency ceased to

08:51:03 22   exist at that point.

08:51:06 23            THE COURT:  Okay.

08:51:09 24            MR. HARRIS:  And it was only -- it was only

08:51:11 25   after the parties couldn't reach an agreement regarding

08:51:14  1    payment for the EOF that the Commission, a year later,

08:51:18  2    declared that it would use its police power and argue that

08:51:21  3    that was retroactive all the way back to April of 2017.

08:51:25  4          But this was really about a funding issue.

08:51:27  5    Whenever they went out in April of 2017, it was to get

08:51:31  6    funding to man the EOF.  It wasn't dealing with access to

08:51:35  7    the facility, because Venoco had never told them they

08:51:38  8    couldn't have access.  Venoco was simply saying, We can't

08:51:41  9    afford to pay the employees any longer; therefore, we don't

08:51:47 10    have the ability to man the facility.  You need to handle

08:51:50 11    getting it manned.

08:51:53 12          The Reimbursement Agreement was signed a few

08:51:54 13    days later.  Beacon West was hired in September.  At that

08:51:56 14    point, even if there was an imminent threat, it was gone.

08:51:59 15    And the emergency exception to the requirement to compensate

08:52:03 16    for a taking no longer existed, and they could not take the

08:52:08 17    facility.

08:52:08 18          Turning now to the plugging and abandoning of

08:52:12 19    the wells.  That doesn't have anything to do with the

08:52:14 20    immediate need of keeping the EOF staffed.  The Bankruptcy

08:52:18 21    Court held that the emergency that would justify the

08:52:21 22    Commission's use of the EOF without compensation held that

08:52:25 23    that would continue until the plugging and abandoning

08:52:28 24    process was completed.  But you have other findings of the

08:52:32 25    Bankruptcy Court that are inconsistent with that.

08:52:33  1                    THE COURT:  Well, wait.  Hold on.

08:52:35  2           So, before you get to what the inconsistent

08:52:37  3    findings are --

08:52:38  4                    MR. HARRIS:  Yes.

08:52:38  5                    THE COURT:  -- what is the finding -- can you

08:52:40  6    repeat again the finding that you just said is inconsistent

08:52:42  7    with what you're about to say?  What's that finding?

08:52:44  8                    MR. HARRIS:  "That an emergency would justify

08:52:47  9    the Commission's use of the EOF without compensation until

08:52:51 10    the plugging and abandoning process was complete."

08:52:58 11           And that's on Page 1486 of the record.

08:53:03 12                    THE COURT:  Okay.  So, you're now challenging

08:53:06 13    the finding by the Bankruptcy Court that an emergency would

08:53:10 14    justify a continued taking until the plugging and

08:53:15 15    abandonment of the wells was complete; is that right?

08:53:17 16                    MR. HARRIS:  That finding is irrelevant to the

08:53:21 17    immediate harm because the immediate harm deals with keeping

08:53:25 18    the EOF manned.  And that has to happen regardless of the

08:53:29 19    plugging and abandoning.  I mean, what the Bankruptcy Court

08:53:32 20    found was there's an imminent harm that the EOF might not be

08:53:36 21    manned, and that imminent harm is going to continue until

08:53:39 22    the plugging and abandoning process is complete.

08:53:41 23           And our argument is that the plugging and

08:53:44 24    abandoning process didn't have anything to do with the

08:53:48 25    imminent harm.  The Bankruptcy Court found --

08:53:51  1                    THE COURT:  Well, wait.  What you're saying is a

08:53:53  2      factual matter?  Are you saying it's --

08:53:57  3                    MR. HARRIS:  Yes, I believe that would be as a

08:54:00  4      factual matter because if you look at the Bankruptcy Court's

08:54:02  5      finding, the finding was -- the immediate need was to keep

08:54:05  6      the EOF up and running to protect the public from exposure.

08:54:08  7                    THE COURT:  Right.

08:54:09  8                    MR. HARRIS:  And it said plugging and abandoning

08:54:12  9      is a separate process.  It has nothing to do with the

08:54:14 10      immediate need to keep the EOF up and running to protect

08:54:17 11      against the hydrogen sulfide.

08:54:19 12                    THE COURT:  So, can you just help me out,

08:54:21 13      though?  I need to understand better the facts, I think.

08:54:24 14                    If the wells are not plugged, okay, is there

08:54:33 15      production of $H_2S$?

08:54:35 16                    MR. HARRIS:  Yes.

08:54:36 17                    THE COURT:  Okay.  And isn't it true that unless

08:54:38 18      that $H_2S$ is --

08:54:44 19                    MR. HARRIS:  Stopped.

08:54:44 20                    THE COURT:  Well, I was going to say it's

08:54:46 21      transformed into some okay chemical, right, then there is an

08:54:52 22      immediate threat of human sickness; right?

08:54:58 23                    MR. HARRIS:  There is a threat, but as long as

08:55:01 24      the EOF is manned and that treatment process --

08:55:03 25                    THE COURT:  No, as long as it's manned, but I do

08:55:05  1    think that that's why I wanted to question you on this.  I

08:55:08  2    thought it was a given that until the wells are plugged,

08:55:15  3    there has to be a facility, via the EOF or creation of some

08:55:19  4    new facility, that mitigates the $H_2S$ that will continue to

08:55:24  5    emanate from the wells until they're plugged.

08:55:26  6              Is that not right?

08:55:28  7              MR. HARRIS:  That is correct.

08:55:28  8              THE COURT:  Okay.  So, how could the Bankruptcy

08:55:32  9    Court be erroneous in finding that until the wells are

08:55:36 10    plugged, there's an imminent threat of harm?

08:55:42 11              MR. HARRIS:  Imminence is a separate question

08:55:44 12    to -- leave that aside for a minute.  But the plugging and

08:55:46 13    abandoning process doesn't manage the $H_2S$.  It would stop it

08:55:51 14    at a point.

08:55:52 15              THE COURT:  It would make it unnecessary.

08:55:54 16              MR. HARRIS:  It would make it unnecessary

08:55:55 17    because you no longer need to manage the $H_2S$ because there

08:55:58 18    would be no $H_2S$.

08:55:59 19              THE COURT:  Right.  But until the wells are

08:56:03 20    fully plugged, there is an $H_2S$ management problem that has

08:56:05 21    to be addressed.  Otherwise, there is a harm.

08:56:07 22              MR. HARRIS:  There is a potential harm, yes.

08:56:09 23              THE COURT:  Well, potential harm, I mean -- how

08:56:11 24    do you get the harm versus potential harm?  I mean, I

08:56:14 25    thought you have to address the $H_2S$ issue, be it plug the

08:56:17  1    well or have some facility, the EOF; isn't that right?

08:56:22  2              MR. HARRIS:  That is right.

08:56:23  3              THE COURT:  Okay.

08:56:24  4              MR. HARRIS:  But the point we're making in the

08:56:25  5    Bankruptcy Court, and the Bankruptcy Court found this, that

08:56:27  6    the plugging and abandoning process isn't part of the

08:56:31  7    treatment for the $H_2S$.  It simply would stop it.  But

08:56:34  8    that --

08:56:35  9              THE COURT:  Okay.

08:56:35 10              MR. HARRIS:  -- that would stop where you no

08:56:37 11    longer have to be there to treat it.  But that is different

08:56:39 12    than whether you have the facility manned, which is what the

08:56:43 13    real threat was.

08:56:44 14              So, it's really -- the imminent threat that the

08:56:47 15    Bankruptcy Court found was the potential that the EOF might

08:56:50 16    be unmanned.  And then the secondary part of that was, and

08:56:55 17    that threat will continue until the plugging and abandoning

08:57:00 18    process is completed.

08:57:01 19              But the threat was leaving it unmanned, not just

08:57:04 20    the hydrogen sulfide.  That's the point we're trying to

08:57:07 21    make.  And, therefore, the plugging and abandoning really

08:57:09 22    doesn't have anything to do with the alleged emergency,

08:57:13 23    other than the stop -- other than the fact that it would

08:57:15 24    eventually stop.  That's how you would stop the hydrogen

08:57:17 25    sulfide is through the plugging process.

08:57:17  1          THE COURT:  Okay.

08:57:31  2          MR. HARRIS:  And so, the point we're making is

08:57:32  3     that the imminent threat was that the EOF might be unmanned.

08:57:37  4     That was resolved in September 2017 when Beacon West entered

08:57:43  5     the facility.  The State had a contractor in place.  There

08:57:45  6     was no longer a threat because the facility being manned was

08:57:50  7     dealing with the hydrogen sulfide.

08:57:52  8          And so, the immediacy, which is one of the

08:57:54  9     requirements of an emergency, the immediacy and the

08:57:59 10     imminence of the threat ceased to exist.  So, therefore, at

08:58:03 11     that point, there was no longer an emergency.

08:58:05 12          The Bankruptcy Court also ignored that an

08:58:09 13     emergency justifying the police powers exception has to be

08:58:12 14     unforeseen, and the California cases involving the police

08:58:16 15     powers exception involve unforeseen circumstances.

08:58:20 16     California law explicitly requires this unforeseen situation

08:58:23 17     to exist before there can be an emergency.  The term

08:58:27 18     "emergency" has long been accepted in California as an

08:58:30 19     unforeseen situation calling for immediate action.  And a

08:58:34 20     situation is not unforeseen if the Government has prior

08:58:37 21     knowledge of the alleged emergency.  Federal Courts,

08:58:41 22     likewise, require that unexpected circumstances exist for

08:58:44 23     there to be an emergency.

08:58:46 24          The Bankruptcy Court first said there's no such

08:58:49 25     broad rule.  There's no requirement that it be unforeseen,

08:58:52  1    but then found that even if it was -- even if there is a

08:58:56  2    requirement that it be unforeseen, it would be satisfied

08:58:59  3    here.

08:59:00  4            But contrary to the Bankruptcy Court's narrow

08:59:03  5    finding on this interpretation, foreseeability, the

08:59:06  6    Government doesn't have to know the exact moment and

08:59:09  7    circumstances that a situation will occur to be

08:59:13  8    unforeseeable.  At a minimum, if the Government intends to

08:59:17  9    handle the emergency in a certain way and does just that,

08:59:20 10    the situation is foreseeable and can't be an emergency.

08:59:25 11            Now, let's look at what happened here.  The

08:59:26 12    Commission required Venoco to provide security for the

08:59:30 13    amount that the Defendants believe was necessary to

08:59:33 14    compensate the Commission for the cost of plugging and

08:59:36 15    abandoning the wells if Venoco or another lessee quitclaimed

08:59:41 16    the leases.  The Commission knew that the leases permitted

08:59:46 17    lessees to unilaterally quitclaim their rights.

08:59:49 18            THE COURT:  Incidentally on that, is there any

08:59:53 19    conditions on the quitclaim?  In other words, on the right

08:59:58 20    to quitclaim?

09:00:00 21            MR. HARRIS:  Not that I'm aware of, Your Honor.

09:00:03 22    There may be a requirement that you can no longer pay or not

09:00:07 23    be able to do it.  I'd need to look at the lease itself to

09:00:10 24    see if there's a condition.  I'm not aware of a condition on

09:00:12 25    the ability to quitclaim.  But if you had a commercially

09:00:16  1   producing well, you wouldn't want to give it back to the

09:00:18  2   State.  That would be negating the value of your lease.

09:00:20  3   It's a situation like here where the --

09:00:23  4            THE COURT:  Well, let me give you an example.

09:00:25  5   So, I've got some well.  I'm making money off it.  Put aside

09:00:30  6   the EOF issue.  And all of a sudden, I hit something in the

09:00:35  7   well.  I don't know, it's a dangerous chemical.  All right.

09:00:39  8   And all of a sudden, it is coming out of the pipe.

09:00:45  9            Are you saying at that point, the lessee could

09:00:48 10   just quitclaim it to the State and say, By the way, we're

09:00:51 11   walking away.  It's on you now to take care of this well.

09:00:54 12            MR. HARRIS:  I would have to double-check the

09:00:56 13   lease.  I'm not aware of a condition that would prevent

09:00:58 14   that.  I believe that a lessee could quitclaim the well back

09:01:01 15   to the State under that circumstance.

09:01:02 16            THE COURT:  Without plugging the well?

09:01:04 17            MR. HARRIS:  Without plugging, but the State

09:01:07 18   knows that this is a potentiality.

09:01:09 19            THE COURT:  Right.  So, it gets a bond.

09:01:11 20            MR. HARRIS:  It gets a bond.  And here it not

09:01:13 21   only got a bond, it checked the bond periodically.  Whenever

09:01:17 22   Venoco filed for bankruptcy in 2016, it increased the amount

09:01:20 23   of the bond.  It increased the bond up to $22 million, which

09:01:23 24   is the amount that the Commission determined was -- should

09:01:26 25   be sufficient for plugging and abandoning the wells and

09:01:30  1    decommissioning Platform Holly.

09:01:32  2                THE COURT:  And on that you say something in

09:01:33  3    your briefs about -- what I inferred from the brief was that

09:01:40  4    the State's only spent 25 million, that there's only a $3

09:01:45  5    million gap; is that right?

09:01:45  6                MR. HARRIS:  That's what I understand.  The bond

09:01:47  7    was 22 million.  The entire amount of the bond has been

09:01:50  8    paid.  The State in its brief said that they spent 25

09:01:53  9    million.  So, yes, $22 million of that was paid out of the

09:01:56 10    bond.  And the bond --

09:01:58 11                THE COURT:  So, are you saying the State's been

09:02:00 12    made whole so far?

09:02:01 13                MR. HARRIS:  Twenty-two of the --

09:02:02 14                THE COURT:  I mean, except for the 3 million

09:02:04 15    bucks.

09:02:04 16                MR. HARRIS:  Yes, Your Honor, we are.  And

09:02:06 17    whenever they set the bond, they specifically considered the

09:02:08 18    cost of plugging, abandoning and decommissioning the wells

09:02:12 19    and Platform Holly.  And that's clearly stated in the

09:02:15 20    record.

09:02:15 21                It's also in the record that they didn't include

09:02:18 22    costs for the EOF.  Now, the State knew to do the

09:02:25 23    decommissioning, to do the plugging and abandoning, it would

09:02:27 24    need to use the EOF.  It knew it didn't have any ownership

09:02:31 25    rights in the EOF.  It knew it didn't have a lease or other

09:02:33  1    contractual right to use the EOF, but it didn't put it in

09:02:37  2    the bond.  It even -- in the record, Ms. Lucchesi testified,

09:02:41  3    "In hindsight, we did not negotiate a bond high enough."

09:02:45  4             That's the issue here.  The State knew exactly

09:02:48  5    what was going to happen.

09:02:49  6             THE COURT:  So, why don't you pay them the $3

09:02:52  7    million, and we'll just settle this case?

09:02:53  8             MR. HARRIS:  It's not the $3 million.  It's the

09:02:56  9    rental value of the EOF that should have been paid.  That's

09:02:59 10    what's in dispute here.

09:03:00 11             THE COURT:  All right.

09:03:05 12             MR. HARRIS:  And so, that really is the point

09:03:07 13    that this was foreseeable, the State knew exactly what was

09:03:10 14    going to happen.  It knew it didn't have access to the EOF,

09:03:13 15    but it didn't put it in the bond.  That was simply a

09:03:15 16    financial issue.  And a year later after they'd been paying

09:03:18 17    for use of the EOF, they decided, We don't want to pay

09:03:21 18    anymore.  We want to use our police power.

09:03:23 19             And that's exactly what happened here.  The

09:03:25 20    police power is not applicable because this was foreseeable,

09:03:29 21    and there was no longer an emergency.

09:03:31 22             THE COURT:  Can I get a little bit more

09:03:33 23    background in this area?  So, as I understand it, there is

09:03:37 24    another pipeline that leads from the EOF to, I don't know,

09:03:43 25    commercial establishments.  In other words, that but for

09:03:53 1    that pipeline, which is owned by another party, Plains --

09:03:56 2              MR. HARRIS:  Yes, the Plains pipelines which

09:03:58 3    ruptured.  Yes, Your Honor.

09:03:59 4              THE COURT:  So, the Plains pipeline ruptured.

09:04:01 5    And then, as a result of that, the folks that are producing

09:04:06 6    the oil and gas out of the wells are in trouble --

09:04:10 7              MR. HARRIS:  Because --

09:04:10 8              THE COURT:  -- because they can't commercialize

09:04:12 9    their product.

09:04:13 10              MR. HARRIS:  They cannot get the gas and get to

09:04:15 11    market.  Exactly right.

09:04:16 12              THE COURT:  So, now, did Plains try to fix the

09:04:20 13    pipeline?

09:04:20 14              MR. HARRIS:  I'm not sure if they tried to fix

09:04:24 15    it.  It either -- either it was not commercially reasonable

09:04:28 16    to do so or maybe they couldn't get permits to do it once

09:04:31 17    this happened, I think it may have been a permitting issue.

09:04:34 18              THE COURT:  That's why --

09:04:34 19              MR. HARRIS:  Yeah.

09:04:35 20              THE COURT:  The reason why I ask is there is

09:04:38 21    intimation in the briefing that suggests that -- makes at

09:04:41 22    least a potential argument that the State created this

09:04:43 23    situation because the State precluded the continued

09:04:48 24    commercialization of the oil and gas when this rupture

09:04:53 25    occurred in 2015.

09:04:55  1          Do you want to say anything about that?

09:04:57  2          MR. HARRIS:  I would have to double-check what

09:05:01  3   the cause was.  I know there's separate litigation pending

09:05:04  4   over the Plains pipeline and its use.  There's different

09:05:07  5   litigation there.  I think it was -- and I'm not a

09:05:10  6   hundred-percent certain on the record, but I believe it was

09:05:12  7   a permitting issue is why they couldn't get the Plains

09:05:15  8   pipeline back operational.

09:05:18  9          So, yes, from that standpoint, I guess it would

09:05:21 10   be the State that caused Venoco the problem.  That once it

09:05:25 11   couldn't get its oil and gas to market, then at that point

09:05:27 12   they had no business ability to continue to pay for the

09:05:32 13   operations.  And it was a matter of going into bankruptcy

09:05:35 14   was its only recourse.

09:05:36 15          THE COURT:  Right.  In your reply brief, you

09:05:40 16   make an argument really at the outset that there's been a

09:05:49 17   failure by the Bankruptcy Court and by the State to

09:05:53 18   recognize that there's really two different properties here.

09:05:57 19   There's the Plant Holly for the -- sorry, the Platform

09:06:02 20   Holly.

09:06:02 21          MR. HARRIS:  Right.

09:06:03 22          THE COURT:  And the leased wells, which really

09:06:07 23   are the State's property leased to Mobil and then ultimately

09:06:13 24   Venoco, on one hand.  And then, on the other hand, there's

09:06:17 25   the EOF.  And that the takings has been of the EOF, not the

09:06:26 1    Plant Holly wells property which you say, in your briefing,

09:06:32 2    Venoco had a right to quitclaim to the State.

09:06:37 3               Now, was that argument presented to the

09:06:39 4    Bankruptcy Court?

09:06:39 5               MR. HARRIS:  All the underlying facts were

09:06:43 6    presented in that -- it's undisputed these are two separate

09:06:47 7    properties.  The quitclaim was for the wells and Platform

09:06:47 8    Holly.

09:06:50 9               Venoco continued to hold title to the EOF.  We

09:06:54 10   argued -- the whole case is about the taking of the EOF, so

09:06:57 11   that's undisputed.  It's undisputed that the hydrogen

09:07:03 12   sulfide is being produced from the wells, and that only gets

09:07:06 13   to the EOF because of the pipeline connecting platform.

09:07:10 14               THE COURT:  I get that the facts are there.  I

09:07:12 15   get that the facts are there.

09:07:14 16               MR. HARRIS:  Yes.

09:07:14 17               THE COURT:  It's just what I found at least the

09:07:16 18   most compelling articulation of the legal arguments that

09:07:20 19   flow from the facts was in the reply brief.  And I'm just

09:07:27 20   trying to -- I didn't see anything -- I didn't see the

09:07:29 21   Bankruptcy Court address that argument in its opinion, so

09:07:34 22   I'm just trying to get a better handle on it.

09:07:37 23               MR. HARRIS:  The Bankruptcy Court didn't

09:07:38 24   expressly address it.  I believe it was raised more in the

09:07:40 25   summary judgment papers at trial.  The focus was really on

09:07:42 1    the emergency aspect, but it's always dealing with two

09:07:46 2    separate properties.

09:07:46 3              Where this really came up and became more

09:07:50 4    prominent is in the State's brief.  They cite all these

09:07:53 5    nuisance cases.  And they say there's no emergency required.

09:07:57 6              You don't have to have an emergency.  What you

09:07:59 7    do for this type of police powers exception is often called

09:08:02 8    the emergency exception in California.

09:08:03 9              THE COURT:  Well, also nuisance, if you take

09:08:10 10   property to address a nuisance, you have to pay people;

09:08:14 11   right?

09:08:15 12             MR. HARRIS:  If you are taking the property on

09:08:18 13   which the nuisance exists for the purpose of remedying the

09:08:22 14   nuisance, that is an exception to the -- to requirement of

09:08:26 15   just compensation.

09:08:27 16             THE COURT:  Okay.

09:08:27 17             MR. HARRIS:  But what we're pointing out or we

09:08:29 18   pointed out in our reply brief is it's always the same

09:08:32 19   property.  Someone creates a nuisance on their property, and

09:08:35 20   you go onto that property to remedy the nuisance.  That's

09:08:38 21   not what happened here.

09:08:39 22             And if you look at the State's brief, in several

09:08:41 23   places it talks about the nuisance or -- may not use the

09:08:45 24   word "nuisance," but it talks about the harm emanating from

09:08:48 25   the EOF.  The harm is coming from the wells in Platform

09:08:52  1    Holly, and the State really melds those together and argues

09:08:56  2    nuisance cases.  The State cites no case in which a party

09:09:00  3    has been able to come onto one property owner's property to

09:09:05  4    remedy a nuisance or problem.

09:09:06  5            THE COURT:  Right.  And that goes back to --

09:09:08  6    this is the argument I'm talking about in the reply brief.

09:09:11  7            MR. HARRIS:  Right.

09:09:11  8            THE COURT:  Is it anywhere in the opinion of the

09:09:12  9    Bankruptcy Court?

09:09:13 10            MR. HARRIS:  It's not.  The Bankruptcy Court

09:09:14 11    didn't squarely address this.  There are times --

09:09:17 12            THE COURT:  Well, did you squarely raise this to

09:09:20 13    the Bankruptcy Court without an opportunity to address it?

09:09:23 14            MR. HARRIS:  All -- Your Honor, all the facts

09:09:25 15    were presented.  It really was argued in terms of there

09:09:28 16    being an emergency, and the emergency focused on the two

09:09:30 17    separate properties.

09:09:31 18            THE COURT:  I'm just trying to -- I mean, should

09:09:33 19    I give the Bankruptcy Court an opportunity, in the first

09:09:35 20    instance, to address that?

09:09:36 21            MR. HARRIS:  Well, maybe so, Your Honor, just

09:09:41 22    like the Bankruptcy Court didn't address the ExxonMobil

09:09:44 23    issue.  That's another issue that we could come to if the

09:09:47 24    Court would like.

09:09:47 25            THE COURT:  Go ahead.

09:09:48  1          MR. HARRIS:  But the Bankruptcy Court didn't

09:09:49  2     squarely tee that up and look at the fact that there were

09:09:52  3     two properties.  Most of the Bankruptcy Court's opinion

09:09:54  4     deals with the emergency issue.

09:09:56  5          Turning to ExxonMobil and that point, the

09:10:00  6     Defendants here can order ExxonMobil to plug and abandon the

09:10:04  7     wells, but the Bankruptcy Court ignored this and ignored

09:10:07  8     this alternative altogether.

09:10:09  9          ExxonMobil was Venoco's predecessor in interest.

09:10:12 10     And as such, both contractually and by statute, ExxonMobil

09:10:17 11     is required to come in and plug, and abandon and

09:10:20 12     decommission if Venoco is unable to do so.

09:10:23 13          When Venoco filed for bankruptcy, the Defendants

09:10:26 14     preserved their rights to enforce the lease obligation.

09:10:28 15          THE COURT:  And is that disputed?

09:10:32 16          MR. HARRIS:  Is what part of that disputed?

09:10:33 17          THE COURT:  The fact -- is the fact -- what

09:10:35 18     you've just alleged, that ExxonMobil was contractually and

09:10:41 19     statutorily obligated to plug the wells if the State

09:10:45 20     required it and Venoco was unable --

09:10:45 21          MR. HARRIS:  Venoco.

09:10:51 22          THE COURT:  Venoco, sorry.

09:10:52 23          MR. HARRIS:  It is not disputed.  The Bankruptcy

09:10:54 24     Court deals with that in Footnote 51 of its opinion.

09:10:57 25          THE COURT:  All right.  Hold on a second.

09:11:03   1            MR. HARRIS:  The footnote runs over from

09:11:06   2    Pages 1463 to 64.

09:11:19   3            THE COURT:  Okay.  This is citing that CalGEM,

09:11:26   4    C-A-L-G-E-M Order --

09:11:29   5            Hold on one second.  Have you been able to hear

09:11:34   6    me?  Am I too far back?

09:11:37   7            THE REPORTER:  I can hear you, Your Honor.

09:11:41   8            MR. HARRIS:  But to answer, Your Honor, I

09:11:42   9    believe it is undisputed --

09:11:43  10            THE COURT:  Okay.

09:11:44  11            MR. HARRIS:  -- that ExxonMobil has that

09:11:45  12    liability, both contractually and by statute.

09:11:48  13            THE COURT:  All right.  Thank you.

09:11:49  14            And anyway, the Court didn't address that.

09:11:53  15            MR. HARRIS:  The Court didn't address it.

09:11:55  16            THE COURT:  Right.  And your point would be,

09:11:56  17    Hey, the emergency -- if there's an emergency, it's

09:12:00  18    emanating from the wells --

09:12:01  19            MR. HARRIS:  It's emanating --

09:12:02  20            THE COURT:  -- right?  And there's -- the State

09:12:05  21    had the power to compel ExxonMobil to address that

09:12:10  22    emergency?

09:12:10  23            MR. HARRIS:  Absolutely.  And it should have

09:12:12  24    been on ExxonMobil, but instead, the State -- in saying

09:12:15  25    ExxonMobil, You have this obligation in the contract, you

09:12:17 1  have this obligation under statute, you need to plug and

09:12:20 2  abandon, you need to decommission, which is going to require

09:12:23 3  use of the EOF, you need to go handle and do that, what the

09:12:26 4  State did instead was exercise, allegedly, its police power

09:12:30 5  to come in and to take the EOF without compensation.

09:12:34 6  Because this alternative was there for the State to use its

09:12:38 7  police power to instead benefit ExxonMobil, that it's

09:12:42 8  arbitrary and unreasonable and, therefore, would not be a

09:12:45 9  valid use of the State's police power.

09:12:47 10          ExxonMobil had this obligation.  ExxonMobil

09:12:50 11 should have done the plugging, and abandoning and

09:12:52 12 decommissioning at its expense, rather than the State taking

09:12:57 13 property without compensation.

09:12:58 14          THE COURT:  All right.  And you're saying that

09:12:59 15 the Court never addressed that argument below?

09:13:01 16          MR. HARRIS:  Correct.

09:13:02 17          THE COURT:  Okay.  You're saying you did raise

09:13:03 18 it squarely?

09:13:04 19          MR. HARRIS:  Correct, Your Honor.

09:13:05 20          THE COURT:  And you're saying that it's

09:13:07 21 undisputed that Exxon had this obligation?

09:13:10 22          MR. HARRIS:  Correct, Your Honor.

09:13:11 23          THE COURT:  And you're saying that Exxon's

09:13:13 24 obligation was a result of CalGEM, which is an Order issued

09:13:19 25 in May of 2017; is that right, by the State of California's

09:13:24 1  Department of Conservation, Division of Oil, Gas and

09:13:26 2  Geothermal Resources?

09:13:27 3           MR. HARRIS:  I believe that Order was the Order

09:13:29 4  for them to plug and abandon.  The obligation arises out of

09:13:34 5  the leases.

09:13:35 6           THE COURT:  Okay.

09:13:36 7           MR. HARRIS:  And it arises out of the statute.

09:13:38 8  It's 3237(c) -- 3237(c) of the California Public Resources

09:13:45 9  Code.

09:13:46 10          But under the leases, it says whenever the State

09:13:51 11  approved the lease assignment from ExxonMobil to Venoco, it

09:13:56 12  made clear that ExxonMobil continued to have this liability,

09:13:59 13  that that was expressed in the lease that if for some reason

09:14:03 14  Venoco was not able to pay for the plugging and abandoning,

09:14:06 15  then ExxonMobil's liable.

09:14:08 16          So, under both of those authorities, they're

09:14:10 17  obligated to do it.  And the plugging, and abandoning and

09:14:13 18  decommissioning requires use of the EOF, which Exxon should

09:14:17 19  be paying for rather than the State using its police power.

09:14:20 20          THE COURT:  Now, was there any attempt by the

09:14:23 21  State to reach out to ExxonMobil?

09:14:25 22          MR. HARRIS:  The State in ExxonMobil entered

09:14:28 23  into what's called a Phase 1 Agreement, which is in the

09:14:30 24  record.  There was a dispute over a couple of the wells.  I

09:14:33 25  think it was three of the 32 wells.  ExxonMobil said, Wait a

09:14:36  1    minute.  We're not operator of those wells.

09:14:38  2              This Phase 1 Agreement resolved that issue, but

09:14:42  3    in that Phase 1 Agreement the Commission reserved its rights

09:14:45  4    against ExxonMobil.  So, all those rights were specifically

09:14:49  5    reserved, so those rights still exist that the Commission

09:14:54  6    can require ExxonMobil to do the plugging, and abandoning

09:15:00  7    and decommissioning.

09:15:00  8              THE COURT:  At its cost?  At Exxon's cost?

09:15:03  9              MR. HARRIS:  At Exxon's costs.  Yes, Your Honor.

09:15:04 10              THE COURT:  All right.  Anything else?

09:15:05 11              MR. HARRIS:  Unless the Court has any questions,

09:15:07 12    we request that the Court reverse the Bankruptcy Court's

09:15:10 13    final judgment and remand to that Court for further

09:15:13 14    proceedings.

09:15:14 15              THE COURT:  So, yeah.  Let's just actually

09:15:16 16    clarify that.

09:15:16 17              So, on relief you're asking for -- your relief

09:15:19 18    is a remand?

09:15:19 19              MR. HARRIS:  A remand for determination of

09:15:21 20    damages.  The police power exception should not be

09:15:23 21    applicable here, in which case the Defendants are required

09:15:27 22    to compensate the Trust and Trustee for the taking.  And

09:15:32 23    there needs to be a remand for the determination of what

09:15:35 24    those damages are.

09:15:35 25              THE COURT:  All right.  Thank you.

09:15:36  1              MR. HARRIS:  Thank you, Your Honor.

09:15:43  2              THE COURT:  You're Mr. Rosenthal?

09:15:44  3              MR. ROSENTHAL:  I am Mr. Rosenthal.  And I've

09:15:47  4    appeared in front of you before, I believe.

09:15:49  5              THE COURT:  Really?

09:15:51  6              MR. ROSENTHAL:  In connection with the sovereign

09:15:53  7    immunity.

09:15:54  8              THE COURT:  Oh, of course.  Yes.

09:15:55  9              MR. ROSENTHAL:  Yes.  Yes, indeed.

09:15:56 10              THE COURT:  Was Mr. Harris not part of that?

09:15:58 11              MR. ROSENTHAL:  What?

09:15:59 12              THE COURT:  The sovereign immunity?

09:16:03 13              MR. ROSENTHAL:  I don't think so.  Maybe.

09:16:03 14              Were you on sovereign immunity?  No.  No, he

09:16:08 15    wasn't.

09:16:10 16              THE COURT:  Why not?

09:16:12 17              MR. HARRIS:  Your Honor, Mark Dendinger from

09:16:14 18    Bracewell handled the sovereign immunity.

09:16:16 19              THE COURT:  Okay.  It's the same client?

09:16:17 20              MR. ROSENTHAL:  Yeah, yeah.

09:16:17 21              THE COURT:  I thought you meant --

09:16:18 22              MR. ROSENTHAL:  No, no, no.

09:16:19 23              THE COURT:  -- just a different lawyer.

09:16:20 24              MR. ROSENTHAL:  It was the same.

09:16:21 25              THE COURT:  Got you.

09:16:22  1          MR. ROSENTHAL:  It's the same case.

09:16:23  2          THE COURT:  Okay.  Go ahead.

09:16:24  3          MR. ROSENTHAL:  Thank you, Your Honor.

09:16:25  4          Again, I'm appearing for the California State

09:16:29  5   Lands Commission and for the State of California.  And

09:16:33  6   I have a presentation, and there's a number of arguments I

09:16:36  7   want to make.  But I was the chief trial counsel and,

09:16:40  8   therefore, I'm quite familiar with the facts of this case.

09:16:43  9   And I wanted to correct some factual issues on questions you

09:16:49 10   raised.  Let me just deal with three of them, and then I'll

09:16:53 11   get to my presentation.

09:16:54 12          Number one, you asked whether there were

09:16:56 13   conditions on the quitclaim.  And you properly analyzed that

09:17:02 14   issue.  There's no condition on the quitclaim.  But the

09:17:05 15   obligation to plug, and abandon and leave the wells in a

09:17:11 16   final state over -- not overrode that, was an independent

09:17:17 17   obligation imposed both by the lease terms and by statute.

09:17:21 18          THE COURT:  Well, if it's independent then

09:17:24 19   how -- that seems to be -- you just said it's not imposed by

09:17:28 20   the lease, it's independent.

09:17:28 21          MR. ROSENTHAL:  I'm sorry.  The lease -- I

09:17:34 22   misspoke.  The lease does contain a provision that the

09:17:40 23   quitclaim of the leasehold has to be consistent with law.

09:17:45 24          THE COURT:  Okay.

09:17:46 25          MR. ROSENTHAL:  And the law requires that there

09:17:48  1   be a plug and abandonment, and that they be safely done.

09:17:54  2   And, therefore --

09:17:55  3              THE COURT:  So, they can't quitclaim the lease

09:17:57  4   unless it's plugged or it's rendered safe.

09:17:59  5              MR. ROSENTHAL:  That is exactly right.

09:18:00  6              THE COURT:  Okay.

09:18:01  7              MR. ROSENTHAL:  That was an independent

09:18:02  8   obligation.  It's why we could call on the bond, because

09:18:05  9   they had an independent obligation to comply with the plug

09:18:09 10   and abandonment.  Because they didn't do it, we called on

09:18:13 11   the bond.

09:18:13 12              THE COURT:  Right.

09:18:14 13              MR. ROSENTHAL:  Okay.

09:18:15 14              THE COURT:  Now, the bond is tied to the wells

09:18:19 15   and platform; right?

09:18:21 16              MR. ROSENTHAL:  That's the second point I was

09:18:23 17   going to make.

09:18:24 18         The $22 million was to pay for everything,

09:18:31 19   which, again, we don't have a final total, but I'll

09:18:37 20   represent that the number is approaching a hundred million

09:18:39 21   dollars for the entire cost.  Therefore --

09:18:43 22              THE COURT:  The entire cost of?

09:18:45 23              MR. ROSENTHAL:  Plug and abandonment, and

09:18:47 24   operation of the EOF.  All of the costs incurred by the

09:18:52 25   State in connection with the Ellwood Field closedown.

09:19:00  1          THE COURT:  All right.  So, I mean, why isn't

09:19:03  2   the problem here the State underestimated what it was going

09:19:06  3   to cost?

09:19:07  4          MR. ROSENTHAL:  It was -- it is -- it is the

09:19:08  5   problem.  I mean --

09:19:09  6          THE COURT:  Well, then why does that not fall on

09:19:11  7   the State?  That doesn't mean you get to just take

09:19:13  8   somebody's property.  You've got to -- you know, you get a

09:19:16  9   bigger bond.

09:19:16 10          MR. ROSENTHAL:  It is -- the State should have

09:19:23 11   asked for more, but that did not excuse leaving a piece of

09:19:29 12   property unsafe.

09:19:35 13          THE COURT:  And the piece of property we're

09:19:36 14   talking about are the wells and the platform?

09:19:40 15          MR. ROSENTHAL:  No, that's the point I want to

09:19:43 16   make.  Venoco operated the wells as a continuous body with

09:19:53 17   the EOF.  It was -- they had always operated this as a

09:19:59 18   continuous body.

09:20:00 19          THE COURT:  But they're different and this is --

09:20:02 20   see this, I think, is your weakest argument.  They haven't

09:20:04 21   really raised it, but let me raise it for you.

09:20:07 22          Let's suppose the EOF was owned by Green Energy

09:20:11 23   Company, and Venoco separately leases the wells and

09:20:19 24   Platform Holly.  And Green Energy Company says to you in

09:20:24 25   April of 2017, We're hitting hard times.  We're going to

09:20:30 1    have to shut this EOF down.  We're going to have to leave it

09:20:33 2    unmanned.  Although, we know of this other company that

09:20:36 3    consists of our COO and other former employees of us, Green

09:20:41 4    Energy Company.  You can negotiate with them a contract that

09:20:44 5    they'll continue to man the EOF.

09:20:49 6              Could you take EOF from Green Energy Company

09:20:52 7    without giving them any compensation whatsoever?

09:20:55 8              MR. ROSENTHAL:  The answer is yes.

09:20:58 9              THE COURT:  Really?

09:20:59 10             MR. ROSENTHAL:  Yeah.

09:21:00 11             THE COURT:  That's an extraordinary thing about

09:21:02 12   litigations of that --

09:21:03 13             MR. ROSENTHAL:  But let me explain what has

09:21:05 14   happened here and why I don't believe it's extraordinary at

09:21:10 15   all.

09:21:10 16             The fact of the matter is forget about this.

09:21:13 17   Let's assume that the gas came from the neighboring

09:21:17 18   property.  If you traced all the way down, the gas came, but

09:21:22 19   it seeped into our property.  Obviously --

09:21:25 20             THE COURT:  And what's your "property"?

09:21:27 21             MR. ROSENTHAL:  I'm sorry?

09:21:28 22             THE COURT:  Well, I'm lost.  You say it seeps

09:21:31 23   into our property.  What's "our property"?

09:21:33 24             MR. ROSENTHAL:  Well, I'm sorry.  I should have

09:21:34 25   been more articulate.

09:21:37  1          If you have a piece of property from which

09:21:45  2     dangerous gas is emitting.

09:21:47  3          THE COURT:  Okay.  Property A.

09:21:49  4          MR. ROSENTHAL:  Property A.  The fact that the

09:21:53  5     ultimate source of the gas, if you go underground and trace

09:21:57  6     it, is to a neighboring piece of property, is not relevant

09:22:02  7     to the question presented, which is:  Does the State have

09:22:07  8     the police power to come onto property A to prevent a risk

09:22:13  9     of injury to the community?

09:22:17 10          We submit, Your Honor, that the fact that the

09:22:20 11     gas may have come from a neighboring piece of property, in

09:22:25 12     this case, the fact that the gas came through from

09:22:29 13     Platform Holly does not affect our right to come onto a

09:22:36 14     piece of property to ameliorate and correct a risk emerging

09:22:43 15     from that property.

09:22:44 16          THE COURT:  Well, see what I'm concerned about

09:22:47 17     here is that not only is the property that is being taken

09:22:55 18     not property A, but the taker of the property is the owner

09:23:03 19     of property A.

09:23:06 20          The State is the owner of the wells in Platform

09:23:11 21     Holly; correct?

09:23:12 22          MR. ROSENTHAL:  We own it, but -- and here's the

09:23:15 23     critical point, Your Honor, which -- the fact is that Venoco

09:23:22 24     always operated the EOF and our property as a unified whole.

09:23:28 25          THE COURT:  But you say that I agree that that

09:23:33  1    is the factual history here, but I don't know why that's

09:23:35  2    relevant to the legal question, especially when the State --

09:23:40  3    because then I think you need to -- well, that's what I'm

09:23:42  4    trying to figure out because --

09:23:43  5                    MR. ROSENTHAL:  Well --

09:23:44  6                    THE COURT:  -- for instance, I'd like you to

09:23:46  7    really -- you know, that's why I gave you the hypo.

09:23:47  8                    MR. ROSENTHAL:  Right.

09:23:47  9                    THE COURT:  And what you're saying is you could

09:23:51 10    actually have the State take from Green Energy Company,

09:23:56 11    which played no role in the operation of the wells, had no

09:24:05 12    obligations with respect to the operation of the wells, but

09:24:08 13    you're saying to remedy the dangerous condition which is

09:24:13 14    created by the wells, because it's the wells that emanate or

09:24:21 15    emit, I guess -- whatever the right word is -- the $H_2S$, the

09:24:26 16    EOF is the remedy to that.

09:24:31 17                    Let me give you this.  Suppose we had a nuclear

09:24:33 18    power plant and the nuclear power plant all of a sudden

09:24:37 19    cracks.  And the Government, to address that dangerous

09:24:44 20    situation, needs to employ the one company in the country

09:24:50 21    that has the ability to address that situation.  But that

09:24:53 22    company doesn't have any relation at all directly to the

09:24:57 23    nuclear power plant.

09:24:59 24                    And under your theory, the Government could come

09:25:02 25    in and it could compel, take over that third-party

09:25:07 1   engineering company in order to remedy the nuclear power

09:25:12 2   plant problem even though it had nothing to do with creating

09:25:15 3   the problem?

09:25:16 4           MR. ROSENTHAL:  No, Your Honor.  We don't

09:25:18 5   subscribe to that position.  And we -- and with all due

09:25:21 6   respect, that's not this case.  What we're talking about

09:25:25 7   here is -- and this is coming onto a piece of property.  The

09:25:32 8   basic facts are not in dispute.  The $H_2S$ is coming off the

09:25:37 9   EOF.  The dangerous gas is coming --

09:25:42 10          THE COURT:  Well, it's coming off?  It's

09:25:46 11  actually -- it's -- I thought the $H_2S$ --

09:25:47 12          MR. ROSENTHAL:  Well --

09:25:48 13          THE COURT:  -- gets from the wells and Platform

09:25:50 14  Holly to the EOF where the EOF does chemical reactions to --

09:25:56 15          MR. ROSENTHAL:  That's exactly --

09:25:58 16          THE COURT:  -- render the $H_2S$ safe.

09:26:00 17          MR. ROSENTHAL:  That's correct.

09:26:00 18          THE COURT:  Okay.

09:26:01 19          MR. ROSENTHAL:  And in the absence of the

09:26:03 20  control mechanisms on the EOF, the $H_2S$ untreated would go

09:26:10 21  into the general environment.

09:26:12 22          THE COURT:  Well, let me ask you this:  How does

09:26:14 23  the -- the $H_2S$ is in the boiled -- in the gas that comes out

09:26:18 24  of the wells at Platform Holly; is that right?

09:26:20 25          MR. ROSENTHAL:  Yes.  Yes.

09:26:21  1            THE COURT:  What if the EOF just shut down the

09:26:24  2    pipeline from Platform Holly, what would happen?

09:26:27  3            MR. ROSENTHAL:  The --

09:26:29  4            THE COURT:  So, it doesn't accept anything

09:26:31  5    anymore.  EOF just says, We're not taking any oil.

09:26:34  6            MR. ROSENTHAL:  Which it cannot lawfully do.

09:26:36  7            THE COURT:  Okay.

09:26:37  8            MR. ROSENTHAL:  I mean, the law, the Clean Air

09:26:42  9    Act permit and the other permits require, as a matter of

09:26:46 10    law, that the EOF treat the $H_2S$.  It isn't as if the State

09:26:57 11    could have cut the line without people going to jail.  The

09:27:03 12    operation was unified as -- under a Clean Air Act permit and

09:27:07 13    was a requirement.

09:27:09 14            So, this is the point I'm trying to make, Your

09:27:13 15    Honor.  And that is, we came on to deal with what we viewed

09:27:20 16    as an exigent circumstance about the problem at the EOF.

09:27:28 17    And those gases may have had an ultimate source elsewhere,

09:27:35 18    but there was nothing we could do, that the State could do

09:27:40 19    to prevent that gas from going from the wells through

09:27:44 20    Platform Holly to the EOF.

09:27:47 21            THE COURT:  Let me stop you there.  Why couldn't

09:27:49 22    you have forced ExxonMobil to plug the well?

09:27:51 23            MR. ROSENTHAL:  Ah, I'll deal with the

09:27:54 24    ExxonMobil.  And --

09:27:59 25            THE COURT:  And before you do, because -- let me

09:28:01  1    just --

09:28:01  2                    MR. ROSENTHAL:  Yeah, I wanted to resolve this

09:28:04  3    issue first and then get to ExxonMobil.

09:28:06  4                    THE COURT:  No.  You know, that's one of the --

09:28:08  5                    MR. ROSENTHAL:  No.  No.  That's your

09:28:10  6    prerogative.

09:28:11  7                    THE COURT:  Yeah.  I'm, unfortunately, the one

09:28:12  8    who has to decide the case.

09:28:12  9                    MR. ROSENTHAL:  Yes, Your Honor.

09:28:14 10                    THE COURT:  So, you, unfortunately, have to go

09:28:16 11    with my questions, if you don't mind.

09:28:17 12                    MR. ROSENTHAL:  Absolutely.

09:28:18 13                    THE COURT:  And let the record reflect I'm not

09:28:20 14    yelling or raising my voice in any way to make that point.

09:28:26 15    The --

09:28:30 16                    MR. ROSENTHAL:  Do you want me to deal with

09:28:31 17    ExxonMobil?

09:28:32 18                    THE COURT:  Let me ask a finer point question.

09:28:37 19    You agree that but for the operation of the wells in

09:28:45 20    Platform Holly, there would be no $H_2S$ to deal with at the

09:28:49 21    EOF; correct?

09:28:51 22                    MR. ROSENTHAL:  That's correct.  If --

09:28:52 23                    THE COURT:  So, if someone plugged the wells,

09:28:57 24    there would be no need for the State to man, either by

09:29:06 25    taking or otherwise the EOF; correct?

09:29:09  1                    MR. ROSENTHAL:  That's correct.

09:29:09  2                    THE COURT:  All right.  Now, go ahead.

09:29:11  3                    MR. ROSENTHAL:  Okay.  The problem with -- first

09:29:13  4     of all -- and this is, I think, a critical point.  The

09:29:18  5     argument that they presented to this Court about ExxonMobil

09:29:23  6     was not -- and I underscore -- not presented to the

09:29:30  7     Bankruptcy Court.  And the reason it did not deal with this

09:29:34  8     issue, they didn't -- did not make the contention they're

09:29:37  9     making today which is that ExxonMobil should have -- well,

09:29:46 10     their argument is that ExxonMobil should have come onto the

09:29:54 11     EOF and operated the EOF.

09:29:57 12                    They never called an ExxonMobil witness.  They

09:30:00 13     never deposed an ExxonMobil witness.  They never dealt with

09:30:06 14     the issue as a factual matter in the Trial Court.  As a

09:30:10 15     result, the issue was never properly posed to the judge.

09:30:17 16     What is in the record, Your Honor, is simply the Settlement

09:30:22 17     Agreement that was entered into between the State and

09:30:24 18     ExxonMobil.

09:30:26 19                    It is correct, Your Honor, that ExxonMobil had

09:30:31 20     an underlying obligation to plug and abandon some portion of

09:30:37 21     the wells that were abandoned.  There was a dispute between

09:30:46 22     the State and ExxonMobil about the extent of that

09:30:50 23     obligation.  And as a result, a Settlement Agreement was

09:30:55 24     entered into in which ExxonMobil, as a contractor to the

09:31:01 25     State, undertook the plug and abandonment.

09:31:05 1          But let me tell you, that argument, that focus

09:31:08 2  on plugged and abandonment doesn't get my opponents, the

09:31:13 3  Trustee, to the promised land because whatever was

09:31:17 4  ExxonMobil's obligation to plug and abandon did not require

09:31:22 5  them to go onto the EOF.  And we, the State, had no power to

09:31:29 6  require them to operate the EOF.  And, therefore, even if we

09:31:36 7  could have and should have forced them to do the plug and

09:31:41 8  abandonment, Exxon was not going to go onto the EOF.  It

09:31:46 9  was --

09:31:46 10          THE COURT:  Well, that seems to me to suggest,

09:31:51 11  at most, that for the time between -- for the time it would

09:31:59 12  have taken Exxon to plug the well, you might have a takings

09:32:03 13  argument.

09:32:04 14          MR. ROSENTHAL:  Right.

09:32:05 15          THE COURT:  But since you didn't at all compel

09:32:08 16  Exxon to do what I think you admit it had an obligation to

09:32:12 17  do, if you didn't ask it to, I don't know how you can argue

09:32:16 18  that it's a justified takings for whatever period of time,

09:32:22 19  you know, it --

09:32:28 20          MR. ROSENTHAL:  I honestly am not following,

09:32:30 21  Your Honor.

09:32:30 22          THE COURT:  Yeah.  That's fair.  I mean, it

09:32:32 23  was --

09:32:32 24          MR. ROSENTHAL:  The time they were plugging and

09:32:34 25  abandonment -- and abandoning, they -- someone needed to

09:32:38  1    operate the EOF.  The --

09:32:41  2                THE COURT:  Okay.

09:32:41  3                MR. ROSENTHAL:  The weakness of their position

09:32:43  4    is there was no way to force ExxonMobil.  First of all,

09:32:47  5    there's no evidence in the record on this issue, but --

09:32:51  6    because no one ever asked ExxonMobil would they have done

09:32:54  7    it.

09:32:54  8                But, as a logical matter, there was no statutory

09:32:59  9    legal argument that we could have imposed on ExxonMobil that

09:33:05 10    could have required them to set foot on the EOF.  And I

09:33:10 11    assure you, Your Honor, they never would have set foot

09:33:13 12    because once they did, they would have liabilities and legal

09:33:18 13    obligations that a sophisticated company like ExxonMobil was

09:33:22 14    never going to do.

09:33:25 15                THE COURT:  Yeah, but I think it's a given that

09:33:30 16    if they are obligated to plug and -- plug the wells, they

09:33:36 17    must have the ability to have access to the EOF to treat the

09:33:42 18    $H_2S$.

09:33:42 19                MR. ROSENTHAL:  No.  That's the point.

09:33:44 20                THE COURT:  Well, how could you plug the wells

09:33:46 21    without addressing the $H_2S$ problem?

09:33:48 22                MR. ROSENTHAL:  They would be willing to plug

09:33:49 23    and abandon, but they would have turned around to the State

09:33:53 24    and said, You're going to have to facilitate that by going

09:33:57 25    onto the EOF and doing exactly what we were going to do.

09:34:03  1    Absent a lawsuit, which would have taken ten years, there

09:34:08  2    never was going to be ExxonMobil going onto the TNA and

09:34:14  3    going to the EOF.

09:34:15  4            At most, all we could say is, Plug and abandon.

09:34:19  5    They would have said, Fine, we need the EOF.  You, the

09:34:23  6    State, need to provide us with the EOF.  You have to

09:34:28  7    facilitate that.

09:34:29  8            THE COURT:  Okay.  See, I need to stop you

09:34:31  9    because this is where I do feel like -- I think this all

09:34:33 10    could be answered as a legal matter by looking at whatever

09:34:37 11    contracts or regulations govern this, but to me it seems

09:34:41 12    pretty important because they're suggesting -- this is like

09:34:46 13    an undisputed area of -- before me or a question, rather,

09:34:52 14    and I think it's undisputed.

09:34:55 15            You both agree that Exxon could be compelled by

09:35:00 16    the State to plug the well; correct?

09:35:03 17            MR. ROSENTHAL:  Some -- to some extent.

09:35:05 18            THE COURT:  All right.  Right.  And the "some

09:35:06 19    extent," the reason why you add those words is because your

09:35:09 20    point is that you could not compel Exxon to pay for or use

09:35:18 21    of the EOF or to somehow address the $H_2S$ issue; is that

09:35:25 22    right?

09:35:25 23            MR. ROSENTHAL:  That's one reason, but it's not

09:35:27 24    the only reason.

09:35:28 25            THE COURT:  All right.

09:35:28 1          MR. ROSENTHAL:  But the fact is that when we

09:35:32 2   went to Exxon, Exxon did dispute how many wells were

09:35:37 3   covered.  And we were going to buy basically a lawsuit if we

09:35:42 4   were going to compel them to clean up, do all the plug and

09:35:47 5   abandonment, which is why there was a Settlement Agreement

09:35:50 6   in which they agreed to do X and Y.

09:35:53 7          Now, let me point out one very important aspect

09:35:57 8   of the Settlement Agreement which may help the Court.  The

09:36:02 9   Settlement Agreement does mention the EOF.  And it is very

09:36:06 10  clear in the terms of the EOF -- and we can provide the

09:36:11 11  cite -- that the EOF is not the subject of the Settlement

09:36:15 12  Agreement.  Exxon was very clear in negotiating the

09:36:21 13  Settlement Agreement that it hadn't -- it did not want to

09:36:23 14  have anything to do with the EOF, and it is expressly

09:36:28 15  excepted from the terms of the Settlement Agreement.  And

09:36:30 16  we'll provide you the page, Your Honor.

09:36:32 17         THE COURT:  Is the obligation on Exxon's part to

09:36:35 18  plug the well or to safely plug the well?

09:36:38 19         MR. ROSENTHAL:  Well, plug and abandonment

09:36:41 20  includes a concept of safely closing it down as a permanent

09:36:44 21  matter.

09:36:45 22         THE COURT:  So, then why -- if that's the

09:36:46 23  obligation Exxon had, why doesn't that cover use of the EOF?

09:36:51 24         MR. ROSENTHAL:  Because we could not compel them

09:36:55 25  to set foot -- the plug and abandon --

09:36:58  1          THE COURT:  You could compel them to safely plug

09:37:00  2    the well.  That means that they have to come up with a way

09:37:04  3    to do it.  And if the only way to do it is to make use of

09:37:08  4    the EOF, it seems that's a legal obligation on Exxon's part.

09:37:12  5          MR. ROSENTHAL:  But the -- Your Honor, we would

09:37:16  6    certainly have had a ten-year lawsuit on that issue.  Their

09:37:22  7    position would be safely plug and abandonment requires that

09:37:25  8    we put in the concrete properly, that we do all the actions

09:37:31  9    out at sea on our leasehold to make this -- make it

09:37:37 10    appropriate, make an appropriate closure.  Their position

09:37:41 11    would absolutely, Your Honor, have been that we have no

09:37:45 12    obligation to go to the EOF.  They would have turned around

09:37:50 13    and said, If you're going --

09:37:52 14          THE COURT:  You might have had to fight that

09:37:54 15    battle, but it sounded like --

09:37:55 16          MR. ROSENTHAL:  But --

09:37:56 17          THE COURT:  -- you conceded that Exxon had a

09:37:58 18    legal obligation to safely plug the wells.  You've conceded

09:38:02 19    that, ultimately, the $H_2S$ safety threat emanates from the

09:38:08 20    wells.  You've said the only way to address that safety

09:38:13 21    threat is through the operation of the EOF.  It seems to me

09:38:19 22    it just follows as a syllogism that as a logic -- logic

09:38:25 23    syllogism that --

09:38:26 24          MR. ROSENTHAL:  But --

09:38:27 25          THE COURT:  -- Exxon then could be compelled to

09:38:29  1    make use of the EOF.

09:38:31  2            MR. ROSENTHAL:  I can't disagree more, Your

09:38:37  3    Honor.  I don't think the syllogism -- their position will

09:38:42  4    be -- safely plugging and abandonment will be limited to the

09:38:48  5    operation to the activities that occur on our leasehold.  If

09:38:55  6    there needs to be support for that proposition, the State

09:39:00  7    will need to -- if the EOF is needed for us to do that, it's

09:39:05  8    like any other support activity.

09:39:10  9            But let me go to the more fundamental issue.  We

09:39:14 10    still were faced with a problem on -- in April of 2017, in

09:39:20 11    which we had to deal with a situation in which there was gas

09:39:24 12    coming out of -- the potential for gas coming out of the

09:39:30 13    EOF.  I mean, at most -- at very most what you're describing

09:39:36 14    is a situation in which the State would have compelled --

09:39:42 15    might have compelled Exxon, after five years of litigation,

09:39:46 16    to do a plug and abandonment.  But that did not represent --

09:39:53 17    and this is a point that the trial -- that the Bankruptcy

09:39:57 18    Court consistently made.  We needed a solution today.  We

09:40:01 19    needed a solution that --

09:40:03 20            THE COURT:  What's the "today"?  What date is

09:40:05 21    "today"?

09:40:05 22            MR. ROSENTHAL:  As of April of 2017.

09:40:07 23            THE COURT:  Okay.

09:40:08 24            MR. ROSENTHAL:  And the fact that we might

09:40:14 25    have some alternative, and two were expressly discussed by

09:40:18  1    the other side.  A platform -- a boat that would be there or

09:40:24  2    running a line ten miles to another location.

09:40:28  3          Any of these alternatives would have required

09:40:32  4    years to implement.  And what you're describing, the

09:40:37  5    ExxonMobil alternative, is an alternative that there is no

09:40:42  6    evidence could have been implemented in April of 2017.  So,

09:40:48  7    whatever our legal rights were, and even if you entertain

09:40:53  8    the assumption that that legal right somehow could have

09:40:56  9    compelled them to go to the EOF, it didn't -- there's no

09:41:00 10    evidence in this record that that was an alternative.

09:41:05 11          THE COURT:  Well, there's evidence that you pay

09:41:08 12    for use of the EOF; right?

09:41:11 13          MR. ROSENTHAL:  As an attempt to try to settle

09:41:14 14    this matter for a limited period of time.

09:41:17 15          THE COURT:  Wait, wait.  You're saying it's a

09:41:19 16    Rule 408 issue.  This is a settlement.

09:41:20 17          MR. ROSENTHAL:  No, no, no.

09:41:21 18          THE COURT:  So, you -- it's undisputed --

09:41:22 19          MR. ROSENTHAL:  Yeah.

09:41:23 20          THE COURT:  -- that you paid for it.

09:41:24 21          MR. ROSENTHAL:  Yeah, for a period of time.

09:41:25 22          THE COURT:  Right.  And so it's undisputed -- it

09:41:27 23    could be paid for.  So, why isn't there enough in the record

09:41:30 24    to say that, Well, Exxon could have paid for it and could

09:41:34 25    have been required to pay for it?

09:41:36   1          MR. ROSENTHAL:  Well --

09:41:37   2          THE COURT:  And, in fact, you can kind of -- I

09:41:38   3   think you could even say there's record evidence of what

09:41:41   4   they would have had to pay.

09:41:42   5          MR. ROSENTHAL:  No, Your Honor.  You've gone

09:41:45   6   from could have to should have.  The fact of the matter is

09:41:49   7   there was no evidence in the record.  Someone had to operate

09:41:53   8   the EOF.  But there's no evidence that we could have

09:41:57   9   compelled or that Exxon would have been willing to operate

09:42:02  10   the EOF.

09:42:04  11          THE COURT:  Well, wait.  You just said --

09:42:06  12          MR. ROSENTHAL:  I'm not trying to contradict

09:42:08  13   myself.

09:42:09  14          THE COURT:  You just said that you agree that

09:42:15  15   Exxon had a legal obligation to safely plug the wells.

09:42:18  16          MR. ROSENTHAL:  Yes.

09:42:19  17          THE COURT:  Okay.  So, it seems to me, and maybe

09:42:23  18   we can get something on briefing on it if you want, but

09:42:27  19   there's a legal argument, at least, that that would -- that

09:42:31  20   obligation would necessarily require compensation to the

09:42:37  21   operator of the EOF by Exxon.

09:42:41  22          MR. ROSENTHAL:  I don't see that connection.

09:42:44  23          THE COURT:  Well, you --

09:42:44  24          MR. ROSENTHAL:  I -- the fact that --

09:42:45  25          THE COURT:  It's a given fact that the wells can

09:42:49  1    only be operated and can only be plugged safely if they have

09:42:53  2    access to the EOF.

09:42:54  3             MR. ROSENTHAL:  No, that someone had access.

09:42:57  4    I'm -- there would have been a dispute, Your Honor.  I mean,

09:43:02  5    there would have been a dispute whether safely closing those

09:43:06  6    wells would have required ExxonMobil to have to pay and go

09:43:13  7    onto the EOF.  Their position would have been that it

09:43:17  8    doesn't entail that, Your Honor.

09:43:18  9             THE COURT:  I guess the position -- I guess the

09:43:21 10    question is:  Did the State not at least contribute to the

09:43:25 11    emergency by not seeking to get Exxon to fulfill that

09:43:30 12    contractual obligation?

09:43:31 13             MR. ROSENTHAL:  No, Your Honor.  Because they --

09:43:36 14    the emergency would have existed even if we turned around

09:43:40 15    and demanded ExxonMobil start cleaning up the wells

09:43:46 16    immediately.  This emergency would have existed

09:43:51 17    independently because the gas would still have been coming

09:43:57 18    to the EOF and emerging from the site.

09:44:04 19             Your Honor, I see I haven't satisfied you on

09:44:09 20    this issue.

09:44:12 21             To us -- first of all, the argument that they

09:44:18 22    present in their reply brief about the fact that the gas

09:44:22 23    came ultimately from the wells was also an argument they did

09:44:28 24    not present to the Trial Court judge.

09:44:31 25             THE COURT:  I think it's in the Trial Court's

09:44:33  1   opinion that the gas --

09:44:35  2                   MR. ROSENTHAL:  No, no, no.

09:44:35  3                   THE COURT:  -- problem emanates from the wells.

09:44:38  4                   MR. ROSENTHAL:  The -- I'm talking about the

09:44:39  5   legal argument, which is the argument that as a result there

09:44:45  6   was -- they -- there was -- we should not be legally

09:44:50  7   entitled to have come onto the property because the gas

09:44:54  8   ultimately came --

09:44:56  9                   THE COURT:  I don't know that there's an

09:44:58 10   argument that you're not legally entitled to come onto the

09:45:00 11   property.  I think it's that if you do come onto the

09:45:03 12   property, you have to pay them; right?

09:45:05 13                   MR. ROSENTHAL:  That is the legal argument.

09:45:06 14                   THE COURT:  That's a huge distinction.  I don't

09:45:08 15   think anybody here in this room, and please stand up if you

09:45:12 16   disagree, argues that the State doesn't have the power to

09:45:16 17   come and address a situation like this.

09:45:19 18                   I think the only argument is whether you get to

09:45:21 19   do it for free at the cost of the Trustee.

09:45:26 20                   MR. ROSENTHAL:  And can I go back to the

09:45:30 21   principle argument, which was what I was going to make, and

09:45:33 22   that is, although certainly an emergency is a justification,

09:45:41 23   the legal concept here is broader, Your Honor.

09:45:45 24                   The takings clause does not cover the State

09:45:53 25   coming onto property to ameliorate a risk to public health,

09:45:57  1    safety or the environment.  It does not -- there are all of

09:46:02  2    these little cubbyholes that the Trustee wants to create:

09:46:05  3    nuisance, emergency, necessity.  The doctrine is broader

09:46:10  4    than that.  And the proof of that --

09:46:13  5              THE COURT:  "The doctrine" being?  What's "the

09:46:15  6    doctrine"?

09:46:15  7              MR. ROSENTHAL:  The doctrine that the State may

09:46:19  8    enter onto private property to remedy a risk to public

09:46:25  9    health, safety or the environment.  And that entering the

09:46:30 10    property and remaining on the property until the hazard is

09:46:33 11    resolved does not constitute a taking of property for which

09:46:38 12    compensation is owed.  That is the legal proposition that we

09:46:43 13    believe the Supreme Court of the United States, we believe

09:46:47 14    the Supreme Court of California, both have held that to be

09:46:51 15    the case.

09:46:53 16              There does not -- an emergency certainly is a

09:46:57 17    subgroup of that, but there does not need to be an

09:47:02 18    emergency.  There does not have to be a -- an exigency that

09:47:09 19    requires imminent and immediate harm for the State to come

09:47:13 20    onto the property.

09:47:15 21              And I'll give you a huge example of that because

09:47:19 22    it comes from their brief.  Under the Superfund Statute, the

09:47:25 23    administrator of the EPA is entitled by law to come onto

09:47:30 24    property to remove pollutants and chemicals on the property.

09:47:38 25    He doesn't have to prove there's an emergency, he just has

09:47:42  1    to prove that there's -- that these chemicals are on the

09:47:46  2    property and are not being properly handled by the owner of

09:47:50  3    the property.  And there are dozens of those cases.

09:47:54  4              Congress can't create an exception to the

09:47:58  5    takings clause.  Every one of those EPA cases under *CERCLA*

09:48:04  6    where EPA comes onto private property to get rid of

09:48:09  7    dangerous chemicals is an example of the Federal

09:48:14  8    Government's exercising of police power.

09:48:16  9              THE COURT:  It might be the exercise of police

09:48:18 10    power, but tell me:  Where does it say that they get to do

09:48:21 11    it for free?

09:48:22 12              MR. ROSENTHAL:  All those cases -- I mean, there

09:48:24 13    are numerous cases in which EPA comes on.  EPA, when they

09:48:29 14    exercise their *CERCLA* power, do not pay just compensation.

09:48:35 15    And --

09:48:35 16              THE COURT:  They don't pay any compensation at

09:48:37 17    all?

09:48:38 18              MR. ROSENTHAL:  They do not.

09:48:38 19              THE COURT:  And these cases are in the briefing?

09:48:41 20              MR. ROSENTHAL:  Yes.  Our cases are in the

09:48:43 21    briefing.

09:48:43 22              Let me give you two Supreme examples of that.

09:48:47 23    The Supreme Court and -- and I -- I note, Your Honor -- I

09:48:51 24    know Your Honor has questioned this.

09:48:56 25              In *Cedar Point Nursery*, which is the most recent

09:48:59  1    exposition of takings law by the Supreme Court, at the end

09:49:04  2    of the opinion, the Supreme Court said, Our holding here

09:49:08  3    does not affect background property law principles.  And one

09:49:16  4    of those principles, and I'm quoting, is "to enter property

09:49:19  5    in the event of public or private necessity," which means,

09:49:26  6    and I'm quoting now, "entry to overt serious harm to person,

09:49:34  7    land or chattel"; that's at 141 Supreme Court 2079.

09:49:39  8         Where the Government comes onto property to

09:49:41  9    overt harm to people, land, even chattels, is a background

09:49:50 10    legal principle that entitles the Government to come onto

09:49:54 11    property and avoid and -- without having to engage in just

09:49:59 12    compensation, without -- it doesn't even constitute a taking

09:50:05 13    where the Government comes onto property.

09:50:08 14         And in this case, Your Honor, and I need to

09:50:11 15    bring you back to this case.  We -- as Your Honor said,

09:50:15 16    we -- we -- no one is disputing our right to come onto the

09:50:19 17    property.  If there was a risk of harm to persons, property,

09:50:28 18    environment, and we were -- we reasonably believed that to

09:50:32 19    be the case, our coming onto the property and our remaining

09:50:36 20    on the property until the emergency ceased was an exercise

09:50:41 21    of our police power.  And the Bankruptcy Court got it

09:50:46 22    exactly right when it said that that's a paradigmatic

09:50:53 23    example of the exercise of the police power for which no

09:50:55 24    compensation is owed.

09:50:57 25         Let me quote one other case, which is the

09:51:03 1    *Customer Company* case from the California Supreme Court

09:51:06 2    which said the -- said basically the same thing.  It talked

09:51:11 3    about, and I'm quoting now, "The so-called emergency

09:51:14 4    exception to the compensation requirement."  It described

09:51:20 5    that, and let me quote the words.  This is, "a specific

09:51:25 6    application of the general rule that damage to or even

09:51:30 7    destruction of property, pursuant to a valid exercise of the

09:51:35 8    police power, often requires no compensation under the just

09:51:38 9    compensation clause."

09:51:41 10           Basically the emergency exception, the necessity

09:51:46 11   exception, nuisance, these are all subgroups of a general

09:51:49 12   principle.  And we submit that what we did here was an

09:51:54 13   exercise of our police power, exactly what the Bankruptcy

09:51:59 14   Court held.  And as a result of that exercise, no just

09:52:05 15   compensation is owed.

09:52:06 16           If I can, I want to explain a little bit why the

09:52:11 17   cases they cite about necessity and unforeseeability really

09:52:20 18   are beside the point.  The cases they cite, which are

09:52:25 19   California cases, if you review all of them, with one

09:52:29 20   exception, they are all public works cases.

09:52:36 21           Under California law, basically if the State is

09:52:40 22   engaged in the planning, the construction, or the operation

09:52:49 23   of a public work, the State is responsible for any damage

09:52:54 24   resulting therefrom.  All of these cases, *Oroville, Odello*

09:53:02 25   *Brothers, House,* et cetera, Your Honor, are all examples of

09:53:05 1    public works.  And what the State is trying to do is avoid

09:53:09 2    compensation because they said it wasn't really the public

09:53:13 3    work that did it, we had an emergency that caused the

09:53:17 4    damage.

09:53:17 5              None of those cases, with one exception, deals

09:53:22 6    with this circumstance which is coming onto property to

09:53:27 7    remedy a danger of public health safety or the environment.

09:53:32 8    Only one of the cases deals with that issue, and that's the

09:53:36 9    *City of Rose* case.

09:53:37 10             And in that case, the Court held there was a

09:53:41 11   factual dispute as to whether the emergency existed -- they

09:53:46 12   call it emergency -- but whether the hazard existed at all

09:53:50 13   because it was substantial testimony.  This was a demolition

09:53:55 14   case and the Court held -- and the Court held -- there was a

09:53:58 15   dispute as to whether there was any danger posed by the

09:54:01 16   building at all.  So, it went to the underlining existence.

09:54:05 17             So, I want to bring the Court back to the basic

09:54:12 18   holding here of the Trial Court -- of the Bankruptcy Court,

09:54:16 19   which is we had a circumstance.  We think there was an

09:54:22 20   emergency, but it didn't need to be.  What it needed to be

09:54:26 21   was a risk to public health, safety or the environment.  And

09:54:30 22   if that was true, and I think it is hard to contend it was

09:54:37 23   not true, then we had the right to enter the property.

09:54:42 24             And we submit, Your Honor, if you look through

09:54:45 25   the case law, that in that circumstance there is no duty to

09:54:52  1    pay compensation if we are exercising our police power to

09:54:56  2    come onto the property.  And we cite enumerable cases for

09:55:02  3    that proposition.

09:55:05  4              THE COURT:  All right.  Anything else?

09:55:09  5              MR. ROSENTHAL:  Not unless Your Honor has some

09:55:12  6    questions.

09:55:13  7              THE COURT:  No.  Thanks.

09:55:18  8              MR. HARRIS:  Would the Court like to hear

09:55:20  9    rebuttal?

09:55:20 10              THE COURT:  If you have any rebuttal points to

09:55:22 11    make.

09:55:22 12              MR. HARRIS:  Yes.  I have three points, Your

09:55:24 13    Honor, and I'll be very brief.

09:55:25 14              First, on the CalGEM Order that we discussed,

09:55:31 15    CalGEM did not order ExxonMobil to do the plugging and

09:55:35 16    abandoning.  CalGEM wrote a letter to ExxonMobil reminding

09:55:39 17    them of their obligation that if Venoco was not able to do

09:55:42 18    it, then they would be liable.  And that's in the record at

09:55:46 19    Page 1398.

09:55:47 20              The letter that's referenced in the footnote

09:55:51 21    that we were looking at in the Bankruptcy Court's opinion is

09:55:54 22    a reference to the letter that CalGEM wrote to Venoco to

09:55:58 23    plug and abandon.  I just wanted to clarify that.  I think I

09:56:02 24    may have misspoken on that.

09:56:03 25              On the ExxonMobil issue, this issue was

09:56:07 1    presented to the Bankruptcy Court.  The Trustee presented

09:56:11 2    evidence that ExxonMobil was the immediately preceding

09:56:13 3    operator.  That's on Page 864 of the record, and it's

09:56:18 4    recognized in the footnote that we were discussing earlier,

09:56:20 5    Footnote 516, the Bankruptcy Court's opinion.

09:56:22 6          The Trustee presented evidence that Venoco was

09:56:25 7    finally unable to cover the cost of plugging and abandoning.

09:56:28 8    And that's all that the Trustee had to show to demonstrate

09:56:32 9    that ExxonMobil's obligated to plug and abandon under the

09:56:35 10   California Public Resources Code as well as the lease.

09:56:39 11         The Trustee presented evidence that the

09:56:41 12   Commission reserved its rights against ExxonMobil in the

09:56:44 13   Phase 1 Agreement.  And making that clear, the Bankruptcy

09:56:47 14   Court found that ExxonMobil was obligated to plug and

09:56:50 15   abandon, and that the EOF was necessary.  And, again, that's

09:56:53 16   in the footnote that we've referenced earlier.

09:56:55 17         On Your Honor's point about ExxonMobil

09:57:00 18   requiring -- being required to use the EOF, that's exactly

09:57:03 19   right.  As the Bankruptcy Court stated in its opinion, "But

09:57:07 20   here the operation of EOF is not simply convenient, it is

09:57:11 21   necessary."

09:57:12 22         And if ExxonMobil was going to safely plug and

09:57:16 23   abandon, it was required to use the EOF, and it would be

09:57:19 24   required to pay the Trust for doing that.  The Phase 1

09:57:25 25   Agreement does say that the EOF is outside of the scope of

09:57:29  1    that agreement.  But the State simply by coming into this

09:57:33  2    Court and saying, But Exxon wouldn't have done that, we

09:57:37  3    would have been in litigation.  The State has lawyers.  And

09:57:39  4    if ExxonMobil won't comply with its obligations, the State

09:57:43  5    should have enforced that.  The State doesn't have the right

09:57:47  6    to come in and take property because it chooses not to

09:57:51  7    enforce its rights against ExxonMobil.

09:57:53  8             And the final point I'll make on the *CERCLA*

09:57:56  9    cases that were addressed, all of those cases is where the

09:57:59 10    Government is entering property where the hazardous material

09:58:04 11    is on that property.  And those are discussed in our reply

09:58:09 12    brief on Page 19 in Note 4.  So, those are all

09:58:13 13    distinguishable from this case.

09:58:14 14             THE COURT:  Okay.  But there is hazardous

09:58:16 15    material on the EOF; right?

09:58:18 16             MR. HARRIS:  It's because it's the State's wells

09:58:20 17    that are moving the hazardous material there, which is very

09:58:24 18    different than the *CERCLA* situation where the owner of the

09:58:27 19    property has hazardous material that it has caused to be on

09:58:30 20    the property.

09:58:31 21             THE COURT:  But under the permit to operate the

09:58:35 22    EOF, Venoco was required to process the incoming oil and gas

09:58:45 23    to address the $H_2S$ situation; right?

09:58:48 24             MR. HARRIS:  I'm not sure about the permits,

09:58:50 25    Your Honor.

09:58:51  1            THE COURT:  Isn't that the whole purpose of the

09:58:55  2   EOF?

09:58:55  3            MR. HARRIS:  It is.  I mean, it was designed to

09:58:57  4   work with the -- to work with Platform Holly and the wells

09:59:01  5   to process and to remove the hydrogen sulfide.  But, again,

09:59:06  6   when the State went into this, and the State under the

09:59:10  7   leases and the State, whenever it knew that it might be

09:59:14  8   obligated to step in if these wells were quitclaimed back,

09:59:19  9   knew that the EOF was going to be required.  And it should

09:59:21 10   have required that in the bond or should have required

09:59:24 11   ExxonMobil to come in and do that cleanup.

09:59:26 12            It didn't do that.  The State made the decision

09:59:30 13   not to put the cost of the EOF in the bond.  Ms. Lucchesi

09:59:34 14   testified, Yeah, we should have negotiated for a higher bond

09:59:36 15   and didn't.  That cost can't be shifted because the State

09:59:40 16   doesn't want to pay for it or, more importantly, doesn't

09:59:42 17   want to have ExxonMobil pay for it.

09:59:45 18            THE COURT:  Just give me a second.

10:01:09 19            Okay.  Thank you very much.

10:01:10 20            MR. HARRIS:  Thanks, Your Honor.

10:01:11 21            THE COURT:  All right.  Thank you very much.

10:01:13 22            It's going to take me a while to think through

10:01:16 23   this.  There's a lot of complexity to the issues.  I

10:01:21 24   appreciate the argument.

10:01:22 25            And, oh, I know what I wanted -- I did want to

10:01:25  1    ask you both.  Has the plugging been completed?

10:01:31  2              MR. ROSENTHAL:  The -- we have notified the

10:01:33  3    opposing -- the Trustee that we will be off the property by

10:01:37  4    the end of May.  The good news is the $H_2S$ releases were

10:01:46  5    ended very recently, but we have to do cleanup on the site

10:01:51  6    to remove $H_2S$ from the site.  But all of that will be done

10:01:54  7    by the end of May, and we will be off the property at that

10:02:00  8    point.

10:02:00  9              THE COURT:  Okay.  All right.

10:02:03 10              And then -- you all can be seated.  And then

10:02:07 11    what's the status of the bankruptcy overall?  Is this the

10:02:10 12    only thing left to be adjudicated?

10:02:21 13              MR. DENDINGER:  Good morning, Your Honor.  Mark

10:02:22 14    Dendinger from Bracewell, counsel to the Trustee handling

10:02:25 15    the bankruptcy.  The bankruptcy has been substantially

10:02:28 16    concluded.

10:02:28 17              There's one claim that remains open.  It's by

10:02:32 18    Iron Mountain.  It's a data storage claim.  Frankly, it

10:02:35 19    relates to the records related to this litigation as well as

10:02:37 20    another piece of litigation that Bracewell is not handling

10:02:40 21    for the Trustee.

10:02:41 22              So, there's this litigation, litigation related

10:02:44 23    to the Plains All-American pipeline rupture that Your Honor

10:02:48 24    referenced earlier and then one claim that we're aware of

10:02:51 25    that's active for a reason --

10:02:54  1                    THE COURT:  Wait.  Tell me about the rupture.

10:02:55  2      So, there is litigation still pending about the rupture, the

10:02:58  3      2015 rupture?

10:03:00  4                    MR. DENDINGER:  There is.  Yes, Your Honor.

10:03:01  5                    THE COURT:  What's going on with that?

10:03:03  6                    MR. DENDINGER:  Again, counsel from -- Bracewell

10:03:05  7      is not handling that litigation, Your Honor, so I have to be

10:03:08  8      a little bit careful about it, I suppose.  But that is

10:03:12  9      litigation that's been ongoing since the May 2015 rupture.

10:03:18 10      It's related to the shut-in of Platform Holly.  And

10:03:22 11      essentially the -- you know, the shut-in of the entirety of

10:03:25 12      the company's production that kick-started the bankruptcy

10:03:29 13      process, both bankruptcies.

10:03:31 14                    THE COURT:  So, it's probably worth a lot

10:03:33 15      potentially?

10:03:34 16                    MR. DENDINGER:  In our mind, it's worth a lot,

10:03:36 17      yes, Your Honor.

10:03:37 18                    THE COURT:  And I'm actually -- one other

10:03:39 19      followup with the State.  Let me ask you:  Did the State --

10:03:47 20      there's an intimation in the brief that the State would not

10:03:50 21      allow for kind of an alternative to the Plain pipeline.

10:03:55 22                    MR. ROSENTHAL:  Oh, that has nothing to do with

10:03:57 23      the California State Lands Commission.

10:04:00 24                    THE COURT:  What about the State?  The State is

10:04:03 25      in it, too; right?

10:04:04  1            MR. ROSENTHAL:  Well, I mean, applications were

10:04:05  2    made.  I'm not sure -- there was an -- there was some

10:04:13  3    proposal made for the pipeline to be reconstructed, but I

10:04:19  4    have to confess, Your Honor, I don't know the details of

10:04:23  5    that, what happened or what block or if there was even a

10:04:34  6    blocking of the pipeline.  I just don't know, Your Honor.

10:04:38  7            THE COURT:  Okay.  All right.

10:04:39  8            All right.  Thank you all.  Have a good day.

10:04:43  9            MR. HARRIS:  Thank you, Your Honor.

        10            (Court was recessed at 10:04 a.m.)

        11            I hereby certify the foregoing is a true and

        12    accurate transcript from my stenographic notes in the

        13    proceeding.

        14            _/s/ Heather M. Triozzi_
                      Certified Merit and Real-Time Reporter
        15            U.S. District Court

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

## $

**$22** [3] - 22:23, 23:9, 37:18

## /

**/s** [1] - 67:14

## 1

**1** [5] - 33:23, 34:2, 34:3, 62:13, 62:24
**10:04** [1] - 67:10
**11** [1] - 1:4
**12th** [6] - 10:18, 10:19, 10:21, 10:22, 11:5, 12:4
**13** [1] - 11:13
**1398** [1] - 61:19
**141** [1] - 58:7
**1463** [1] - 31:2
**1486** [1] - 16:11
**1497** [1] - 5:24
**14th** [2] - 11:20, 13:16
**17-10828(JTD** [1] - 1:5
**17th** [2] - 10:14, 14:20
**18-50908(JTD** [1] - 1:7
**19** [1] - 63:12

## 2

**2015** [3] - 25:25, 66:3, 66:9
**2016** [1] - 22:22
**2017** [12] - 9:6, 9:10, 9:24, 14:8, 15:3, 15:5, 20:4, 32:25, 38:25, 51:10, 51:22, 52:6
**2023** [1] - 1:16
**2079** [1] - 58:7
**22** [1] - 23:7
**22-1174-CFC** [1] - 1:11
**25** [2] - 23:4, 23:8
**25th** [13] - 8:4, 8:7, 8:9, 8:11, 10:4, 10:7, 10:23, 11:6, 11:16, 12:4, 12:7, 12:16, 12:20
**26** [1] - 1:16

## 3

**3** [4] - 23:4, 23:14, 24:6, 24:8
**30th** [1] - 8:7
**32** [1] - 33:25
**3237(c** [2] - 33:8

## 4

**4** [1] - 63:12
**408** [1] - 52:16

## 5

**51** [1] - 30:24
**516** [1] - 62:5

## 6

**64** [1] - 31:2

## 8

**844** [1] - 1:15
**864** [1] - 62:3
**8:36** [1] - 1:17

## A

**a.m** [2] - 1:17, 67:10
**abandon** [14] - 30:6, 30:11, 32:2, 33:4, 36:15, 45:20, 46:4, 47:23, 48:4, 49:25, 61:23, 62:9, 62:15, 62:23
**abandoned** [2] - 5:1, 45:21
**abandoning** [24] - 4:5, 6:2, 15:18, 15:23, 16:10, 16:19, 16:22, 16:24, 17:8, 18:13, 19:6, 19:17, 19:21, 21:15, 22:25, 23:18, 23:23, 32:11, 33:14, 33:17, 34:6, 46:25, 61:16, 62:7
**abandonment** [13] - 16:15, 37:1, 37:10, 37:23, 45:25, 46:2, 46:8, 46:25, 49:5, 49:19, 50:7, 51:4, 51:16
**ability** [5] - 15:10, 21:25, 26:12, 41:21, 47:17
**able** [6] - 7:22, 21:23, 29:3, 31:5, 33:14, 61:17
**absence** [1] - 42:19
**absent** [1] - 48:1
**absolutely** [3] - 31:23, 44:12, 50:11
**accept** [1] - 43:4
**accepted** [1] - 20:18
**access** [7] - 13:4, 15:6, 15:8, 24:14,
47:17, 54:2, 54:3
**accounting** [1] - 12:19
**accurate** [1] - 67:12
**Act** [2] - 43:9, 43:12
**action** [2] - 9:3, 20:19
**actions** [1] - 50:8
**active** [1] - 65:25
**activities** [1] - 51:5
**activity** [3] - 4:15, 51:8
**add** [1] - 48:19
**address** [17] - 18:25, 27:21, 27:24, 28:10, 29:11, 29:13, 29:20, 29:22, 31:14, 31:15, 31:21, 41:19, 41:21, 48:21, 50:20, 55:17, 63:23
**addressed** [3] - 18:21, 32:15, 63:9
**addressing** [1] - 47:21
**adjudicated** [1] - 65:12
**administrator** [1] - 56:23
**admit** [1] - 46:16
**Adv** [1] - 1:7
**affect** [2] - 40:13, 58:3
**affects** [1] - 5:16
**afford** [1] - 15:9
**ago** [1] - 9:13
**agree** [6] - 11:6, 11:7, 40:25, 44:19, 48:15, 53:14
**agreed** [1] - 49:6
**Agreement** [19] - 11:21, 12:22, 13:15, 14:7, 14:13, 15:12, 33:23, 34:2, 34:3, 45:17, 45:23, 49:5, 49:8, 49:9, 49:12, 49:13, 49:15, 62:13, 62:25
**agreement** [4] - 11:23, 13:18, 14:25, 63:1
**ahead** [4] - 8:20, 29:25, 36:2, 45:2
**Air** [2] - 43:8, 43:12
**ALICIA** [1] - 2:11
**Alicia** [1] - 3:12
**All-American** [1] - 65:23
**alleged** [6] - 4:3, 5:2, 9:14, 19:22, 20:21, 30:18
**allegedly** [3] - 4:22, 9:12, 32:4
**allow** [1] - 66:21
**almost** [1] - 11:25
**alternative** [9] - 4:6, 5:15, 30:8, 32:6,
51:25, 52:5, 52:10, 66:21
**alternatives** [1] - 52:3
**altogether** [1] - 30:8
**ameliorate** [2] - 40:14, 55:25
**American** [1] - 65:23
**amount** [4] - 21:13, 22:22, 22:24, 23:7
**analyzed** [1] - 36:13
**ANDREW** [1] - 1:21
**Andrew** [1] - 3:2
**answer** [2] - 31:8, 39:8
**answered** [1] - 48:10
**anyway** [2] - 8:19, 31:14
**APPEARANCES** [2] - 1:20, 2:1
**appeared** [1] - 35:4
**appearing** [2] - 3:18, 36:4
**Appellant** [1] - 1:9
**Appellees** [1] - 1:13
**applicable** [2] - 24:20, 34:21
**application** [2] - 8:22, 59:6
**applications** [1] - 67:1
**appreciate** [1] - 64:24
**approaching** [1] - 37:20
**appropriate** [2] - 50:10
**approved** [1] - 33:11
**April** [32] - 1:16, 8:4, 8:7, 8:9, 8:11, 9:24, 10:4, 10:7, 10:14, 10:18, 10:19, 10:21, 10:22, 10:23, 11:5, 11:6, 11:16, 11:20, 12:4, 12:7, 12:16, 12:20, 13:6, 13:16, 15:3, 15:5, 38:25, 51:10, 51:22, 52:6
**arbitrary** [1] - 32:8
**area** [2] - 24:23, 48:13
**argue** [2] - 15:2, 46:17
**argued** [2] - 27:10, 29:15
**argues** [2] - 29:1, 55:16
**argument** [23] - 16:23, 25:22, 26:16, 27:3, 27:21, 29:6, 32:15, 38:20, 45:5, 45:10, 46:1, 46:13, 47:9, 53:19, 54:21, 54:23, 55:5, 55:10, 55:13, 55:18, 55:21, 64:24
**Argument** [1] - 1:17

**arguments** [2] - 27:18, 36:6
**arises** [2] - 33:4, 33:7
**arose** [1] - 9:12
**ARSHT** [1] - 1:21
**articulate** [2] - 7:15, 39:25
**articulation** [1] - 27:18
**aside** [2] - 18:12, 22:5
**aspect** [2] - 28:1, 49:7
**assert** [1] - 9:17
**assignment** [1] - 33:11
**associates** [1] - 10:17
**assume** [1] - 39:17
**assumed** [2] - 9:6, 9:10
**assuming** [3] - 13:21, 14:5, 14:17
**assumption** [1] - 52:8
**assure** [1] - 47:11
**attempt** [2] - 33:20, 52:13
**Attorney** [2] - 3:17, 3:19
**ATTORNEY** [1] - 2:16
**ATTORNEY'S** [1] - 2:13
**authorities** [1] - 33:16
**available** [2] - 12:12
**avoid** [2] - 58:11, 60:1
**aware** [4] - 21:21, 21:24, 22:13, 65:24

## B

**background** [3] - 24:23, 58:3, 58:9
**bankruptcies** [1] - 66:13
**Bankruptcy** [51] - 4:7, 4:20, 4:21, 4:24, 5:1, 5:13, 5:16, 5:17, 9:11, 13:1, 13:20, 14:5, 14:11, 14:18, 15:20, 15:25, 16:13, 16:19, 16:25, 17:4, 18:8, 19:5, 19:15, 20:12, 20:24, 21:4, 26:17, 27:4, 27:21, 27:23, 29:9, 29:10, 29:13, 29:19, 29:22, 30:1, 30:3, 30:7, 30:23, 34:12, 45:7, 51:17, 58:21, 59:13, 60:18, 61:21, 62:1, 62:5, 62:13, 62:19
**bankruptcy** [7] - 22:22, 26:13, 30:13, 65:11, 65:15, 66:12

**based** [1] - 9:14
**basic** [2] - 42:8, 60:17
**battle** [1] - 50:15
**beacon** [1] - 6:6
**Beacon** [11] - 7:7, 7:8, 7:10, 7:24, 12:25, 13:9, 13:18, 14:9, 14:15, 15:13, 20:4
**became** [1] - 28:3
**BEFORE** [1] - 1:19
**behalf** [1] - 3:10
**below** [1] - 32:15
**benefit** [1] - 32:7
**beside** [1] - 59:18
**better** [2] - 17:13, 27:22
**between** [5] - 12:4, 13:6, 45:17, 45:21, 46:11
**bigger** [1] - 38:9
**bit** [3] - 24:22, 59:16, 66:8
**BLACK** [2] - 2:14, 3:17
**black** [1] - 3:18
**block** [1] - 67:5
**blocking** [1] - 67:6
**boat** [1] - 52:1
**body** [2] - 38:16, 38:18
**Boggs** [1] - 1:14
**boiled** [1] - 42:23
**bond** [21] - 22:19, 22:20, 22:21, 22:23, 23:6, 23:7, 23:10, 23:17, 24:2, 24:3, 24:15, 37:8, 37:11, 37:14, 38:9, 64:10, 64:13, 64:14
**BRACEWELL** [1] - 2:2
**Bracewell** [5] - 3:4, 35:18, 65:14, 65:20, 66:6
**brief** [13] - 23:3, 23:8, 26:15, 27:19, 28:4, 28:18, 28:22, 29:6, 54:22, 56:22, 61:13, 63:12, 66:20
**briefing** [5] - 25:21, 27:1, 53:18, 57:19, 57:21
**briefs** [1] - 23:3
**bring** [2] - 58:15, 60:17
**BRITTANY** [1] - 2:4
**broad** [1] - 20:25
**broader** [2] - 55:23, 56:3
**Brothers** [1] - 59:25
**brought** [1] - 10:6
**bucks** [1] - 23:15
**building** [1] - 60:16

**business** [1] - 26:12
**buy** [1] - 49:3
**BY** [12] - 1:21, 2:2, 2:3, 2:3, 2:4, 2:4, 2:7, 2:10, 2:10, 2:11, 2:11, 2:14
**bypass** [1] - 4:10

## C

**C.A** [1] - 1:11
**Caleb** [1] - 1:14
**CalGEM** [6] - 31:3, 32:24, 61:14, 61:15, 61:16, 61:22
**CALGEM** [1] - 31:4
**California** [21] - 2:12, 2:17, 3:10, 3:19, 3:20, 8:16, 8:21, 8:24, 20:14, 20:16, 20:18, 28:8, 33:8, 36:4, 36:5, 56:14, 59:1, 59:19, 59:21, 62:10, 66:23
**CALIFORNIA** [3] - 1:11, 1:11, 2:16
**California's** [1] - 32:25
**cannot** [2] - 25:10, 43:6
**capacity** [1] - 1:7
**care** [2] - 14:13, 22:11
**careful** [1] - 66:8
**Case** [1] - 1:5
**case** [22] - 8:23, 24:7, 27:10, 29:2, 34:21, 36:1, 36:8, 40:12, 42:6, 44:8, 56:15, 58:14, 58:15, 58:19, 58:25, 59:1, 60:9, 60:10, 60:14, 60:25, 63:13
**cases** [19] - 20:14, 28:5, 29:2, 57:3, 57:5, 57:12, 57:13, 57:19, 57:20, 59:17, 59:18, 59:19, 59:20, 59:24, 60:5, 60:8, 61:2, 63:9
**caused** [3] - 26:10, 60:3, 63:19
**ceased** [4] - 13:2, 14:21, 20:10, 58:20
**Cedar** [1] - 57:25
**cede** [1] - 3:20
**CERCLA** [4] - 57:5, 57:14, 63:8, 63:18
**certain** [2] - 21:9, 26:6
**certainly** [4] - 14:19, 50:6, 55:22, 56:16
**Certified** [1] - 67:14

**certify** [1] - 67:11
**cetera** [1] - 59:25
**challenged** [2] - 5:8, 14:2
**challenging** [2] - 13:20, 16:12
**chance** [1] - 8:17
**Chapter** [1] - 1:4
**chattel** [1] - 58:7
**chattels** [1] - 58:9
**check** [2] - 22:12, 26:2
**checked** [1] - 22:21
**chemical** [3] - 17:21, 22:7, 42:14
**chemicals** [3] - 56:24, 57:1, 57:7
**chief** [1] - 36:7
**choice** [4] - 5:14, 5:23, 5:25, 6:9
**chooses** [1] - 63:6
**circumstance** [5] - 22:15, 43:16, 60:6, 60:19, 60:25
**circumstances** [7] - 4:9, 4:12, 4:16, 4:19, 20:15, 20:22, 21:7
**cite** [5] - 28:4, 49:11, 59:17, 59:18, 61:2
**cites** [1] - 29:2
**citing** [1] - 31:3
**City** [1] - 60:9
**claim** [3] - 65:17, 65:18, 65:24
**clarify** [2] - 34:16, 61:23
**clause** [1] - 55:24, 57:5, 59:9
**Clean** [2] - 43:8, 43:12
**clean** [1] - 49:4
**cleaning** [1] - 54:15
**cleanup** [2] - 64:11, 65:5
**clear** [8] - 5:12, 5:18, 6:3, 13:23, 33:12, 49:10, 49:12, 62:13
**clearly** [4] - 5:9, 5:21, 14:3, 23:19
**CLERK** [1] - 2:20
**client** [1] - 35:19
**closedown** [1] - 37:25
**closing** [2] - 49:20, 54:5
**closure** [1] - 50:10
**Clough** [1] - 3:12
**CLOUGH** [1] - 2:11
**Code** [2] - 33:9, 62:10
**COHEN** [1] - 2:10
**Cohen** [1] - 3:13
**colleagues** [1] - 3:3,

3:11, 8:11
**COLM** [1] - 1:19
**Colm** [1] - 2:22
**combat** [1] - 4:15
**coming** [14] - 10:12, 22:8, 28:25, 42:7, 42:8, 42:9, 42:10, 51:12, 54:17, 55:25, 58:19, 60:6, 63:1
**commercial** [1] - 24:25
**commercialization** [1] - 25:24
**commercialize** [1] - 25:8
**commercially** [2] - 21:25, 25:15
**Commission** [28] - 2:12, 3:11, 3:14, 3:21, 5:14, 5:23, 6:4, 7:3, 7:25, 9:17, 9:20, 9:21, 9:24, 10:4, 10:11, 10:21, 11:10, 11:20, 15:1, 21:12, 21:14, 21:16, 22:24, 34:3, 34:5, 36:5, 62:12, 66:23
**COMMISSION** [1] - 1:12
**Commission's** [2] - 15:22, 16:9
**common** [1] - 4:17
**community** [1] - 40:9
**company** [8] - 7:24, 7:25, 12:16, 39:2, 41:20, 41:22, 42:1, 47:13
**Company** [6] - 38:23, 38:24, 39:4, 39:6, 41:10, 59:1
**company's** [1] - 66:12
**compel** [7] - 31:21, 41:25, 46:15, 48:20, 49:4, 49:24, 50:1
**compelled** [6] - 48:15, 50:25, 51:14, 51:15, 52:9, 53:9
**compelling** [1] - 27:18
**compensable** [1] - 4:21
**compensate** [3] - 15:15, 21:14, 34:22
**compensation** [21] - 4:10, 9:22, 12:8, 15:22, 16:9, 28:15, 32:5, 32:13, 39:7, 53:20, 56:12, 57:14, 57:16, 58:12, 58:24, 59:4, 59:8, 59:9, 59:15, 60:2, 61:1

**complete** [3] - 16:10, 16:15, 16:22
**completed** [3] - 15:24, 19:18, 65:1
**complexity** [1] - 64:23
**comply** [2] - 37:9, 63:4
**compromise** [1] - 12:2
**conceded** [2] - 50:17, 50:18
**concept** [2] - 49:20, 55:23
**concerned** [1] - 40:16
**concluded** [1] - 65:16
**concrete** [1] - 50:8
**condition** [5] - 21:24, 22:13, 36:14, 41:13
**conditions** [2] - 21:19, 36:13
**confess** [1] - 67:4
**Congress** [1] - 57:4
**connecting** [1] - 27:13
**connection** [3] - 35:6, 37:25, 53:22
**CONNOLLY** [1] - 1:19
**Connolly** [1] - 2:22
**Conservation** [1] - 33:1
**considered** [1] - 23:17
**consistent** [1] - 36:23
**consistently** [1] - 51:18
**consists** [1] - 39:3
**constitute** [3] - 9:1, 56:11, 58:12
**constitutes** [1] - 5:12
**construction** [1] - 59:22
**contain** [1] - 36:22
**contend** [1] - 60:22
**contention** [1] - 45:8
**continue** [6] - 15:23, 16:21, 18:4, 19:17, 26:12, 39:5
**CONTINUED** [1] - 2:1
**continued** [4] - 16:14, 25:23, 27:9, 33:12
**continuous** [2] - 38:16, 38:18
**contract** [5] - 12:24, 13:8, 14:16, 31:25, 39:4
**contractor** [7] - 6:7, 9:5, 9:9, 13:2, 14:20, 20:5, 45:24
**contracts** [1] - 48:11
**contractual** [2] - 24:1, 54:12
**contractually** [3] - 30:10, 30:18, 31:12
**contradict** [1] - 53:12

**contrary** [1] - 21:4
**contribute** [1] - 54:10
**control** [1] - 42:20
**convenient** [1] - 62:20
**COO** [4] - 6:15, 6:16, 6:24, 39:3
**correct** [16] - 6:6, 13:10, 18:7, 32:16, 32:19, 32:22, 36:9, 40:14, 40:21, 42:17, 44:21, 44:22, 44:25, 45:1, 45:19, 48:16
**cost** [12] - 4:5, 21:14, 23:18, 34:8, 37:21, 37:22, 38:3, 55:19, 62:7, 64:13, 64:15
**costs** [3] - 23:22, 34:9, 37:24
**counsel** [5] - 3:18, 3:20, 36:7, 65:14, 66:6
**counsel's** [1] - 3:3
**country** [1] - 41:20
**couple** [1] - 33:24
**course** [1] - 35:8
**Court** [71] - 2:21, 3:24, 4:7, 4:20, 4:22, 4:24, 5:16, 5:17, 9:11, 13:1, 14:6, 14:11, 14:18, 15:21, 15:25, 16:13, 16:19, 16:25, 18:9, 19:5, 19:15, 20:12, 20:24, 26:17, 27:4, 27:21, 27:23, 29:9, 29:10, 29:13, 29:19, 29:22, 29:24, 30:1, 30:7, 30:24, 31:14, 31:15, 32:15, 34:11, 34:12, 34:13, 45:5, 45:7, 45:14, 49:8, 51:18, 54:24, 56:13, 56:14, 57:23, 58:1, 58:2, 58:7, 58:21, 59:1, 59:14, 60:10, 60:14, 60:17, 60:18, 61:8, 62:1, 62:14, 62:19, 63:2, 67:10, 67:15
**COURT** [203] - 1:1, 2:23, 3:7, 3:15, 3:22, 5:4, 5:10, 5:18, 5:25, 6:3, 6:8, 6:11, 6:19, 6:21, 6:24, 7:2, 7:6, 7:9, 7:13, 7:15, 8:2, 8:8, 8:19, 9:7, 9:23, 10:3, 10:13, 10:19, 10:25, 11:3, 11:9, 11:13, 11:22, 11:25, 12:15, 13:5, 13:8, 13:11, 13:22, 13:25,
**Court's** [10] - 5:2, 5:13, 13:20, 17:4, 21:4, 30:3, 34:12, 54:25, 61:21, 62:5
**Courthouse** [1] - 1:14
**Courts** [1] - 20:21

14:4, 14:23, 16:1, 16:5, 16:12, 17:1, 17:7, 17:12, 17:17, 17:20, 17:25, 18:8, 18:15, 18:19, 18:23, 19:3, 19:9, 20:1, 21:18, 22:4, 22:16, 22:19, 23:2, 23:11, 23:14, 24:6, 24:11, 24:22, 25:4, 25:8, 25:12, 25:18, 25:20, 26:15, 26:22, 27:14, 27:17, 28:9, 28:16, 29:5, 29:8, 29:12, 29:18, 29:25, 30:15, 30:17, 30:22, 30:25, 31:3, 31:10, 31:13, 31:16, 31:20, 32:14, 32:17, 32:20, 32:23, 33:6, 33:20, 34:8, 34:10, 34:15, 34:25, 35:2, 35:5, 35:8, 35:10, 35:12, 35:16, 35:19, 35:21, 35:23, 35:25, 36:2, 36:18, 36:24, 37:3, 37:6, 37:12, 37:14, 37:22, 38:1, 38:6, 38:13, 38:19, 39:9, 39:11, 39:20, 39:22, 40:3, 40:16, 40:25, 41:6, 41:9, 42:10, 42:13, 42:16, 42:18, 42:22, 43:1, 43:4, 43:7, 43:21, 43:25, 44:4, 44:7, 44:10, 44:13, 44:18, 44:23, 45:2, 46:10, 46:15, 46:22, 47:2, 47:15, 47:20, 48:8, 48:18, 48:25, 49:17, 49:22, 50:1, 50:14, 50:17, 50:25, 51:20, 51:23, 52:11, 52:15, 52:18, 52:20, 52:22, 53:2, 53:11, 53:14, 53:17, 53:23, 53:25, 54:9, 54:25, 55:3, 55:9, 55:14, 56:5, 57:9, 57:16, 57:19, 61:4, 61:7, 61:10, 63:14, 63:21, 64:1, 64:18, 64:21, 65:9, 66:1, 66:5, 66:14, 66:18, 66:24, 67:7

**courts** [1] - 4:9
**cover** [3] - 49:23, 55:24, 62:7
**covered** [1] - 49:3
**cracks** [1] - 41:19
**create** [2] - 56:2, 57:4
**created** [2] - 25:22, 41:14
**creates** [1] - 28:19
**creating** [1] - 42:2
**creation** [1] - 18:3
**crime** [2] - 4:15, 8:14
**criminally** [1] - 8:13
**critical** [2] - 40:23, 45:4
**cubbyholes** [1] - 56:2
**Customer** [1] - 59:1
**cut** [3] - 14:7, 14:8, 43:11

**D**

**damage** [3] - 59:6, 59:23, 60:4
**damages** [2] - 34:20, 34:24
**danger** [3] - 11:7, 60:7, 60:15
**dangerous** [6] - 22:7, 40:2, 41:13, 41:19, 42:9, 57:7
**data** [1] - 65:18
**date** [2] - 8:5, 51:20
**dated** [2] - 10:14, 10:18
**dates** [1] - 8:6
**David** [1] - 3:9
**DAVID** [1] - 2:7
**DAVIS** [3] - 1:7, 2:3, 10:18
**Davis** [1] - 3:4
**days** [3] - 11:13, 14:13, 15:13
**deal** [7] - 36:10, 43:15, 43:23, 44:16, 44:20, 45:7, 51:11
**dealing** [4] - 13:4, 15:6, 20:7, 28:1
**deals** [5] - 16:17, 30:4, 30:24, 60:5, 60:8
**dealt** [1] - 45:13
**Debtor** [1] - 1:6
**decide** [1] - 44:8
**decided** [2] - 12:1, 24:17
**decision** [1] - 64:12
**declared** [1] - 15:2
**decommission** [2] - 30:12, 32:2
**decommissioning** [6]

- 23:1, 23:18, 23:23, 32:12, 33:18, 34:7
**Defendant's** [1] - 4:6
**Defendants** [4] - 21:13, 30:6, 30:13, 34:21
**DELAWARE** [1] - 1:2
**Delaware** [2] - 1:15, 2:21
**demanded** [1] - 54:15
**demolition** [1] - 60:13
**demonstrate** [1] - 62:8
**DENDINGER** [5] - 2:4, 65:13, 66:4, 66:6, 66:16
**Dendinger** [2] - 35:17, 65:14
**Department** [1] - 33:1
**deposed** [1] - 45:13
**Deputy** [2] - 3:17, 3:19
**DEPUTY** [1] - 2:20
**described** [1] - 59:4
**describing** [2] - 51:13, 52:4
**designed** [1] - 64:3
**destruction** [1] - 59:7
**details** [1] - 67:4
**determination** [5] - 5:5, 5:8, 34:19, 34:23
**determinations** [1] - 5:9
**determined** [1] - 22:24
**different** [7] - 8:6, 19:11, 26:4, 26:18, 35:23, 38:19, 63:18
**directly** [1] - 41:22
**disagree** [3] - 13:19, 51:2, 55:16
**disagreeing** [1] - 14:1
**disasters** [1] - 4:14
**discussed** [3] - 51:25, 61:14, 63:11
**discussing** [1] - 62:4
**dispute** [10] - 10:25, 24:10, 33:24, 42:8, 45:21, 49:2, 54:4, 54:5, 60:11, 60:15
**disputed** [3] - 30:15, 30:16, 30:23
**disputing** [1] - 58:16
**distinction** [1] - 55:14
**distinguishable** [1] - 63:13
**District** [3] - 2:21, 67:15
**DISTRICT** [2] - 1:1, 1:2
**Division** [1] - 33:1
**doctrine** [4] - 56:3, 56:5, 56:6, 56:7

**dollars** [1] - 37:21
**done** [6] - 12:17, 32:11, 37:1, 47:6, 63:2, 65:6
**double** [2] - 22:12, 26:2
**double-check** [2] - 22:12, 26:2
**down** [6] - 5:22, 8:4, 39:1, 39:18, 43:1, 49:20
**dozens** [1] - 57:3
**due** [1] - 42:5
**duty** [1] - 60:25

**E**

**Edward** [1] - 3:18
**EDWARD** [1] - 2:14
**effectively** [1] - 6:5
**either** [3] - 25:15, 44:24
**element** [1] - 5:17
**Ellwood** [1] - 37:25
**elsewhere** [1] - 43:17
**email** [4] - 9:25, 10:14, 10:21, 10:22
**emails** [2] - 6:16, 7:2
**emanate** [2] - 18:5, 41:14
**emanates** [2] - 50:19, 55:3
**emanating** [3] - 28:24, 31:18, 31:19
**emergencies** [2] - 4:13, 4:16
**emergency** [51] - 4:1, 4:3, 4:7, 4:20, 4:22, 4:25, 5:2, 8:22, 9:12, 12:25, 14:21, 15:15, 15:21, 16:8, 16:13, 19:22, 20:9, 20:11, 20:13, 20:17, 20:18, 20:21, 20:23, 21:9, 21:10, 24:21, 28:1, 28:5, 28:6, 28:8, 29:16, 30:4, 31:17, 31:22, 54:11, 54:14, 54:16, 55:22, 56:3, 56:16, 56:18, 56:25, 58:20, 59:3, 59:10, 60:3, 60:11, 60:12, 60:20
**emerging** [2] - 40:14, 54:18
**emit** [1] - 41:15
**emitting** [1] - 40:2
**employ** [2] - 7:22, 41:20
**employees** [4] - 7:12,

12:6, 15:9, 39:3
**end** [3] - 58:1, 65:4, 65:7
**ended** [1] - 65:5
**Energy** [5] - 38:22, 38:24, 39:4, 39:6, 41:10
**enforce** [2] - 30:14, 63:7
**enforced** [1] - 63:5
**engage** [1] - 58:11
**engaged** [1] - 59:22
**engineering** [1] - 42:1
**engineers** [1] - 10:6
**entail** [1] - 54:8
**enter** [3] - 56:8, 58:4, 60:23
**entered** [5] - 11:21, 20:4, 33:22, 45:17, 45:24
**entering** [2] - 56:9, 63:10
**entertain** [1] - 52:7
**entire** [3] - 23:7, 37:21, 37:22
**entirety** [1] - 66:11
**entitled** [3] - 55:7, 55:10, 56:23
**entitles** [1] - 58:10
**entry** [1] - 58:6
**enumerable** [1] - 61:2
**environment** [6] - 42:21, 56:1, 56:9, 58:18, 60:7, 60:21
**EOF** [105] - 4:6, 4:23, 9:6, 9:10, 9:13, 9:15, 9:19, 9:22, 10:3, 12:12, 14:16, 15:1, 15:6, 15:20, 15:22, 16:9, 16:18, 16:20, 17:6, 17:10, 17:24, 18:3, 19:1, 19:15, 20:3, 22:6, 23:22, 23:24, 23:25, 24:1, 24:9, 24:14, 24:17, 24:24, 26:25, 27:9, 27:10, 27:13, 28:25, 32:3, 32:5, 33:18, 37:24, 38:17, 38:22, 39:1, 39:5, 39:6, 40:24, 41:16, 42:9, 42:14, 42:20, 43:1, 43:5, 43:10, 43:16, 43:20, 44:21, 44:25, 45:11, 46:5, 46:6, 46:8, 47:1, 47:10, 47:17, 47:25, 48:3, 48:5, 48:6, 48:21, 49:9, 49:10, 49:11, 49:14, 49:23, 50:4,

50:12, 50:21, 51:1, 51:7, 51:13, 52:9, 52:12, 53:8, 53:10, 53:21, 54:2, 54:7, 54:18, 62:15, 62:18, 62:20, 62:23, 62:25, 63:15, 63:22, 64:2, 64:9, 64:13
**EPA** [5] - 56:23, 57:5, 57:6, 57:13
**erroneous** [6] - 5:2, 5:9, 5:21, 14:1, 14:3, 18:9
**error** [1] - 5:12
**especially** [1] - 41:2
**ESQUIRE** [14] - 1:21, 1:22, 2:2, 2:3, 2:3, 2:4, 2:4, 2:7, 2:10, 2:10, 2:11, 2:11, 2:14, 2:16
**essentially** [1] - 66:11
**establishments** [1] - 24:25
**et** [1] - 59:25
**EUGENE** [1] - 1:7
**event** [1] - 58:5
**eventually** [1] - 19:24
**evidence** [10] - 47:5, 52:6, 52:10, 52:11, 53:3, 53:7, 53:8, 62:2, 62:6, 62:11
**exact** [1] - 21:6
**exactly** [10] - 24:4, 24:13, 24:19, 25:11, 37:5, 42:15, 47:25, 58:22, 59:13, 62:18
**example** [5] - 11:20, 22:4, 56:21, 57:7, 58:23
**examples** [2] - 57:22, 59:25
**except** [1] - 23:14
**excepted** [1] - 49:15
**exception** [15] - 4:8, 8:23, 15:15, 20:13, 20:15, 28:7, 28:8, 28:14, 34:20, 57:4, 59:4, 59:10, 59:11, 59:20, 60:5
**excuse** [1] - 38:11
**exercise** [8] - 32:4, 57:9, 57:14, 58:20, 58:23, 59:7, 59:13, 59:14
**exercising** [2] - 57:8, 61:1
**exigency** [1] - 56:18
**exigent** [1] - 43:16
**exist** [6] - 4:25, 14:22, 20:10, 20:17, 20:22,

34:5
**existed** [6] - 4:22, 15:16, 54:14, 54:16, 60:11, 60:12
**existence** [1] - 60:16
**exists** [1] - 28:13
**expense** [1] - 32:12
**experience** [1] - 7:21
**explain** [2] - 39:13, 59:16
**explicit** [1] - 8:23
**explicitly** [1] - 20:16
**explore** [1] - 7:17
**exposition** [1] - 58:1
**exposure** [1] - 17:6
**expressed** [1] - 33:13
**expressly** [3] - 27:24, 49:14, 51:25
**extent** [3] - 45:22, 48:17, 48:19
**extraordinary** [2] - 39:11, 39:14
**Exxon** [20] - 32:21, 33:18, 46:8, 46:12, 46:16, 48:15, 48:20, 49:2, 49:12, 49:23, 50:17, 50:25, 51:15, 52:24, 53:9, 53:15, 53:21, 54:11, 63:2
**Exxon's** [5] - 32:23, 34:8, 34:9, 49:17, 50:4
**ExxonMobil** [54] - 4:4, 29:22, 30:5, 30:6, 30:9, 30:10, 30:18, 31:11, 31:21, 31:24, 31:25, 32:7, 32:10, 33:11, 33:12, 33:21, 33:22, 33:25, 34:4, 34:6, 43:22, 43:24, 44:3, 44:17, 45:5, 45:9, 45:10, 45:12, 45:13, 45:18, 45:19, 45:22, 45:24, 47:4, 47:6, 47:9, 47:13, 48:2, 52:5, 54:6, 54:15, 61:15, 61:16, 61:25, 62:2, 62:12, 62:14, 62:17, 62:22, 63:4, 63:7, 64:11, 64:17
**ExxonMobil's** [3] - 33:15, 46:4, 62:9

## F

**faced** [1] - 51:10
**facilitate** [1] - 47:24, 48:7
**facility** [14] - 7:20,

7:22, 13:3, 13:4, 14:12, 15:7, 15:10, 15:17, 18:3, 18:4, 19:1, 19:12, 20:5, 20:6
**fact** [20] - 5:10, 5:11, 12:19, 19:23, 30:2, 30:17, 39:16, 40:4, 40:10, 40:12, 40:23, 49:1, 51:24, 53:2, 53:6, 53:24, 53:25, 54:22
**factors** [1] - 14:19
**facts** [8] - 17:13, 27:5, 27:14, 27:15, 27:19, 29:14, 36:8, 42:8
**factual** [8] - 5:4, 5:21, 17:2, 17:4, 36:9, 41:1, 45:14, 60:11
**failure** [1] - 26:17
**fair** [1] - 46:22
**fall** [1] - 38:6
**familiar** [2] - 8:15, 36:8
**far** [2] - 23:12, 31:6
**Federal** [2] - 20:21, 57:7
**federal** [2] - 8:21, 8:25
**few** [2] - 14:13, 15:12
**Field** [1] - 37:25
**fight** [1] - 50:14
**figure** [1] - 41:4
**filed** [2] - 22:22, 30:13
**final** [4] - 34:13, 36:16, 37:19, 63:8
**finally** [1] - 62:7
**financial** [1] - 24:16
**findings** [2] - 15:24, 16:3
**Fine** [1] - 48:5
**finer** [1] - 44:18
**fires** [1] - 4:14
**firm** [2] - 3:4, 3:12
**first** [11] - 4:1, 4:17, 4:21, 13:15, 20:24, 29:19, 44:3, 45:3, 47:4, 54:21, 61:14
**five** [2] - 13:12, 51:15
**fix** [2] - 25:12, 25:14
**floods** [1] - 4:14
**flow** [2] - 8:20, 27:19
**focus** [3] - 12:14, 27:25, 46:1
**focused** [1] - 29:16
**folks** [1] - 25:5
**following** [1] - 46:20
**follows** [1] - 50:22
**followup** [1] - 66:19
**foot** [3] - 47:10, 47:11, 49:25

**Footnote** [2] - 30:24, 62:5
**footnote** [4] - 31:1, 61:20, 62:4, 62:16
**FOR** [1] - 1:2
**force** [1] - 47:4
**forced** [2] - 43:22, 46:7
**foregoing** [1] - 67:11
**foreseeability** [1] - 21:5
**foreseeable** [4] - 4:3, 21:10, 24:13, 24:20
**forget** [2] - 8:5, 39:16
**formed** [2] - 7:11, 7:23
**former** [3] - 6:15, 7:11, 39:3
**four** [1] - 13:12
**FOURNIER** [2] - 2:7, 3:9
**Fournier** [1] - 3:10
**frankly** [1] - 65:18
**free** [2] - 55:19, 57:11
**front** [1] - 35:4
**fulfill** [1] - 54:11
**fully** [1] - 18:20
**fundamental** [1] - 51:9
**funding** [4] - 9:20, 10:5, 15:4, 15:6

## G

**gap** [1] - 23:5
**gas** [20] - 25:6, 25:10, 25:24, 26:11, 39:17, 39:18, 40:2, 40:5, 40:11, 40:12, 42:9, 42:23, 43:19, 51:11, 51:12, 54:17, 54:22, 55:1, 55:7, 63:22
**Gas** [1] - 33:1
**gases** [1] - 43:17
**General** [2] - 3:17, 3:19
**general** [3] - 42:21, 59:6, 59:11
**GENERAL'S** [1] - 2:16
**Geothermal** [1] - 33:2
**given** [3] - 18:2, 47:15, 53:25
**govern** [1] - 48:11
**Government** [10] - 4:10, 20:20, 21:6, 21:8, 41:19, 41:24, 58:8, 58:10, 58:13, 63:10
**Government's** [1] - 57:8
**great** [2] - 3:7, 3:15
**Green** [5] - 38:22,

38:24, 39:3, 39:6, 41:10
**guess** [5] - 13:13, 26:9, 41:15, 54:9

## H

**H2S** [25] - 8:12, 17:15, 17:18, 18:4, 18:13, 18:17, 18:18, 18:20, 18:25, 19:7, 41:15, 42:8, 42:11, 42:16, 42:20, 42:23, 43:10, 44:20, 47:18, 47:21, 48:21, 50:19, 63:23, 65:4, 65:6
**HAMILTON** [1] - 2:7
**hand** [2] - 26:24
**handle** [6] - 3:5, 3:13, 15:10, 21:9, 27:22, 32:3
**handled** [2] - 35:18, 57:2
**handling** [3] - 65:14, 65:20, 66:7
**hard** [2] - 38:25, 60:22
**harm** [17] - 16:17, 16:20, 16:21, 16:25, 18:10, 18:21, 18:22, 18:23, 18:24, 28:24, 28:25, 56:19, 58:6, 58:9, 58:17
**HARRIS** [106] - 2:2, 3:24, 5:7, 5:13, 5:23, 6:1, 6:6, 6:10, 6:17, 6:20, 6:23, 7:1, 7:5, 7:8, 7:10, 7:14, 7:19, 8:6, 8:15, 8:21, 9:8, 10:2, 10:10, 10:24, 11:2, 11:8, 11:12, 11:18, 11:23, 12:10, 12:21, 13:10, 13:13, 13:24, 14:2, 14:5, 14:24, 16:4, 16:8, 16:16, 17:3, 17:8, 17:16, 17:19, 17:23, 18:7, 18:11, 18:16, 18:22, 19:2, 19:4, 19:10, 20:2, 21:21, 22:12, 22:17, 22:20, 23:6, 23:13, 23:16, 24:8, 24:12, 25:2, 25:7, 25:10, 25:14, 25:19, 26:2, 26:21, 27:5, 27:16, 27:23, 28:12, 28:17, 29:7, 29:10, 29:14, 29:21, 30:1, 30:16, 30:21, 30:23, 31:1, 31:8, 31:11, 31:15, 31:19,

31:23, 32:16, 32:19, 32:22, 33:3, 33:7, 33:22, 34:9, 34:11, 34:19, 35:1, 35:17, 61:8, 61:12, 63:16, 63:24, 64:3, 64:20, 67:9
**Harris** [4] - 3:4, 3:5, 3:25, 35:10
**hazard** [2] - 56:10, 60:12
**hazardous** [4] - 63:10, 63:14, 63:17, 63:19
**health** [8] - 4:2, 8:25, 9:5, 9:9, 55:25, 56:9, 60:7, 60:21
**hear** [3] - 31:5, 31:7, 61:8
**Heather** [1] - 67:14
**held** [8] - 4:20, 15:21, 15:22, 56:14, 59:14, 60:10, 60:14
**help** [4] - 6:13, 7:17, 17:12, 49:8
**hereby** [1] - 67:11
**high** [1] - 24:3
**higher** [1] - 64:14
**hindsight** [1] - 24:3
**hire** [1] - 12:22
**hired** [6] - 6:7, 7:25, 11:14, 12:5, 14:9, 15:13
**hires** [1] - 14:15
**history** [1] - 41:1
**hit** [1] - 22:6
**hitting** [1] - 38:25
**hmm** [1] - 10:24
**hold** [6] - 5:25, 13:22, 16:1, 27:9, 30:25, 31:5
**holding** [5] - 5:2, 5:15, 5:19, 58:2, 60:18
**Holly** [17] - 23:1, 23:19, 26:19, 26:20, 27:1, 27:8, 29:1, 38:24, 40:13, 40:21, 42:14, 42:24, 43:2, 43:20, 44:20, 64:4, 66:10
**honestly** [1] - 46:20
**Honor** [56] - 3:1, 3:9, 3:17, 11:8, 12:10, 13:13, 21:21, 23:16, 25:3, 29:14, 29:21, 31:7, 31:8, 32:19, 32:22, 34:9, 35:1, 35:17, 36:3, 40:10, 40:23, 42:4, 43:15, 44:9, 45:16, 45:19, 46:21, 47:11, 49:16,

50:5, 50:11, 51:3, 53:5, 54:4, 54:8, 54:13, 54:19, 55:23, 57:23, 57:24, 58:14, 58:15, 59:25, 60:24, 61:5, 61:13, 63:25, 64:20, 65:13, 65:23, 66:4, 66:7, 66:17, 67:4, 67:6, 67:9
**Honor's** [1] - 62:17
**HONORABLE** [1] - 1:19
**Honorable** [1] - 2:22
**House** [1] - 59:25
**huge** [2] - 55:14, 56:21
**human** [1] - 17:22
**hundred** [2] - 26:6, 37:20
**hundred-percent** [1] - 26:6
**hydrogen** [7] - 9:15, 17:11, 19:20, 19:24, 20:7, 27:11, 64:5
**hypo** [1] - 41:7
**hypothetically** [1] - 9:25

## I

**ignored** [4] - 4:7, 20:12, 30:7
**immediacy** [2] - 20:8, 20:9
**immediate** [10] - 9:2, 9:14, 15:20, 16:17, 17:5, 17:10, 17:22, 20:19, 56:19
**immediately** [2] - 54:16, 62:2
**imminence** [4] - 11:19, 13:2, 18:11, 20:10
**imminent** [31] - 4:2, 4:8, 4:17, 5:3, 7:4, 8:22, 8:24, 9:1, 9:2, 9:4, 9:8, 11:1, 11:2, 11:4, 13:1, 13:6, 13:12, 13:17, 14:6, 14:10, 14:11, 14:19, 14:21, 15:14, 16:20, 16:21, 16:25, 18:10, 19:14, 20:3, 56:19
**immunity** [4] - 35:7, 35:12, 35:14, 35:18
**implement** [1] - 52:4
**implemented** [1] - 52:6
**important** [2] - 48:12, 49:7

**importantly** [1] - 64:16
**imposed** [3] - 36:17, 36:19, 47:9
**IN** [1] - 1:1
**incidentally** [1] - 21:18
**include** [1] - 23:21
**includes** [1] - 49:20
**including** [1] - 7:13
**incoming** [1] - 63:22
**inconsistent** [3] - 15:25, 16:2, 16:6
**increased** [2] - 22:22, 22:23
**incurred** [1] - 37:24
**indeed** [1] - 35:9
**indefinitely** [1] - 4:25
**independent** [5] - 36:16, 36:18, 36:20, 37:7, 37:9
**independently** [1] - 54:17
**inferred** [1] - 23:3
**injury** [1] - 40:9
**inquiry** [1] - 7:17
**instance** [2] - 29:20, 41:6
**instead** [5] - 9:20, 10:5, 31:24, 32:4, 32:7
**intends** [1] - 21:8
**interceded** [1] - 11:19
**interest** [1] - 30:9
**interpretation** [1] - 21:5
**interrupted** [1] - 8:20
**intimation** [2] - 25:21, 66:20
**involve** [4] - 4:12, 4:17, 4:18, 20:15
**involving** [2] - 4:16, 20:14
**Iron** [1] - 65:18
**irrelevant** [1] - 16:16
**issue** [26] - 5:5, 15:4, 18:25, 22:6, 24:4, 24:16, 25:17, 26:7, 29:23, 30:4, 34:2, 36:14, 44:3, 45:8, 45:14, 45:15, 47:5, 48:21, 50:6, 51:9, 52:16, 54:20, 60:8, 61:25
**issued** [1] - 32:24
**issues** [2] - 36:9, 64:23
**itself** [1] - 21:23

## J

**jail** [1] - 43:11
**job** [1] - 8:11
**JOHN** [1] - 2:11
**joined** [2] - 3:3, 3:11
**judge** [2] - 45:15, 54:24
**judgment** [2] - 27:25, 34:13
**justification** [1] - 55:22
**justified** [2] - 4:21, 46:18
**justify** [3] - 15:21, 16:8, 16:14
**justifying** [2] - 4:8, 20:13

## K

**keep** [3] - 9:14, 17:5, 17:10
**keeping** [2] - 15:20, 16:17
**kick** [1] - 66:12
**kick-started** [1] - 66:12
**killed** [1] - 8:12
**kind** [4] - 6:13, 8:13, 53:2, 66:21
**King** [1] - 1:15
**knowledge** [1] - 20:21
**knows** [1] - 22:18

## L

**land** [3] - 46:3, 58:7, 58:9
**LANDS** [1] - 1:11
**Lands** [6] - 2:12, 3:11, 3:14, 3:21, 36:5, 66:23
**latest** [1] - 14:8
**law** [15] - 8:16, 8:21, 8:23, 8:24, 9:1, 20:16, 36:23, 36:25, 43:8, 43:10, 56:23, 58:1, 58:3, 59:21, 60:25
**lawful** [2] - 10:8, 11:17
**lawfully** [1] - 43:6
**laws** [1] - 8:18
**lawsuit** [3] - 48:1, 49:3, 50:6
**lawyer** [1] - 35:23
**lawyers** [1] - 63:3
**lead** [1] - 3:20
**leads** [1] - 24:24
**leaked** [1] - 8:12

**lease** [13] - 21:23, 22:2, 22:13, 23:25, 30:14, 33:11, 33:13, 36:17, 36:20, 36:21, 36:22, 37:3, 62:10
**leased** [2] - 26:22, 26:23
**leasehold** [3] - 36:23, 50:9, 51:5
**leases** [6] - 21:16, 33:5, 33:10, 38:23, 64:7
**least** [4] - 25:22, 27:17, 53:19, 54:10
**leave** [6] - 4:23, 9:13, 14:12, 18:12, 36:15, 39:1
**leaving** [4] - 10:3, 10:22, 19:19, 38:11
**left** [2] - 8:12, 65:12
**legal** [19] - 5:5, 5:7, 5:9, 27:18, 41:2, 47:9, 47:12, 48:10, 50:4, 50:18, 52:7, 52:8, 53:15, 53:19, 55:5, 55:13, 55:23, 56:12, 58:10
**legally** [2] - 55:6, 55:10
**lessee** [3] - 21:15, 22:9, 22:14
**lessees** [1] - 21:17
**letter** [3] - 61:16, 61:20, 61:22
**liabilities** [1] - 47:12
**liability** [2] - 31:12, 33:12
**liable** [3] - 4:4, 33:15, 61:18
**likewise** [2] - 9:1, 20:22
**limitations** [1] - 4:12
**limited** [4] - 4:9, 4:12, 51:4, 52:14
**line** [2] - 43:11, 52:2
**liquidating** [1] - 1:6
**Liquidating** [2] - 1:7, 1:8
**litigation** [11] - 26:3, 26:5, 51:15, 63:3, 65:19, 65:20, 65:22, 66:2, 66:7, 66:9
**litigations** [1] - 39:12
**LLC** [1] - 1:5
**LLP** [4] - 1:21, 2:2, 2:7, 2:9
**local** [1] - 3:18
**location** [1] - 52:2
**locked** [2] - 12:11
**LOEB** [2] - 2:9

**Loeb** [2] - 3:12
**logic** [2] - 50:22
**logical** [1] - 4:8
**look** [6] - 17:4, 21:11, 21:23, 28:22, 30:2, 60:24
**Look** [1] - 12:3
**looking** [4] - 7:21, 10:16, 48:10, 61:21
**lost** [1] - 39:22
**Lucchesi** [2] - 24:2, 64:13

## M

**man** [4] - 15:6, 15:10, 39:5, 44:24
**manage** [2] - 18:13, 18:17
**management** [1] - 18:20
**manned** [9] - 12:5, 12:13, 15:11, 16:18, 16:21, 17:24, 17:25, 19:12, 20:6
**manning** [1] - 13:3
**MARC** [1] - 2:10
**Marc** [1] - 3:12
**Mark** [1] - 35:17
**mark** [1] - 65:13
**MARK** [1] - 2:4
**market** [2] - 25:11, 26:11
**material** [4] - 63:10, 63:15, 63:17, 63:19
**matter** [13] - 8:10, 12:13, 17:2, 17:4, 26:13, 39:16, 43:9, 45:14, 47:8, 48:10, 49:21, 52:14, 53:6
**MATTHEW** [1] - 1:22
**McEVILY** [1] - 2:3
**mean** [18] - 12:15, 12:17, 12:18, 16:19, 18:23, 18:24, 23:14, 29:18, 38:1, 38:5, 38:7, 43:8, 46:22, 51:13, 54:4, 57:12, 64:3, 67:1
**means** [2] - 50:2, 58:5
**meant** [1] - 35:21
**mechanisms** [1] - 42:20
**melds** [1] - 29:1
**mention** [1] - 49:9
**Merit** [1] - 67:14
**Michel** [1] - 3:5
**MICHEL** [1] - 2:3
**might** [9] - 16:20, 19:15, 20:3, 46:12,

50:14, 51:15, 51:24, 57:9, 64:7
**miles** [1] - 52:2
**million** [11] - 22:23, 23:4, 23:5, 23:7, 23:9, 23:14, 24:7, 24:8, 37:18, 37:20
**mind** [4] - 5:12, 5:20, 44:11, 66:16
**minimum** [1] - 21:8
**minute** [3] - 9:13, 18:12, 34:1
**misspoke** [1] - 36:22
**misspoken** [1] - 61:24
**Mitchell** [1] - 3:19
**MITCHELL** [1] - 2:16
**mitigates** [1] - 18:4
**Mobil** [1] - 26:23
**moment** [1] - 21:6
**money** [1] - 22:5
**months** [1] - 13:12
**morning** [6] - 2:23, 2:25, 3:1, 3:9, 3:23, 65:13
**MORRIS** [1] - 1:21
**Morris** [1] - 3:2
**most** [8] - 8:18, 27:18, 30:3, 46:11, 48:4, 51:13, 57:25
**Mountain** [1] - 65:18
**moving** [1] - 63:17
**MR** [202] - 3:1, 3:8, 3:9, 3:17, 3:24, 5:7, 5:13, 5:23, 6:1, 6:6, 6:10, 6:17, 6:20, 6:23, 7:1, 7:5, 7:8, 7:10, 7:14, 7:19, 8:6, 8:15, 8:21, 9:8, 10:2, 10:10, 10:24, 11:2, 11:8, 11:12, 11:18, 11:23, 12:10, 12:21, 13:7, 13:10, 13:13, 13:24, 14:2, 14:5, 14:24, 16:4, 16:8, 16:16, 17:3, 17:8, 17:16, 17:19, 17:23, 18:7, 18:11, 18:16, 18:22, 19:2, 19:4, 19:10, 20:2, 21:21, 22:12, 22:17, 22:20, 23:6, 23:13, 23:16, 24:8, 24:12, 25:2, 25:7, 25:10, 25:14, 25:19, 26:2, 26:21, 27:5, 27:16, 27:23, 28:12, 28:17, 29:7, 29:10, 29:14, 29:21, 30:1, 30:16, 30:21, 30:23, 31:1, 31:8, 31:11, 31:15, 31:19,

31:23, 32:16, 32:19, 32:22, 33:3, 33:7, 33:22, 34:9, 34:11, 34:19, 35:1, 35:3, 35:6, 35:9, 35:11, 35:13, 35:17, 35:20, 35:22, 35:24, 36:1, 36:3, 36:21, 36:25, 37:5, 37:7, 37:13, 37:16, 37:23, 38:4, 38:10, 38:15, 39:8, 39:10, 39:13, 39:21, 39:24, 40:4, 40:42, 41:5, 41:8, 42:4, 42:12, 42:15, 42:17, 42:19, 42:25, 43:3, 43:6, 43:8, 43:23, 44:2, 44:5, 44:9, 44:12, 44:16, 44:22, 45:1, 45:3, 46:14, 46:20, 46:24, 47:3, 47:19, 47:22, 48:17, 48:23, 49:1, 49:19, 49:24, 50:5, 50:16, 50:24, 51:2, 51:22, 51:24, 52:13, 52:17, 52:19, 52:21, 53:1, 53:5, 53:12, 53:16, 53:22, 53:24, 54:3, 54:13, 55:2, 55:4, 55:13, 55:20, 56:7, 57:12, 57:18, 57:20, 61:5, 61:8, 61:12, 63:16, 63:24, 64:3, 64:20, 65:2, 65:13, 66:4, 66:6, 66:16, 66:22, 67:1, 67:9
**MS** [1] - 10:18
**must** [3] - 4:8, 9:2, 47:17

## N

**name** [2] - 3:24, 6:17
**NANCY** [1] - 2:3
**Nancy** [1] - 3:4
**narrow** [2] - 4:16, 21:4
**natural** [1] - 4:13
**necessarily** [1] - 53:20
**necessary** [3] - 21:13, 62:15, 62:21
**necessity** [4] - 56:3, 58:5, 59:10, 59:17
**need** [21] - 9:14, 15:10, 15:20, 17:5, 17:10, 17:13, 18:17, 21:23, 23:24, 32:1, 32:2, 32:3, 41:3, 44:24, 48:5, 48:6, 48:8, 51:7, 56:17,

58:14, 60:20
**needed** [6] - 7:20, 46:25, 51:7, 51:18, 51:19, 60:20
**needs** [3] - 34:23, 41:20, 51:6
**negating** [1] - 22:2
**negotiate** [2] - 24:3, 39:4
**negotiated** [1] - 64:14
**negotiating** [1] - 49:12
**neighboring** [3] - 39:17, 40:6, 40:11
**never** [10] - 12:11, 15:7, 32:15, 45:12, 45:13, 45:15, 47:11, 47:14, 48:2
**new** [1] - 18:4
**news** [1] - 65:4
**Nichols** [1] - 3:2
**NICHOLS** [1] - 1:21
**nobody** [1] - 12:20
**non** [1] - 4:21
**non-compensable** [1] - 4:21
**none** [1] - 60:5
**North** [1] - 1:15
**note** [1] - 57:23
**Note** [1] - 63:12
**notes** [1] - 67:12
**nothing** [5] - 11:18, 11:19, 17:9, 42:2, 43:18, 66:22
**notified** [1] - 65:2
**nuclear** [4] - 41:17, 41:18, 41:23, 42:1
**nuisance** [13] - 28:5, 28:9, 28:10, 28:13, 28:14, 28:19, 28:20, 28:23, 28:24, 29:2, 29:4, 56:3, 59:11
**number** [2] - 36:6, 37:20
**Number** [1] - 36:12
**numerous** [1] - 57:13
**Nursery** [1] - 57:25

## O

**obligated** [6] - 30:19, 33:17, 47:16, 62:9, 62:14, 64:8
**obligation** [24] - 30:14, 31:25, 32:1, 32:10, 32:21, 32:24, 33:4, 36:15, 36:17, 37:8, 37:9, 45:20, 45:23, 46:4, 46:16, 49:17, 49:23, 50:4, 50:12, 50:18, 53:15,

53:20, 54:12, 61:17
**obligations** [3] -
41:12, 47:13, 63:4
**obviously** [1] - 39:19
**occur** [2] - 21:7, 51:5
**occurred** [1] - 25:25
**odd** [1] - 7:16
**Odello** [1] - 59:24
**OF** [2] - 1:2, 1:11
**OFFICE** [2] - 2:13,
2:16
**often** [2] - 28:7, 59:8
**Oil** [1] - 33:1
**oil** [5] - 25:6, 25:24,
26:11, 43:5, 63:22
**once** [6] - 9:5, 9:9,
13:2, 25:16, 26:10,
47:12
**one** [27] - 5:8, 5:10,
5:11, 7:2, 8:7, 12:11,
20:8, 26:24, 29:3,
31:5, 36:12, 41:20,
44:4, 44:7, 47:6,
48:23, 49:7, 57:5,
58:3, 58:16, 58:25,
59:19, 60:5, 60:8,
65:17, 65:24, 66:18
**one's** [1] - 8:7
**ongoing** [1] - 66:9
**open** [1] - 65:17
**operate** [5] - 46:6,
47:1, 53:7, 53:9,
63:21
**operated** [5] - 38:16,
38:17, 40:24, 45:11,
54:1
**operation** [9] - 37:24,
41:11, 41:12, 43:12,
44:19, 50:21, 51:5,
59:22, 62:20
**operational** [1] - 26:8
**operations** [3] - 9:6,
9:10, 26:13
**operator** [3] - 34:1,
53:21, 62:3
**opinion** [9] - 27:21,
29:8, 30:3, 30:24,
55:1, 58:2, 61:21,
62:5, 62:19
**opponents** [1] - 46:2
**opportunity** [2] -
29:13, 29:19
**opposing** [1] - 65:3
**Oral** [1] - 1:17
**order** [3] - 30:6, 42:1,
61:15
**Order** [5] - 31:4,
32:24, 33:3, 61:14
**Oroville** [1] - 59:24
**otherwise** [2] - 18:21,

44:25
**outset** [1] - 26:16
**outside** [1] - 62:25
**overall** [1] - 65:11
**overrode** [1] - 36:16
**oversimplifying** [1] -
8:2
**overt** [2] - 58:6, 58:9
**owed** [3] - 56:12,
58:24, 59:15
**own** [2] - 10:6, 40:22
**owned** [2] - 25:1,
38:22
**owner** [4] - 40:18,
40:20, 57:2, 63:18
**owner's** [1] - 29:3
**ownership** [1] - 23:24

## P

**page** [1] - 49:16
**Page** [5] - 5:24, 16:11,
61:19, 62:3, 63:12
**Pages** [1] - 31:2
**paid** [6] - 23:8, 23:9,
24:9, 52:20, 52:23,
52:24
**papers** [1] - 27:25
**paradigmatic** [1] -
58:22
**part** [7] - 7:6, 19:6,
19:16, 30:16, 35:10,
49:17, 50:4
**parties** [2] - 6:5, 14:25
**partners** [1] - 10:17
**party** [9] - 6:9, 10:6,
11:15, 12:5, 12:7,
25:1, 29:2, 41:25
**pay** [20] - 15:9, 21:22,
24:6, 24:17, 26:12,
28:10, 33:14, 37:18,
48:20, 52:11, 52:25,
53:4, 54:6, 55:12,
57:14, 57:16, 61:1,
62:24, 64:16, 64:17
**paying** [2] - 24:16,
33:19
**payment** [1] - 15:1
**PEMBERTON** [1] - 2:4
**pending** [2] - 26:3,
66:2
**people** [6] - 7:21,
8:12, 12:22, 28:10,
43:11, 58:9
**PEPPER** [1] - 2:7
**Pepper** [1] - 3:10
**percent** [1] - 26:6
**peril** [3] - 4:18, 9:1,
9:2
**period** [3] - 46:18,

52:14, 52:21
**periodically** [1] -
22:21
**permanent** [1] - 49:20
**permanently** [1] - 5:1
**permit** [3] - 43:9,
43:12, 63:21
**permits** [3] - 25:16,
43:9, 63:24
**permitted** [1] - 21:16
**permitting** [3] - 4:10,
25:17, 26:7
**person** [2] - 6:15, 58:6
**persons** [1] - 58:17
**Phase** [5] - 33:23,
34:2, 34:3, 62:13,
62:24
**piece** [8] - 38:11,
38:13, 40:1, 40:6,
40:11, 40:14, 42:7,
65:20
**pipe** [1] - 22:8
**pipeline** [12] - 24:24,
25:1, 25:4, 25:13,
26:4, 26:8, 27:13,
43:2, 65:23, 66:21,
67:3, 67:6
**pipelines** [1] - 25:2
**place** [6] - 11:24,
12:23, 13:2, 13:19,
14:16, 20:5
**places** [1] - 28:23
**Plain** [1] - 66:21
**Plains** [7] - 25:1, 25:2,
25:4, 25:12, 26:4,
26:7, 65:23
**planning** [1] - 59:22
**plant** [1] - 8:12, 10:7,
10:22, 11:5, 11:7,
11:16, 12:20, 41:18,
41:23, 42:2
**Plant** [2] - 26:19, 27:1
**Platform** [15] - 23:1,
23:19, 26:19, 27:7,
28:25, 38:24, 40:13,
40:20, 42:13, 42:24,
43:2, 43:20, 44:20,
64:4, 66:10
**platform** [4] - 27:13,
37:15, 38:14, 52:1
**played** [1] - 41:11
**Plug** [1] - 48:4
**plug** [35] - 18:25, 30:6,
30:11, 30:19, 32:1,
33:4, 36:15, 37:1,
37:9, 37:23, 43:22,
45:20, 45:25, 46:4,
46:7, 46:12, 47:16,
47:20, 47:22, 48:16,
49:4, 49:18, 49:19,

49:25, 50:1, 50:7,
50:18, 51:16, 53:15,
61:23, 62:9, 62:14,
62:22
**plugged** [10] - 5:1,
17:14, 18:2, 18:5,
18:10, 18:20, 37:4,
44:23, 46:2, 54:1
**plugging** [30] - 4:5,
6:1, 15:18, 15:23,
16:10, 16:14, 16:19,
16:22, 16:23, 17:8,
18:12, 19:6, 19:17,
19:21, 19:25, 21:14,
22:16, 22:17, 22:25,
23:18, 23:23, 32:11,
33:14, 33:17, 34:6,
46:24, 51:4, 61:15,
62:7, 65:1
**Point** [1] - 57:25
**point** [30] - 12:17,
14:10, 14:17, 14:22,
15:14, 18:14, 19:4,
19:20, 20:2, 20:11,
22:9, 24:12, 26:11,
30:5, 31:16, 37:16,
38:15, 40:23, 43:14,
44:14, 44:18, 45:4,
47:19, 48:20, 49:7,
51:17, 59:18, 62:17,
63:8, 65:8
**pointed** [1] - 28:18
**pointing** [1] - 28:17
**points** [4] - 3:25,
13:13, 61:10, 61:12
**police** [25] - 4:8, 4:15,
8:23, 9:17, 9:18,
9:22, 15:2, 20:13,
20:14, 24:18, 24:20,
28:7, 32:4, 32:7,
32:9, 33:19, 34:20,
40:8, 57:8, 57:9,
58:21, 58:23, 59:8,
59:13, 61:1
**political** [1] - 4:14
**pollutants** [1] - 56:24
**portion** [1] - 45:20
**posed** [2] - 45:15,
60:15
**position** [9] - 13:5,
13:11, 42:5, 47:3,
50:7, 50:10, 51:3,
54:7, 54:9
**potential** [6] - 18:22,
18:23, 18:24, 19:15,
25:22, 51:12
**potentiality** [1] - 22:18
**potentially** [1] - 66:15
**power** [25] - 9:22,
15:2, 24:18, 24:20,

31:21, 32:4, 32:7,
32:9, 33:19, 34:20,
40:8, 41:18, 41:23,
42:1, 46:5, 55:16,
57:8, 57:10, 57:14,
58:21, 58:23, 59:8,
59:13, 61:1
**powers** [7] - 4:8, 8:23,
9:18, 9:19, 20:13,
20:15, 28:7
**practical** [1] - 8:10
**preceding** [1] - 62:2
**precluded** [1] - 25:23
**predecessor** [1] - 30:9
**prerogative** [1] - 44:6
**present** [3] - 3:25,
54:22, 54:24
**presentation** [5] - 3:5,
3:13, 3:21, 36:6,
36:11
**presented** [10] - 27:3,
27:6, 29:15, 40:7,
45:5, 45:6, 62:1,
62:6, 62:11
**preserved** [1] - 30:14
**presiding** [1] - 2:22
**pretty** [1] - 48:12
**prevent** [2] - 22:13,
40:8, 43:19
**prevented** [1] - 11:18
**primarily** [2] - 5:7, 7:5
**principle** [3] - 55:21,
58:10, 59:12
**principles** [2] - 58:3,
58:4
**private** [4] - 4:11,
56:8, 57:6, 58:5
**Pro** [1] - 1:7
**problem** [13] - 12:8,
18:20, 26:10, 29:4,
38:2, 38:5, 42:2,
42:3, 43:16, 45:3,
47:21, 51:10, 55:3
**proceeding** [1] - 67:13
**proceedings** [1] -
34:14
**PROCEEDINGS** [1] -
2:18
**process** [13] - 15:24,
16:10, 16:22, 16:24,
17:9, 17:24, 18:13,
19:6, 19:18, 19:25,
63:22, 64:5, 66:13
**produced** [1] - 27:12
**producing** [2] - 22:1,
25:5
**product** [1] - 25:9
**production** [2] -
17:15, 66:12
**prominent** [1] - 28:4

**promised** [1] - 46:3
**pronounce** [1] - 6:15
**proof** [1] - 56:4
**properly** [4] - 36:13, 45:15, 50:8, 57:2
**properties** [5] - 26:18, 27:7, 28:2, 29:17, 30:3
**property** [67] - 4:11, 26:23, 27:1, 28:10, 28:12, 28:19, 28:20, 29:3, 32:13, 38:8, 38:12, 38:13, 39:18, 39:19, 39:20, 39:23, 40:1, 40:3, 40:4, 40:6, 40:8, 40:11, 40:14, 40:15, 40:17, 40:18, 40:19, 40:24, 42:7, 55:7, 55:11, 55:12, 55:25, 56:8, 56:10, 56:11, 56:20, 56:24, 57:2, 57:3, 57:6, 58:3, 58:4, 58:8, 58:11, 58:13, 58:17, 58:19, 58:20, 59:7, 60:6, 60:23, 61:2, 63:6, 63:10, 63:11, 63:19, 63:20, 65:3, 65:7
**proposal** [1] - 67:3
**proposition** [3] - 51:6, 56:12, 61:3
**prosecuted** [1] - 8:13
**protect** [3] - 9:15, 17:6, 17:10
**prove** [2] - 56:25, 57:1
**provide** [4] - 21:12, 48:6, 49:10, 49:16
**provision** [1] - 36:22
**public** [12] - 8:25, 9:15, 17:6, 55:25, 56:8, 58:5, 59:20, 59:23, 60:1, 60:2, 60:7, 60:21
**Public** [2] - 33:8, 62:10
**public's** [3] - 4:2, 9:5, 9:9
**punishing** [1] - 12:1
**purpose** [2] - 28:13, 64:1
**pursuant** [1] - 59:7
**put** [8] - 11:10, 12:23, 13:19, 22:5, 24:1, 24:15, 50:8, 64:13

### Q

**questioned** [1] - 57:24
**questions** [4] - 34:11,

36:9, 44:11, 61:6
**quitclaim** [12] - 21:17, 21:19, 21:20, 21:25, 22:10, 22:14, 27:2, 27:7, 36:13, 36:14, 36:23, 37:3
**quitclaimed** [2] - 21:15, 64:8
**quite** [1] - 36:8
**quote** [2] - 58:25, 59:5
**quoting** [1] - 58:4, 58:6, 59:3

### R

**raise** [3] - 29:12, 32:17, 38:21
**raised** [3] - 27:24, 36:10, 38:21
**raising** [1] - 44:14
**rather** [3] - 32:12, 33:19, 48:13
**Re** [1] - 1:4
**reach** [2] - 14:25, 33:21
**reactions** [1] - 42:14
**read** [1] - 9:7
**Real** [1] - 67:14
**real** [1] - 19:13
**Real-Time** [1] - 67:14
**really** [19] - 12:13, 14:13, 15:4, 19:14, 19:21, 24:12, 26:16, 26:18, 26:22, 27:25, 28:3, 29:1, 29:15, 35:5, 38:21, 39:9, 41:7, 59:17, 60:2
**reason** [7] - 25:20, 33:13, 45:7, 48:19, 48:23, 48:24, 65:25
**reasonable** [2] - 4:6, 25:15
**reasonably** [1] - 58:18
**rebuttal** [2] - 61:9, 61:10
**recent** [1] - 57:25
**recently** [1] - 65:5
**recessed** [1] - 67:10
**recognize** [1] - 26:18
**recognized** [1] - 62:4
**recollection** [1] - 10:15
**reconstructed** [1] - 67:3
**record** [17] - 3:2, 8:7, 16:11, 23:20, 23:21, 24:2, 26:6, 33:24, 44:13, 45:16, 47:5, 52:10, 52:23, 53:3, 53:7, 61:18, 62:3

**records** [1] - 65:19
**recourse** [1] - 26:14
**reference** [1] - 61:22
**referenced** [3] - 61:20, 62:16, 65:24
**reflect** [1] - 44:13
**regarding** [1] - 14:25
**regardless** [1] - 16:18
**regulations** [1] - 48:11
**Reimbursement** [6] - 11:21, 12:22, 13:15, 14:7, 14:13, 15:12
**related** [3] - 65:19, 65:22, 66:10
**relates** [1] - 65:19
**relation** [1] - 41:22
**releases** [1] - 65:4
**relevant** [3] - 6:14, 40:6, 41:2
**relied** [1] - 7:3
**relief** [1] - 34:17
**remaining** [2] - 56:10, 58:19
**remains** [1] - 65:17
**remand** [4] - 34:13, 34:18, 34:19, 34:23
**remedy** [7] - 28:20, 29:4, 41:13, 41:16, 42:1, 56:8, 60:7
**remedying** [1] - 28:13
**remember** [2] - 6:17, 12:10
**reminding** [1] - 61:16
**REMMING** [3] - 1:21, 3:1, 3:8
**Remming** [1] - 3:2
**remove** [3] - 56:24, 64:5, 65:6
**render** [1] - 42:16
**rendered** [1] - 37:4
**rental** [1] - 24:9
**repeat** [1] - 16:6
**reply** [6] - 26:15, 27:19, 28:18, 29:6, 54:22, 63:11
**REPORTER** [1] - 31:7
**Reporter** [1] - 67:14
**represent** [2] - 37:20, 51:16
**request** [1] - 34:12
**require** [8] - 8:21, 20:22, 32:2, 34:6, 43:9, 46:4, 46:6, 53:20
**required** [16] - 21:12, 28:5, 30:11, 30:20, 34:21, 47:10, 52:3, 52:25, 54:6, 62:18, 62:23, 62:24, 63:22, 64:9, 64:10

**requirement** [8] - 4:11, 15:15, 20:25, 21:2, 21:22, 28:14, 43:13, 59:4
**requirements** [1] - 20:9
**requires** [8] - 8:24, 9:1, 20:16, 33:18, 36:25, 50:7, 56:19, 59:8
**requiring** [1] - 62:18
**reserved** [3] - 34:3, 34:5, 62:12
**resolve** [1] - 44:2
**resolved** [3] - 20:4, 34:2, 56:11
**Resources** [3] - 33:2, 33:8, 62:10
**respect** [2] - 41:12, 42:6
**responsible** [2] - 12:18, 59:23
**rest** [1] - 5:9
**restate** [1] - 5:20
**result** [6] - 25:5, 32:24, 45:15, 45:23, 55:5, 59:14
**resulting** [1] - 59:24
**retroactive** [1] - 15:3
**reverse** [1] - 34:12
**review** [1] - 59:19
**rid** [1] - 57:6
**rights** [9] - 21:17, 23:25, 30:14, 34:3, 34:4, 34:5, 52:7, 62:12, 63:7
**rise** [1] - 2:20
**Rishe** [1] - 3:20
**RISHE** [1] - 2:16
**risk** [6] - 40:8, 40:14, 55:25, 56:8, 58:17, 60:21
**role** [1] - 41:11
**room** [1] - 55:15
**Rose** [1] - 60:9
**ROSENTHAL** [90] - 2:10, 13:7, 35:3, 35:6, 35:9, 35:11, 35:13, 35:20, 35:22, 35:24, 36:1, 36:3, 36:21, 36:25, 37:5, 37:7, 37:13, 37:16, 37:23, 38:4, 38:10, 38:15, 39:8, 39:10, 39:13, 39:21, 39:24, 40:4, 40:22, 41:5, 41:8, 42:4, 42:12, 42:15, 42:17, 42:19, 42:25, 43:3, 43:6, 43:8, 43:23, 44:2,

44:5, 44:9, 44:12, 44:16, 44:22, 45:1, 45:3, 46:14, 46:20, 46:24, 47:3, 47:19, 47:22, 48:17, 48:23, 49:1, 49:19, 49:24, 50:5, 50:16, 50:24, 51:2, 51:22, 51:24, 52:13, 52:17, 52:19, 52:21, 53:1, 53:5, 53:12, 53:16, 53:22, 53:24, 54:3, 54:13, 55:2, 55:4, 55:13, 55:20, 56:7, 57:12, 57:18, 57:20, 61:5, 65:2, 66:22, 67:1
**Rosenthal** [4] - 3:12, 3:13, 35:2, 35:3
**rule** [2] - 20:25, 59:6
**Rule** [1] - 52:16
**running** [4] - 9:15, 17:6, 17:10, 52:2
**runs** [1] - 31:1
**rupture** [5] - 25:24, 65:23, 66:1, 66:2, 66:3, 66:9
**ruptured** [2] - 25:3, 25:4

### S

**safe** [2] - 37:4, 42:16
**safely** [11] - 37:1, 49:18, 49:20, 50:1, 50:7, 50:18, 51:4, 53:15, 54:1, 54:5, 62:22
**safety** [10] - 4:2, 8:25, 9:5, 9:9, 50:19, 50:20, 56:1, 56:9, 60:7, 60:21
**SANDERS** [1] - 2:7
**satisfied** [2] - 21:2, 54:19
**scope** [1] - 62:25
**sea** [1] - 50:9
**seated** [2] - 2:24, 65:10
**second** [7] - 4:4, 4:18, 4:24, 30:25, 31:5, 37:16, 64:18
**secondary** [1] - 19:16
**security** [1] - 21:12
**see** [9] - 14:4, 21:24, 27:20, 38:20, 40:16, 48:8, 53:22, 54:19
**seeking** [1] - 54:11
**seeped** [1] - 39:19
**seeps** [1] - 39:22
**sense** [1] - 4:13

**separate** [7] - 7:24, 17:9, 18:11, 26:3, 27:6, 28:2, 29:17
**separately** [1] - 38:23
**September** [11] - 9:6, 9:10, 12:24, 13:6, 13:9, 13:19, 14:8, 14:15, 14:20, 15:13, 20:4
**serious** [1] - 58:6
**set** [4] - 23:17, 47:10, 47:11, 49:25
**settle** [2] - 24:7, 52:13
**Settlement** [8] - 45:16, 45:23, 49:5, 49:8, 49:9, 49:11, 49:13, 49:15
**settlement** [1] - 52:16
**several** [1] - 28:22
**shifted** [1] - 64:15
**show** [1] - 62:8
**shows** [1] - 9:21
**shut** [5] - 8:4, 39:1, 43:1, 66:10, 66:11
**shut-in** [2] - 66:10, 66:11
**sickness** [1] - 17:22
**side** [1] - 52:1
**signed** [3] - 13:8, 13:15, 15:12
**simply** [7] - 12:12, 15:8, 19:7, 24:15, 45:16, 62:20, 63:1
**site** [3] - 54:18, 65:5, 65:6
**situation** [16] - 9:2, 9:18, 20:16, 20:19, 20:20, 21:7, 21:10, 22:3, 25:23, 41:20, 41:21, 51:11, 51:14, 55:17, 63:18, 63:23
**so-called** [1] - 59:3
**solution** [2] - 51:18, 51:19
**someone** [6] - 7:20, 28:19, 44:23, 46:25, 53:7, 54:3
**sophisticated** [1] - 47:13
**sorry** [6] - 8:19, 26:19, 30:22, 36:21, 39:21, 39:24
**sought** [1] - 10:5
**sounded** [1] - 50:15
**sounds** [1] - 12:2
**source** [2] - 40:5, 43:17
**sovereign** [4] - 35:6, 35:12, 35:14, 35:18
**specific** [1] - 59:5

**specifically** [2] - 23:17, 34:4
**spent** [2] - 23:4, 23:8
**squarely** [4] - 29:11, 29:12, 30:2, 32:18
**staffed** [1] - 15:20
**stand** [1] - 55:15
**standpoint** [1] - 26:9
**start** [1] - 54:15
**started** [1] - 66:12
**STATE** [2] - 1:11, 1:11
**State** [90] - 2:12, 2:17, 3:10, 3:18, 3:20, 3:21, 7:3, 10:5, 11:9, 11:10, 11:11, 12:1, 12:5, 12:11, 12:16, 12:18, 12:21, 14:15, 20:5, 22:2, 22:10, 22:15, 22:17, 23:8, 23:22, 24:4, 24:13, 25:22, 25:23, 26:10, 26:17, 27:2, 29:1, 29:2, 30:19, 31:20, 31:24, 32:4, 32:6, 32:12, 32:25, 33:10, 33:19, 33:21, 33:22, 36:4, 36:5, 37:25, 38:2, 38:7, 38:10, 40:7, 40:20, 41:2, 41:10, 43:10, 43:18, 44:24, 45:17, 45:22, 45:25, 46:5, 47:23, 48:6, 48:16, 51:6, 51:14, 54:10, 55:16, 55:24, 56:7, 56:19, 59:21, 59:23, 60:1, 63:1, 63:3, 63:4, 63:5, 64:6, 64:7, 64:12, 64:15, 66:19, 66:20, 66:23, 66:24
**state** [2] - 8:18, 36:16
**State's** [9] - 9:5, 9:9, 23:4, 23:11, 26:23, 28:4, 28:22, 32:9, 63:16
**STATES** [1] - 1:1
**States** [2] - 2:21, 56:13
**status** [1] - 65:11
**statute** [5] - 30:10, 31:12, 32:1, 33:7, 36:17
**Statute** [1] - 56:22
**statutorily** [1] - 30:19
**statutory** [1] - 47:8
**stenographic** [1] - 67:12
**step** [7] - 5:14, 5:24, 6:1, 6:11, 6:12, 9:23, 64:8

**STEPHANI** [1] - 2:3
**Stephani** [1] - 3:5
**stepping** [1] - 6:4
**STEVEN** [1] - 2:10
**Steven** [1] - 3:12
**still** [4] - 34:5, 51:10, 54:17, 66:2
**stop** [10] - 11:3, 13:16, 18:13, 19:7, 19:10, 19:23, 19:24, 43:21, 48:8
**stopped** [1] - 17:19
**storage** [1] - 65:18
**Street** [1] - 1:15
**strikes** [1] - 7:16
**subgroup** [1] - 56:17
**subgroups** [1] - 59:11
**subject** [1] - 49:11
**submit** [3] - 40:10, 59:12, 60:24
**subscribe** [1] - 42:5
**substantial** [2] - 8:25, 60:13
**substantially** [1] - 65:15
**sudden** [3] - 22:6, 22:8, 41:18
**sufficient** [2] - 13:16, 22:25
**suggest** [1] - 46:10
**suggesting** [1] - 48:12
**suggests** [1] - 25:21
**sulfide** [7] - 9:16, 17:11, 19:20, 19:25, 20:7, 27:12, 64:5
**summary** [1] - 27:25
**Superfund** [1] - 56:22
**support** [2] - 51:6, 51:8
**suppose** [3] - 38:22, 41:17, 66:8
**Supreme** [8] - 56:13, 56:14, 57:22, 57:23, 58:1, 58:2, 58:7, 59:1
**suspect** [1] - 8:16
**syllogism** [3] - 50:22, 50:23, 51:3

**T**

**table** [1] - 3:3
**taker** [1] - 40:18
**takings** [7] - 4:11, 26:25, 46:12, 46:18, 55:24, 57:5, 58:1
**TALIAFERRO** [1] - 2:11
**talks** [2] - 28:23, 28:24
**TALMO** [1] - 1:22

**tee** [1] - 30:2
**ten** [3] - 48:1, 50:6, 52:2
**ten-year** [1] - 50:6
**term** [1] - 20:17
**terms** [4] - 29:15, 36:17, 49:10, 49:15
**testified** [2] - 24:2, 64:14
**testimony** [1] - 60:13
**THE** [206] - 1:1, 1:2, 1:19, 2:23, 3:7, 3:15, 3:22, 5:4, 5:10, 5:18, 5:25, 6:3, 6:8, 6:11, 6:19, 6:21, 6:24, 7:2, 7:6, 7:9, 7:13, 7:15, 8:2, 8:8, 8:19, 9:7, 9:23, 10:3, 10:13, 10:19, 10:25, 11:3, 11:9, 11:13, 11:22, 11:25, 12:15, 13:5, 13:8, 13:11, 13:22, 13:25, 14:4, 14:23, 16:1, 16:5, 16:12, 17:1, 17:7, 17:12, 17:17, 17:20, 17:25, 18:8, 18:15, 18:19, 18:23, 19:3, 19:9, 20:1, 21:18, 22:4, 22:16, 22:19, 23:2, 23:11, 23:14, 24:6, 24:11, 24:22, 25:4, 25:8, 25:12, 25:18, 25:20, 26:15, 26:22, 27:14, 27:17, 28:9, 28:16, 29:5, 29:8, 29:12, 29:18, 29:25, 30:15, 30:17, 30:22, 30:25, 31:3, 31:7, 31:10, 31:13, 31:16, 31:20, 32:14, 32:17, 32:20, 32:23, 33:6, 33:20, 34:8, 34:10, 34:15, 34:25, 35:2, 35:5, 35:8, 35:10, 35:12, 35:16, 35:19, 35:21, 35:23, 35:25, 36:2, 36:18, 36:24, 37:3, 37:6, 37:12, 37:14, 37:22, 38:1, 38:6, 38:13, 38:19, 39:9, 39:11, 39:20, 39:22, 40:3, 40:16, 40:25, 41:6, 41:9, 42:10, 42:13, 42:16, 42:18, 42:22, 43:1, 43:4, 43:7, 43:21, 43:25, 44:4, 44:7, 44:10, 44:13, 44:18, 44:23, 45:2, 46:10,

46:15, 46:22, 47:2, 47:15, 47:20, 48:8, 48:18, 48:25, 49:17, 49:22, 50:1, 50:14, 50:17, 50:25, 51:20, 51:23, 52:11, 52:15, 52:18, 52:20, 52:22, 53:2, 53:11, 53:14, 53:17, 53:23, 53:25, 54:9, 54:25, 55:3, 55:9, 55:14, 56:5, 57:9, 57:16, 57:19, 61:4, 61:7, 61:10, 63:14, 63:21, 64:1, 64:18, 64:21, 65:9, 66:1, 66:5, 66:14, 66:18, 66:24, 67:7
**theory** [1] - 41:24
**therefore** [8] - 15:9, 19:21, 20:10, 32:8, 36:8, 37:2, 37:21, 46:6
**therefrom** [1] - 59:24
**they've** [1] - 11:13
**third** [8] - 6:5, 6:9, 10:6, 11:15, 12:5, 12:7, 41:25
**third-party** [1] - 41:25
**threat** [29] - 4:2, 7:4, 8:25, 9:4, 9:8, 11:4, 13:1, 13:6, 13:12, 13:17, 14:6, 14:11, 14:16, 14:19, 14:21, 15:14, 17:22, 17:23, 18:10, 19:13, 19:14, 19:17, 19:19, 20:3, 20:6, 20:10, 50:19, 50:21
**threatened** [2] - 4:23, 9:12
**three** [3] - 33:25, 36:10, 61:12
**tied** [1] - 37:14
**title** [1] - 27:9
**TNA** [1] - 48:2
**to..** [1] - 5:25
**today** [7] - 3:3, 3:6, 3:25, 45:9, 51:18, 51:20, 51:21
**together** [2] - 11:10, 29:1
**took** [3] - 10:7, 12:23, 14:13
**total** [1] - 37:19
**totally** [1] - 5:4
**trace** [1] - 40:5
**traced** [1] - 39:18
**traditional** [1] - 4:13
**transcript** [1] - 67:12
**transformed** [1] -

17:21
**treat** [3] - 19:11, 43:10, 47:17
**treatment** [2] - 17:24, 19:7
**Trial** [4] - 45:14, 54:24, 54:25, 60:18
**trial** [3] - 27:25, 36:7, 51:17
**tried** [1] - 25:14
**trigger** [1] - 8:22
**triggered** [1] - 9:19
**Triozzi** [1] - 67:14
**trouble** [1] - 25:6
**TROUTMAN** [1] - 2:7
**Troutman** [1] - 3:10
**true** [4] - 17:17, 60:22, 60:23, 67:11
**Trust** [5] - 1:8, 2:5, 3:3, 34:22, 62:24
**trust** [1] - 3:6
**Trustee** [12] - 1:7, 34:22, 46:3, 55:19, 56:2, 62:1, 62:6, 62:8, 62:11, 65:3, 65:14, 65:21
**try** [2] - 25:12, 52:13
**trying** [8] - 19:20, 27:20, 27:22, 29:18, 41:4, 43:14, 53:12, 60:1
**TUNNELL** [1] - 1:21
**turned** [3] - 47:23, 50:12, 54:14
**turning** [2] - 15:18, 30:5
**twenty** [1] - 23:13
**twenty-two** [1] - 23:13
**two** [12] - 3:25, 4:17, 13:13, 14:19, 23:13, 26:18, 27:6, 28:1, 29:16, 30:3, 51:25, 57:22
**type** [1] - 28:7

**U**

**U.S** [2] - 2:13, 67:15
**U.S.D.C.J** [1] - 1:19
**ultimate** [2] - 40:5, 43:17
**ultimately** [4] - 26:23, 50:19, 54:23, 55:8
**unable** [3] - 30:12, 30:20, 62:7
**under** [13] - 22:15, 32:1, 33:10, 33:16, 41:24, 43:12, 56:22, 57:5, 59:8, 59:21, 62:9, 63:21, 64:6

**underestimated** [1] - 38:2
**underground** [1] - 40:5
**underlining** [1] - 60:16
**underlying** [2] - 27:5, 45:20
**underscore** [1] - 45:6
**undertook** [1] - 45:25
**undisputed** [9] - 27:6, 27:11, 31:9, 32:21, 48:13, 48:14, 52:18, 52:22
**unexpected** [1] - 20:22
**unforeseeability** [2] - 5:16, 59:17
**unforeseeable** [4] - 4:9, 4:18, 5:3, 21:8
**unforeseen** [7] - 20:14, 20:15, 20:16, 20:19, 20:20, 20:25, 21:2
**unfortunately** [2] - 44:7, 44:10
**unified** [2] - 40:24, 43:12
**unilaterally** [1] - 21:17
**UNITED** [1] - 1:1
**United** [2] - 2:20, 56:13
**unless** [4] - 17:17, 34:11, 37:4, 61:5
**unmanned** [12] - 4:23, 9:13, 10:3, 10:22, 11:5, 11:6, 14:12, 14:17, 19:16, 19:19, 20:3, 39:2
**unnecessary** [2] - 18:15, 18:16
**unreasonable** [1] - 32:8
**unsafe** [1] - 38:12
**untreated** [1] - 42:20
**up** [11] - 9:15, 12:1, 17:6, 17:10, 22:23, 28:3, 30:2, 49:4, 50:2, 54:15, 55:15
**urgency** [1] - 12:23

**V**

**vacant** [1] - 8:12
**valid** [2] - 32:9, 59:7
**value** [2] - 22:2, 24:9
**VENOCO** [1] - 1:5
**Venoco** [35] - 1:8, 2:5, 3:2, 4:22, 6:25, 7:11, 7:22, 9:12, 10:1,

11:20, 12:11, 14:12, 15:7, 15:8, 21:12, 21:15, 22:22, 26:10, 26:24, 27:2, 27:9, 30:12, 30:13, 30:20, 30:21, 30:22, 33:11, 33:14, 38:16, 38:23, 40:23, 61:17, 61:22, 62:6, 63:22
**Venoco's** [1] - 30:9
**versus** [1] - 18:24
**via** [1] - 18:3
**viewed** [1] - 43:15
**violation** [1] - 8:18
**voice** [1] - 44:14

**W**

**Wait** [1] - 33:25
**wait** [8] - 13:22, 16:1, 17:1, 52:15, 53:11, 66:1
**walked** [2] - 8:11, 10:7
**walking** [1] - 22:11
**wants** [1] - 56:2
**WARREN** [1] - 2:2
**Warren** [2] - 3:4, 3:25
**wars** [1] - 4:14
**weakest** [1] - 38:20
**weakness** [1] - 47:3
**Wednesday** [1] - 1:16
**wells** [54] - 4:5, 4:25, 15:19, 16:15, 17:14, 18:2, 18:5, 18:9, 18:19, 21:15, 22:25, 23:18, 25:6, 26:22, 27:1, 27:7, 27:12, 28:25, 30:7, 30:19, 31:18, 33:24, 33:25, 34:1, 36:15, 37:14, 38:14, 38:16, 38:23, 40:20, 41:11, 41:12, 41:14, 42:13, 42:24, 43:19, 44:19, 44:23, 45:21, 47:16, 47:20, 49:2, 50:18, 50:20, 53:15, 53:25, 54:6, 54:15, 54:23, 55:3, 63:16, 64:4, 64:8
**West** [12] - 6:6, 7:7, 7:8, 7:11, 7:24, 12:25, 13:9, 13:18, 14:9, 14:15, 15:13, 20:4
**whatsoever** [1] - 39:7
**whole** [4] - 23:12, 27:10, 40:24, 64:1
**willing** [2] - 47:22, 53:9
**Wilmington** [1] - 1:15

**witness** [2] - 45:12, 45:13
**word** [2] - 28:24, 41:15
**words** [4] - 21:19, 24:25, 48:19, 59:5
**workers** [1] - 7:22
**works** [2] - 59:20, 60:1
**worth** [2] - 66:14, 66:16
**worthy** [1] - 7:17
**Wracher** [7] - 6:14, 6:18, 6:19, 6:24, 7:13, 8:3, 8:10
**WRACHER** [1] - 6:21
**write** [1] - 5:22
**wrote** [2] - 61:16, 61:22

**Y**

**year** [3] - 15:1, 24:16, 50:6
**years** [3] - 48:1, 51:15, 52:4
**yelling** [1] - 44:14
**younger** [1] - 10:17